**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

SIERRA CLUB,                              )
85 Second Street, 2nd Floor               )
San Francisco, CA 94105,                  )
                                          )
       Plaintiff,               )
    v.                            )
                                          )
DUKE ENERGY INDIANA, INC.                 )
1000 E. Main Street                       )
Plainfield, IN 46168                      )
                                          )
                                          )   Case No. 1:08-cv-00437-SEB-TAB
CINERGY CORP.,                            )
139 East Fourth Street                    )   Cause: 893 (Environmental)
Cincinnati, OH 45202                      )
                                          )
CINERGY PSI, INC.                         )
1000 E. Main Street                       )
Plainfield, IN 46168                      )
                                          )
PSI ENERGY, INC.,                         )
1000 E. Main Street                       )
Plainfield, IN 46168                      )
                                          )
CINERGY POWER GENERATION                  )
SERVICES, LLC                             )
139 East Fourth Street                    )
Cincinnati, OH 45202                      )
                                          )
                                          )
       Defendants.              )

**FIRST AMENDED COMPLAINT**

Plaintiff, Sierra Club, through the undersigned attorneys, alleges as follows:

**NATURE OF THE ACTION**

1.     This is a civil action brought against Duke Energy Indiana, Inc. ("Duke"),

Cinergy Corp. ("Cinergy"), Cinergy PSI, Inc. ("CPSI"), PSI Energy, Inc. ("PSI") and Cinergy

Power Generation Services, LLC ("CPGS") (collectively, the "Defendants") pursuant to Section 304 of the Clean Air Act ("the Act"), 42 U.S.C. § 7604, for declaratory and injunctive relief and the assessment of civil penalties for violations of the Prevention of Significant Deterioration ("PSD") provisions of the Act, 42 U.S.C. §§ 7470-92.

2.     On numerous occasions, Defendants modified and thereafter operated their coal-fired and oil-fired electric generating units at the Edwardsport Generating Station ("EGS") in Knox County, Indiana, without first obtaining appropriate permits authorizing this construction, without meeting emission limits that are "best available control technology," without demonstrating that emissions from the EGS were not causing air pollution, without applying for or obtaining the appropriate operating permits, and without installing appropriate technology to control emissions, as required by the Act and implementing regulations.

3.     As a result of the Defendants' operation of the EGS following unpermitted, unlawful modifications, and in the absence of appropriate controls, unlawful amounts of various pollutants have been, and continue to be, released into the atmosphere, aggravating air pollution locally and far downwind from these plants.

4.     An order from this Court directing Defendants to obtain the necessary permits, which should require compliance with best available control technology limits, installation of modern pollution controls, and a demonstration to the appropriate regulatory agencies and the public that emissions from the facility will not result in unlawful amounts of air pollution, will improve air quality for millions of Americans, including Sierra Club's member. It will reduce illness and death, increase agricultural yields, decrease damage to historic structures, and protect lakes and streams from further degradation due to the fallout from acid rain and mercury deposition.

5.      Sulfur dioxide, nitrogen oxides, particulate matter, mercury, sulfuric acid mist, carbon dioxide, and other pollutants, when emitted into the air, have substantial adverse environmental and health impacts.

6.      Sulfur dioxide ("$SO_2$") interacts in the atmosphere to form sulfate aerosols, which can be inhaled and cause sickness and mortality from lung and heart disorders, including asthma, bronchitis, and heart attacks.

7.      Nitrogen oxides ("NOx") have adverse effects on human health, human welfare, and the environment. NOx forms ground level ozone, commonly referred to as smog, which is harmful to human health and the environment. Ozone can cause temporary and permanent damage to human lungs, decrease lung capacity, and increased hospital visits.  These effects impact children and the elderly most significantly.  Ozone also causes significant damage to vegetation including agricultural crops.

8.      $SO_2$ and NOx also form acid rain. Acid rain turns lakes and streams acidic, rendering them uninhabitable by aquatic life as well as harming plants, and causes decay of buildings and monuments.

9.      Particulate matter ("PM") is the term for solid or liquid particles in the air. Smaller particulate matter of a diameter of 10 micrometers or less is referred to as $PM_{10}$. Power plants, including the EGS, are major sources of PM and $PM_{10}$.  PM and $PM_{10}$ cause premature death, damage to lungs, cancer, and respiratory disease, especially among the elderly, children, and people with chronic lung disease or asthma.

10.     Particulate matter of a diameter of 2.5 microns or less is referred to as $PM_{2.5}$. $PM_{2.5}$ is known to be harmful to human health and cause premature death, damage to lungs, cancer, and respiratory disease and to cross from the lungs into the circulatory system and to

cause or aggravate heart conditions, heart attacks, and strokes. There is no known safe level of $PM_{2.5}$ in the air.

11.     If Defendants comply with the Clean Air Act, including the Prevention of Significant Deterioration program, 42 U.S.C. §§ 7470-7479, the Edwardsport Generating Station will decrease its air pollution emissions, including $SO_2$, NOx, PM, $PM_{10}$ and $PM_{2.5}$, by thousands of tons.

## PARTIES

12.     Plaintiff Sierra Club is an incorporated, not-for-profit organization that has its headquarters at 85 Second Street, 2nd Floor, San Francisco, California. Sierra Club has over 1.3 million members and supporters, including members who live, work, and recreate in the area that will be immediately impacted by pollution emissions from the Edwardsport Generating Station. Sierra Club's purpose includes practicing and promoting the responsible use of earth's ecosystems and resources, and protecting and restoring the quality of the natural and human environment. Its mission includes reducing and eliminating pollution from the mining, combustion, and waste disposal of coal, which negatively affects Sierra Club's members as well as other members of the public. Sierra Club's Indiana Chapter (Hoosier Chapter) has more than 7,000 members, and its mailing address is 1915 W. 8th Street, Suite D, Indianapolis, Indiana 46202. The health and welfare of Sierra Club's members, as well as their enjoyment of outdoor activities, has been harmed by unlawful air pollution from the Edwardsport Generating Station as described below and in Plaintiff's Claims for Relief 1-5, *infra*, and will continue to be harmed unless the relief requested in this case is granted.

13.     Sierra Club is a "person" within the meaning of section 304(a) of the Act, 42 U.S.C. § 7604(a).

14.     At all relevant times hereto, Defendant PSI was an Indiana corporation that owned or operated the Edwardsport Generating Station.  On October 1, 2006, PSI Energy changed its name to Duke Energy, Indiana.  Defendant PSI was known, at relevant times hereto, as Public Service Indiana and as Public Service Company of Indiana.  Defendant PSI was, at one time, a subsidiary of Defendant Cinergy and, later, of Defendant Duke Energy Indiana.

15.     Defendant Duke Energy Indiana is an Indiana corporation that owns or operates, or at relevant times hereto owned or operated, the Edwardsport Generating Station.

16.     Defendant Cinergy was created on October 24, 1994.  At relevant times hereto, Defendant Cinergy owned and operated the Edwardsport Generating Station.  Defendant PSI, and another company, Cincinnati Gas & Electric Company, were acquired by Cinergy.  Cinergy is a Delaware corporation with its principal place of business in Cincinnati, Ohio.

17.     Defendant Cinergy Power Generation Services, LLC, at relevant times hereto, was an unregulated subsidiary of Defendant Cinergy.  Defendant Cinergy Power Generating Services, LLC, provided electric production-related construction, operation, and maintenance services regarding the Edwardsport Generating Station.

18.     Each of the Defendants is a "person" within the meaning of Sections 302(e) and 304(a)(3) of the Act, 42 U.S.C. §§ 7602(e), 7604(a)(3).

**JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction over the claims set forth in this complaint pursuant to 42 U.S.C. § 7604(a), 28 U.S.C. § 1331, 1355, 2201 and 2202.  The relief requested by the Plaintiff is authorized by statute in 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 7413, 7604.

20.     All or a substantial part of the alleged events or omissions giving rise to the claims herein occurred in the Southern District of Indiana.  Thus venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).  In addition, the alleged violations which are the subject of this case are alleged to have occurred at Edwardsport Generating Station, which is located within the Southern District of Indiana.  Thus venue is also proper in this Court pursuant to 42 U.S.C. § 7604(c)(1).

**NOTICE**

21.     No prior notice is required for the claims set forth below arising pursuant to 42 U.S.C. § 7604(a)(3).

22.     On May 1, 2008, Sierra Club provided Defendants  a notice of intent to sue for violations of the Clean Air Act and Indiana State Implementation Plan for the claims set forth below pursuant to 42 U.S.C. § 7604(a)(1).  A true and accurate copy of that notice is attached hereto as Exhibit 1.

23.     On March 13, 2009, Sierra Club provided an amended notice of intent to sue for violations by Defendants of other provisions of the Clean Air Act and Indiana State Implementation Plan for the claims set forth below pursuant to 42 U.S.C. § 7604(a)(1).  A true and accurate copy of that amended notice is attached hereto as Exhibit 2.

24.     More than 60 days have passed since Sierra Club sent the notice of intent to sue and supplemental notice of intent to sue.

## BACKGROUND ON THE CLEAN AIR ACT

25.     The Clean Air Act is designed to protect and enhance the quality of the Nation's air so as to promote the public health and welfare and the productive capacity of its population. 42 U.S.C. § 7401(b)(1).

26.     Section 108(a) of the Act, 42 U.S.C. § 7408(a), requires the Environmental Protection Agency ("EPA") to identify and prepare air quality criteria for each air pollutant which may endanger public health and welfare when emitted, and which results from numerous or diverse mobile or stationary sources. Section 109 of the Act, 42 U.S.C. § 7409, requires the Administrator to promulgate National Ambient Air Quality Standards ("NAAQS"), which are upper limits on air pollution, to protect public health and welfare.

27.     Under Section 107(d) of the Act, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality meets or exceeds the NAAQS for each pollutant. An area that meets the NAAQS for a particular pollutant is termed an "attainment" area, whereas area that does not meet the NAAQS is a "nonattainment" area.  Areas for which there is insufficient information to determine compliance with NAAQS are "unclassifiable" and are treated the same as attainment areas.

### The Prevention of Significant Deterioration (PSD) Program

28.     Congress enacted a Prevention of Significant Deterioration program in Part C of Title I of the Act, 42 U.S.C. §§ 7470-7492, which applies in areas designated as attainment or unclassifiable.  The PSD program intends to assure that new sources of pollution, or increases in

pollution from existing sources, will be added to an area  in a manner consistent with the

preservation of existing clean air resources, to limit the degree to which pollution can cause air

quality deterioration in areas attaining NAAQS, and to assure that any decision to permit

increased air pollution is made only after careful evaluation of all the consequences of such a

decision and after public participation in the decision making process.

29.     The PSD program prohibits the construction and subsequent operation of a major

emitting facility in an area designated as attainment unless a PSD permit has been issued.  42

U.S.C. § 7475(a); 40 C.F.R. § 52.21(r).  "Construction" means any physical change or change in

the method of operation (including fabrication, erection, installation, demolition, or modification

of an emissions unit) that would result in a change in emissions, 40 C.F.R. § 52.21(b)(8); *see*

*also* 42 U.S.C. § 7479(2)(B).

30.     Under the PSD program, a "major stationary source" is defined to include fossil

fuel-fired steam electric plants of more than 250 million British thermal units (Btu) per hour heat

input, which emit or have the potential to emit one hundred (100) tons per year or more of any

regulated air pollutant. 42 U.S.C. § 7479(1); 40 C.F.R. § 52.21(b)(1)(i)(a).

31.      A "significant" net emissions increase means an increase in the rate of emissions

that would equal or exceed any of the following rates for the following pollutants: 40 tons per

year of NOx; 40 tons per year of $SO_2$; 7 tons per year of sulfuric acid mist, and 25 tons per year

of PM. 40 C.F.R. § 52.21(b)(23)(i).  For pollutants subject to regulation under the Act that are

not set forth in 40 C.F.R. § 52.21(b)(23)(i), any increase is significant.

32.     A major stationary source of air pollution which makes a major modification in an

attainment area shall meet an emission rate based on the  best available control technology

("BACT") for each pollutant subject to regulation under the Act that it would have the potential

to emit in significant quantities. 40 C.F.R. § 52.21(j). The PSD program also requires a person who wishes to construct or modify a major emitting facility in an attainment area to demonstrate, before construction commences, that construction of the facility will not cause or contribute to air pollution in violation of any ambient air quality standard or any specified incremental amount. 40 C.F.R. § 52.21(k).

33.      The CAA requires states to adopt a SIP that contains emission limitations and such other measures as may be necessary to prevent significant deterioration of air quality in areas designated as attainment or unclassifiable, CAA Sections 110(a)(2)(C) and 161, 42 U.S.C. §§ 7410(a)(2)(C) and 7471. A state may comply with Sections 110(a) and 161 by having its own PSD regulations approved as part of its SIP by EPA, which must be at least as stringent as those set forth at 40 C.F.R. § 51.166. If a state does not have a PSD program that has been approved by EPA and incorporated into the SIP, the federal PSD regulations set forth at 40 C.F.R. § 52.21 are applicable. 40 C.F.R. § 52.21(a).

34.      On August 7, 1980, EPA disapproved Indiana's proposed PSD program, 40 C.F.R. § 52.793, 45 Fed. Reg. 52676, 52741 (August 7, 1980), and then incorporated by reference the federal PSD regulations set forth in 40 C.F.R. § 52.21(b) through (w) into the Indiana SIP. 46 Fed. Reg. 9580, 9583 (January 19, 1981). The federal PSD program at 40 C.F.R. § 52.21 applied in Indiana at the time that each of the projects at issue in this case was undertaken.

35.      On June 18, 2007, EPA approved a revision to the Indiana State Implementation Plan to incorporate a PSD program contained in the Indiana regulations. 72 Fed. Reg. 33,395 (June 18, 2007). This approval was prospective, and applies to construction, modification, and

operation of major stationary sources of air pollution, including the EGS, occurring after July 18, 2007.

36.     The Edwardsport Generating Station is, and at all relevant times was, a "major stationary source" for purposes of the Clean Air Act's PSD program.

## The Title V (Five) Operating Permit Program

37.     Title V of the Act establishes an operating permit program for certain sources, including "major sources."  The purpose of Title V is to ensure that all "applicable requirements" for compliance with the Clean Air Act, including PSD requirements, are collected in one place. 42 U.S.C. § 7661-7661f.

38.     EPA promulgated regulations establishing minimum elements of a Title V permit program to be administered by an air pollution control agency.  57 Fed. Reg. 32,250 (July 21, 1992).  Those regulations are codified at 40 C.F.R. part 70.

39.     Indiana developed a Title V program to issue federal operating permits and submitted that program to U.S. EPA for approval on August 10, 1994.  60 Fed. Reg. 57,188 (November 14, 1995).  U.S. EPA granted interim approval of the Indiana Title V program on November 14, 1995, conditioned on Indiana correcting various deficiencies in its program.  *Id*. U.S. EPA subsequently extended interim approval several times and granted final approval of Indiana's Title V program, retroactive to November 1, 2001.  66 Fed. Reg. 62,969 (December 4, 2001).

40.     The Act makes it unlawful for any person to violate any requirement of a permit issued under Title V or to operate a major source except in compliance with a permit issued by a permitting authority under Title V.  42 U.S.C. § 7661a and 40 C.F.R. § 70.7(b).

41.     Indiana's program similarly prohibits operation of an air pollution source unless it has either submitted all required, and complete, applications or in compliance with a Title V operating permit.  326 IAC 2-7-3.

42.     The Act and Indiana's Title V operating permit program require that each Title V permit include, among other things, enforceable emission limitations and such other conditions as are necessary to assure compliance with applicable requirements of the Act and the requirements of the applicable SIP, including any applicable PSD requirement to comply with an emission rate that meets BACT.  42 U.S.C. § 7661c(a); 40 C.F.R. § 70.6(a)(1) and 326 IAC 2-7-5.

43.     The Act and Indiana's Title V operating permit program require an operator of an emissions unit to apply for a modification to a Title V permit when there is a modification pursuant to the Indiana State Implementation Plan or Part C or Part D of Title I of the Act.  42 U.S.C. §§ 7661a, 7661b; 40 C.F.R. § 70.5; 326 IAC 2-7-4(1)(B).

44.     Any application for a Title V permit must be complete and must include, *inter alia*, the citation and description of all requirements applicable to the source and a description and compliance plan for requirements for which the source is not in compliance.  42 U.S.C. § 7661b(c), 40 C.F.R. §§ 70.5(a) and (c), and 326 IAC 2-7-4(c)(3)(A), (G), (4)(A), (5), (10)(A), (B).

## GENERAL ALLEGATIONS

### The Edwardsport Generating Station

45.     Defendants are entities who own, operate, or were at relevant times responsible for operation or projects conducted at the Edwardsport Generating Station.

46.     The Edwardsport Generating Station includes four fossil fueled boilers connected to three turbine generators.

47.     The boilers at the EGS are known as 6 (or 6-1), 7-1, 7-2, and 8 (or 8-1).  These four boilers, and their associated turbine generators, have the capability of generating a total of 160 megawatts ("MW") of electricity for sale to the outside grid.  The combined hourly heat input capacity of these four boilers is more than 250 million Btus per hour.  Individually, each boiler's hourly heat input capacity is more than 250 million Btus per hour.

48.     Boiler 6-1 is a Babcock & Wilcox boiler that was installed in 1943.  The boiler was originally designed in the 1940s to burn pulverized coal, but was modified to burn No. 2 fuel oil in the early 1970s.  Boiler 6-1 serves a generator rated at a capacity of approximately 37.5 MW.

49.     Boilers 7-1, 7-2 and 8-1 are Riley Stoker boilers designed to burn pulverized coal. Boilers 7-1 and 7-2 were installed in 1948 and each has a rated electric generating capacity of approximately 37.5 MW.  Boiler 8-1 was installed in 1950 and has a rated electric generating capacity of approximately 60 MW.

50.     Each of the boilers at the Edwardsport Generating Station generates steam to produce electricity.  Each boiler was constructed with the purpose of supplying at least one third (1/3) of its potential electric output capacity and at least twenty-five megawatts (25 MW) of electric output capacity to a power distribution system for sale.

51.     Each of the boilers at the Edwardsport Generating Station is an Electric Utility Steam Generating Unit as that term is used in 40 C.F.R. § 52.21(b)(31).

52.     The Edwardsport Generating Station has the potential to emit in excess of 100 tons per year of the following pollutants: carbon dioxide, nitrogen oxides, sulfur dioxide, carbon monoxide, and particulate matter.

53.     The Edwardsport Generating Station is a "major emitting facility" as that term is used in 42 U.S.C. § 7475(a) and a "major stationary source" as that term is used in 40 C.F.R. § 52.21(a)(2), (b)(1).

54.     The Edwardsport Generating Station received its first Title V Operating Permit from the Indiana Department of Environmental Management in August, 2004.

55.     At all times relevant to this Complaint, the Edwardsport Generating Station was located in Knox County, Indiana, which was classified as either attainment or unclassifiable for all pollutants.

**Public Service Company of Indiana Identifies Lost Operation, Time Due To Boiler Tube Leaks at Edwardsport Plant, As A Problem**

56.     In February, 1986, D.E. Vondielingen of Public Service Company of Indiana (also known as Public Service Indiana) wrote a memo to P.J. Isenogle titled "location: Edwardsport Station; subject: Potential Generation Capability Reduction."  A copy of that memo is attached as Exhibit 3.

57.     The February, 1986, Vondielingen memo states:

> Due to the past operating performance and problems with boiler tube leaks, it will now be necessary to plan for a 40 MW, coal fired capability cut due to boiler tube leaks.  Such capability reduction should be used for planning and scheduling purposes and results in a station, coal fired, capability of 80/80 megawatts, effective March 1, 1986.  As you can see from the attachment, Edwardsport's Equivalent Availability has decreased from the 1982 figure, due in part to the boiler tube failure rates we are presently experiencing.  We will continue to report the current capability for Edwardsport but the above figure should be used for planning and scheduling purposes until boiler tube replacement has

been accomplished.  If you have any questions or require any further information, please advise.

58.    The February, 1986 Vondielingen memo then provides the following chart, showing the equivalent availability of the Edwardsport station as the line labeled "PSI":



EDWARDSPORT STATION EQUIVALENT AVAILABILITY
(equivalent outage hours*100/period hours)

|        | 1981 | 1982 | 1983 | 1984 | 1985 |
|--------|------|------|------|------|------|
| PSI    | 81.1 | 96.6 | 84.2 | 65.8 | 69.6 |
| NERC   | 84.4 | 83.5 | 83.4 | 83.2 |      |

59.    On June 2, 1986, D.J. Chenault of the Power Department at Public Service Indiana wrote to J. Hise at Public Service Indiana regarding an Economic Study that Public Service Indiana conducted regarding the economic "breakeven point" if the Unit 7-2 was retubed, based on the additional native load and off-system sales that Public Service Indiana could expect from additional Unit 7-2 operations and, therefore, whether retubing Unit 7-2 boiler was economically justified.  The analysis concluded that "retubing should be deferred and reviewed yearly with and without off-system sales."

## The Sargent & Lundy Life Extension Plan

60.     Sargent & Lundy is an outside engineering and consulting firm hired by Public

Service Indiana to do analysis and engineering related to the Edwardsport Generating Station.

61.     On August 23, 1988, J.U. Bott, the Manager of Betterment Programs for Public

Service Indiana, wrote to Mr. A.W. Wendoff, of Sargent and Lundy Engineers, and stated in his

letter:

> This is to confirm our discussion of August 22, 1988 in your
> offices concerning the life extension effort for Edwardsport and
> Nobelsville Stations.  I would like for you to develop a list of
> probable projects, based on S & L's experience and PSI's input,
> needed to extend the lives of both stations.  We will also want a
> conceptual level of cost associated with the projects.  As part of
> this effort, I will also need a conceptual level cost estimate to
> convert Edwardsport 6-1 boiler back to coal as well as a rough idea
> of what would be required to reduce Edwardsport to an emission
> level of about 1 lb. sulfur per million btu heat input equivalent.

62.     On September 23, 1988, Sargeny & Lundy provided Public Service Indiana with

a document titled "Scope of Work for Engineering Services; Public Service Indiana; Plant

Investigations; Nobelsville and Edwardsport Generating Stations."  (Hereinafter "1988 Scope of

Work").  A true and accurate copy of the 1988 Scope of Work is attached as Exhibit 4 hereto.

63.     The Introduction to the 1988 Scope of Work provides:

> Public Service Indiana (PSI) requested Sargent & Lundy (S&L)
> prepare a scope of work for plant investigations at the Nobelsville
> and Edwardsport Generating Stations to determine the required
> plant modifications and system improvements to extend the
> operating life of the stations to year 2005.  Meetings were held
> with the station personnel at Nobellville on September 14, 1988,
> and with the station personnel at Edwardsport on September 15,
> 1988.  These discussions formulated the basis of this proposal and
> are documented in meeting notices of the respective meetings.

64.     The 1988 Scope of Work also states that Sargent & Lundy will perform a number of investigations at the Edwardsport plant "to determine if replacement, modification, or additions are required to extend the life of the equipment and systems to the year 2005."

65.     Additionally, the 1988 Scope of Work provides that Sargent & Lundy will prepare a "capital cost estimate" for each project that it investigates, will prioritize projects "to determine the most cost effective distribution of funds for the plant betterment projects," and publish a report of its findings.

66.     On April 25, 1989, Sargent & Lundy provided a report titled "Report SL-4502, Engineering Condition Assessment Plant, Edwardsport Generating Station, Dated April 1989." (hereinafter "April 1989 Report").

67.     The April 1989 Report contained an Executive Summary, which provided, in part:

> With their letter of August 23, 1988, Public Service Indiana (PSI) requested an engineering investigation to develop an engineering condition assessment plan for the Edwardsport Generating Station. This plan would include the development of a list of potential projects based on Sargent & Lundy's (S&L) experience and PSI's knowledge of the station.  This plan would also include the preparation of conceptual cost estimates associated with the projects.
>
> On September 15, 1988, a meeting was held at the Edwardsport Generating Station with the station personnel to review the status of the existing equipment and systems.  Using this information, an outline for further engineering investigations was prepared by S&L.  Notes of this meeting provided the basis for the engineering investigations performed by S&L and the basis of this report.  The scope of the work was outlined in S&L's letter dated September 23, 1988.  Upon acceptance of this scope of work, S&L performed field investigations to confirm, investigate, and observe various conditions throughout the plant.  This field investigation was performed between October 4 and October 7, 1988.

- 16 -

The field investigations revealed numerous equipment and systems that should be upgraded, modified, and/or repaired to continue operations.  Discussions were held on several occasions with the station personnel in joint meetings with Edwardsport and Nobelsville personnel to discuss the findings, the relative merits of the system improvements and modifications, and the categorization and prioritization of the items developed for this report.

This report is a summation of the work efforts of PSI and S&L to develop a feasible plan for the continued reliable service of the Edwardsport Generating Station.

…

Station interviews and the field examinations resulted in the recommendation of 35 major areas to be modified, upgraded, or replaced.  In the 35 major areas, a total of 90 potential work packages were developed.

The 90 work packages were categorized into two major expenditures: capital and maintenance.  This separation was based on well-established definitions of capital and maintenance expenditures used by PSI.  Further analysis of the individual work packages resulted in the ranking of the items.  For this report, the ranking was limited to a high or low priority.  This subjective determination of relative priority was identified during discussions at the project review meetings.  The high ranking was given to the work packages S&L believes are necessary for continued reliable service of the system equipment in the station.  The low ranking was assigned to work packages that would improve system or equipment operations but are not necessary for continued operation.

68.     The April 1989 Report identified, among others, the following projects to be undertaken at the Edwardsport Generating Station:

- "Replace 20% of Boiler Tubes"

- "Provide New Boiler Controls"

- "Replace ID Fan Casing"

- "Repair Bent Shafts"

- "Replace Air Heater Baskets"

- "Reconvert Boiler 6-1 to Coal"

- "Replace Feedwater Heaters"

- "Upgrade Turbines"

69.     Following the April 25, 1989 Report by Sargent & Lundy, a number of projects

identified in the Report were undertaken at the Edwardsport Generating Station.

**Project 1: Replacing 20% of Boiler Tubes[1]**

70.     Defendants replaced approximately 20% of the boiler tubes on boilers 7-1, 7-2

and 8-1.

71.     Regarding replacement of 20% of the boiler tubes at the Edwardsport Generating

Station, the April 1989 Report provides:

> Although our random sampling indicated reasonable tube
> thickness, the plant personnel noted on several occasions that tube
> leaks occur frequently on startup of the boilers.  With the expected
> use of these units, an allotment of replacement tubes must be
> considered.  Due to the unknown quantity of tube replacements
> required, S&L recommends replacement of approximately 20% of
> the tubes in each boiler's convection pass.
>          …
> The estimated cost to replace 20% of the boiler tubes is
> $1,210,000…   The estimated duration for this work from
> authorization to completion is one year per boiler.

72.     The April 1989 Report identifies replacement of boiler tubes as a capital

expenditure.

73.     Attached hereto as Exhibit 5 is a true and accurate copy of a Work Order for

Public Service Company of Indiana designated as "Construction 37139" and "Retirement

67139."  The work order is to "Remove and replace 20% of 8-1 Boiler Tubes."

---

[1] Sierra Club groups these projects for ease of reference.  The groupings are subject to change as discovery
progresses.  The groupings do not constitute "facts" pled in this Amended Complaint and Sierra Club will not amend
the pleadings to account for regrouping one or more of the elements of the various projects that have occurred at the
Edwardsport Generating Station.

74.     According to the work order (Construction 37139/Retirement 67139) the "necessity of the project" was due to "Down-comer tubes, low temperature superheater tubes and risers needed to be replaced to reduce boiler down-time because of tube failures."

75.     The work order was prepared in November, 1990, and was approved or authorized on May 21, 1991.  Approval by company executives was required for the project.

76.     The work order estimates costs of $310,000 for materials, $270,000 for contract labor, and total construction costs, including overhead and allowance for funds used during construction (AFUDC), of $596,600 for construction and $125,000 for removal of old equipment.  The estimated total net cost of replacing the tubes on boiler 8-1 was budgeted to be $721,600.

77.     Attached as Exhibit 6 is a copy of a Work Order Completion Notice from Public Service Company of Indiana, Inc., for Work Order Construction 37139/Retirement 67139.  The Work Order Completion Notice states that the new boiler tubes on Unit 8-1, covered in the work order, were placed into service on November 15, 1991.

78.     The work to replace approximately 20% of the tubes in boiler 8-1 was treated as a capital expenditure for budget and accounting purposes.  It was completed with outside contractors.

79.     The work to replace approximately 20% of the tubes in boiler 8-1 required materials to be ordered and brought to the plant because onsite inventory of spare parts did not include all of the materials required to complete the retubing work.

80.      Attached as Exhibit 7 is a copy of a Work Order for the Public Service Company of Indiana, Inc., designated as "Construction 38280" and "Retirement 68380."  The

work order is for a project described as "Purchase & install 20% of 7-2 boiler tubes.  Remove

20% of old tubes."

81.     Work Order Construction 38280/Retirement 68380 identifies the "necessity" of

the project as: "Wall tubes need [to be] replaced because of fly ash wear on the outside & oxygen

corrosion on the inside.  The thin wall thickness causes constant tube leakages, excessive down

time, unavailable & decreases unit reliability."

82.     Work Order Construction 38380/Retirement 68380 was prepared and approved

in November, 1989.  Approval by company executives was required.

83.     Work Order Construction 38380/Retirement 68380 estimated costs of $310,000

for materials, $180,000 for contract labor, and total net costs of $694,600.

84.     The tubing that was replaced on boiler 7-2 was made from SA-192 material,

which did not meet the applicable ASME Boiler and Pressure Vessel Code, at the time of the

replacement, for temperatures of 850 degrees Fahrenheit or greater.  Therefore Burns &

McDonnell, the engineering firm hired by Public Service Indiana for the project, recommended

using SA 23-T11 tubing for the superheater replacement portion of the project.

85.     Attached as Exhibit 8 is a copy of a Work Order Completion Notice for the

Public Service Company of Indiana, for Work Order Construction 38380/Retirement 68380.  As

noted in the Work Order Completion Notice, the project to replace 20% of the boiler tubes in

Unit 7-2 was completed and put into service on June 1, 1990.

86.     The work to replace 20% of the tubes on Unit 7-2 occurred at the same time as

the replacement of the sootblowers on Unit 7-2.

87.     The work to replace approximately 20% of the tubes in boiler 7-2 was treated as a capital expenditure for budget and accounting purposes.  It was completed with outside contractors.

88.     The work to replace approximately 20% of the tubes in boiler 7-2 required materials to be ordered and brought to the plant because onsite inventory of spare parts did not include all of the materials required to complete the retubing work.

89.     Attached as Exhibit 9 is a Work Order for Public Service Company of Indiana for a project designated as work order number "Construction 39328" and "Retirement 69328" for a project described as "Remove and replace 20% of 7-1 boiler tubes."

90.     Work Order Construction 39328/Retirement 69328 states that the "necessity" of the project to replace 20% of the tubes on unit 7-1 was "Down-comer tubes, low temperature superheater tubes and risers need to be replaced to reduce boiler downtime because of boiler tube failures."

91.      Work Order Construction 39328/Retirement 69328 was prepared and authorized in October 1992.  The work order estimates costs for the project of $310,000 in materials, $370,000 in company labor, and a total net cost of $833,400.

92.     Attached as Exhibit 10 is a copy of a Work Order Completion Notice by the Public Service Company of Indiana for work order Construction 39328/Retirement 69328.  As stated in the Work Order Completion Notice, the project to replace 20% of boiler tubes on Unit 7-1 was completed and in service on June 2, 1993.

93.     The work to replace approximately 20% of the tubes in boiler 7-1 was treated as a capital expenditure for budget and accounting purposes.  It was completed with outside contractors.

94.     The project that included replacing approximately 20% of the tubes in boiler 7-1 required materials to be ordered and brought to the plant because onsite inventory of spare parts did not include all of the materials required to complete the retubing work.

### Project 2: Retubing Feedwater Heaters

95.     Defendants retubed, or fully replaced, the high pressure feedwater heaters on units 6 and 7 (boilers 7-1, and 7-2).

96.     The April 1989 Report by Sargent & Lundy recommended replacing the feedwater heaters at the Edwardsport plant units with new heaters "having an improved channel closure design and stainless steel tubes."

97.     The April 1989 Report further stated that new heater shells would be required as part of this project as "[t]he existing heater shells will not accept stainless tubes because longer tube lengths are required to maintain current heat transfer capabilities."

98.     The feedwater heaters for boiler 6, 7-1 and 7-2 were replaced with feedwater heaters containing tubes with a different design that the tubes being replaced.

99.     Attached as Exhibit 11 is a copy of Public Service Indiana's Work Order Authorization designated as "Construction 37133C" and "Retirement 67133C."  The work order is for a project to replace the #6 "E" high pressure feedwater heater at the Edwardsport plant.

100.     According to the work order, the #6 "E" high pressure feedwater heater needed replacement because it had "more than 25% of the tubes plugged," that the tube bundle had been replaced twice, previously, and it was "more economical to replace the whole heater than the tube bundle alone."

101.     Work Order Construction 37133C/Retirement 67133C was dated September 26, 1994, and estimated a net cost for the project of $96,680, including $60,000 for material and $15,000 for contract labor.

102.     Attached as Exhibit 12 is a copy of Public Service Indiana's Work Order Completion Notice for the replacement of the #6 "E" high pressure feedwater heater.  As stated on the Work Order Completion Notice, the #6 "E" feedwater heater replacement was completed and in service on December 22, 1995.

103.     Attached as Exhibit 13 is a copy of Public Service Indiana's Work Order Authorization designed as "Construction 37132C" and "Retirement 67132C."  The work order was for a project done at the Edwardsport plant to replace the #6 "D" high pressure feedwater heater.

104.     The work order states that the project to replace the #6 "D" feedwater heater was necessary because "more than 25% of the tubes [were] plugged due to tube leakage," that the tube bundle had been replaced two times in the past, and that complete replacement was needed "[t]o restore the heater thermal performance."

105.     Work Order Construction 37132C/Retirement 67132C was dated September 26, 1994 and estimated a net cost for the project of $91,680, including $60,000 in material and $15,000 in contract labor.

106.     Attached as Exhibit 14 is Public Service Indiana's Work Order Completion Notice for the project to replace the #6 "D" feedwater heater.  As stated in the Work Order Completion Notice, the project to replace the #6 "D" feedwater heater was completed and placed in service on December 22, 1995.

107.     The #6 "E" feedwater heater and the #6 "D" feedwater heater were replaced at the same time.  The replacement parts for the #6 "E" and the #6 "D" feedwater heater replacements were provided by the same company, Struthers Industries, Inc., and were covered by the same bid by Struthers Industries.

108.     Replacing the high pressure feedwater heaters on Unit 6-1 was treated as a capital expenditure for budget and accounting purposes.  It was completed with outside contractors.

109.     Replacing the high pressure feedwater heaters on Unit 6-1required materials to be ordered and brought to the plant because onsite inventory of spare parts did not include all of the materials required to complete the project.

110.     The new feedwater heaters on #7 were also replaced by Struthers Industries, Inc. The new #7 feedwater heaters were of a different design than the heaters that were replaced.

111.     Attached as Exhibit 15 is a memorandum from James Y. Lai, of Public Service Indiana, to J.R. Williams, dated April 15, 1994.  In the memo, Mr. Lai states that:

> Edwardsport station intends to replace their unit #7 H.P. feedwater heater tube bundles this year.  Similar work was done on unit #6 heaters several years ago at a cost of approximately $45,000 per heater.

> Unit #7 heaters are straight-tube design with a floating head.  It has been a maintenance nightmare to plug tubes when a leak is detected.  The U-tube design without float head will definitely reduce the maintenance costs to fix the tube leak.

112.      Replacing the high pressure feedwater heaters on Unit 7 was treated as a capital expenditure for budget and accounting purposes.  It was completed with outside contractors.

113.     Replacing the high pressure feedwater heaters on Unit 7 required materials to be ordered and brought to the plant because onsite inventory of spare parts did not include all of the materials required to complete the project.

**Project 3: Retubing Condensers**

114.     Defendants replaced significant portions of the #7 and #8 condensers at the Edwardsport Generating Station.

115.     Attached as Exhibit 16 is a copy of Public Service Indiana's Work Order Authorization designated as "Construction 37105" and "Retirement 67105." The work order is to replace the lower half of the "#7 condenser."

116.     As noted in Work Order Construction 37105/Retirement 67105, the "necessity" of the project was that the tubes in the lower half of the condenser were original, installed in 1949, and had "deteriorated to the point that thirty-five (35) percent are plugged creating turbine problems, water contamination and unit being unreliable/unavailable."

117.     Work Order Construction 37105/Retirement 67105 was dated January 13, 1989 and estimated a net cost for the project of $228,500, including $130,000 for materials, $5,000 for company labor, and $40,000 for contract labor.

118.     Attached as Exhibit 17 is Public Service of Indiana's Work Order Completion Notice to replace portions of the #7 condenser described in Work Order Construction 37105/Retirement 67105. As noted in the Work Order Completion Notice, replacement lower half of the #7 condenser was completed and placed back into service on May 26, 1989.

119.     Replacing the bottom half of the #7 condenser was treated as a capital expenditure for budget and accounting purposes. It was completed with outside contractors.

120.     Replacing the bottom half of the #7 condenser required materials to be ordered and brought to the plant because onsite inventory of spare parts did not include all of the materials required to complete the project.

121.     Attached as Exhibit 18 is a copy of Public Service Indiana's Work Order Authorization designated as "Construction 38389" and "Retirement 68389" for replacement of 8,175 tubes in the #8 surface condenser.  The work order was dated August 6, 1986, and estimated a net cost for the project of $392,000, including $288,000 for materials and $29,000 for company labor.

122.     Attached as Exhibit 19 is Public Service Indiana's Work Order Completion Notice for Work Order Construction 38389/Retirement 68389, to retube the #8 condenser.  As stated in the Work Order Completion Notice, the work was completed and in service on December 26, 1986.

123.     The work including retubing the #8 condenser was treated as a capital expenditure for budget and accounting purposes.  It was completed with outside contractors.

124.     Retubing the #8 condenser required materials to be ordered and brought to the plant because onsite inventory of spare parts did not include all of the materials required to complete the project.

### Project 4: Unit 7-1 and 7-2 Lower Arch Tube Stub Replacements

125.     Defendants replaced portions of the water wall tubing on boilers 7-1 and 7-2 at EGS.  These were replaced due to tube leaks.

126.     Attached as Exhibit 20 is a copy of Cinergy's Work Order Authorization designated as "Construction 37174" and "Retirement 67174."  The work order was prepared and approved in August, 1999.

127.     Work Order 37174/67174 is to replace the lower arch tube stubs on Unit 7-1. This involved replacing 100% of the tubes connecting to the lower ring wall header on Unit 7-1, including removing the refractory and replacing it.

128.     The stated "non-budget justification" in Work Order 37174/67174 for the work to replace the lower arch tube stubs on Unit 7-1 was:

> The Boiler Water Wall tubing at the bot[t]om ring wall header is deteri[o]rated from combined internal and external corrosion resulting in frequent tube leaks and loss of availability.

129.     According to Work Order 37174/67174, the work was economically justified "based on maintaining unit availability," because Unit 7-1 was "experiencing frequent tube leaks in this area."

130.     The Work Order further stated:

> Predicting 1 tube leak every 3 weeks resulting in loss of this boiler for 2 days to repair (40 MW derate for 16hr per day) gives an EFA change of 1.55% and additional O&M cost of $3,500 per repair. Predicting a 10 year life the Economic Indicators are: PET Capital Cost: $342,290 NPV-$282,111 IRR-22% B.C.-1.8

131.     Work Order 37174/67174 estimated the cost to replace tube stubs on Unit 7-1 to be $217,202 in construction costs and $110,790 as the cost of retiring the replaced parts, for a total net cost of $327,992.

132.     Work Order 37174/67174 was approved by at least one executive of the company.

133.     The work to replace the lower arch tube stubs on Unit 7-1 began on March 1, 1999 and was completed on May 1, 1999, at which time the unit was returned to service.

134.     The work included replacing 48 tubes on the back wall of the boiler, 24 side wall

tubes (12 on each side), 33 bottom row tubes on the front boiler wall, and 32 top row tubes on

the front wall.

135.     Defendants studied whether replacing the lower arch tube stubs on Unit 7-1

should be capitalized.  Attached as Exhibit 21 is a copy of some of the documents created by

Defendants as part of that analysis.

136.     Defendants expected that replacing the lower arch tube stubs on Unit 7-1 to

result in increased operation from the unit.  Defendants predicted an increased Equivalent

Availability Factor of 1.55% as a result of the project.

137.     The existing tubing that was replaced as part of this work was made of ASME

SA-192 material, which was no longer in common use for boilers and was not readily available.

The new tubing that was installed in the boiler was made of ASME SA-210-A1 material, which

has more than 20% higher allowable tensile strength and is more resistant to corrosion and tube

failure than the previous material.

138.     A similar replacement of the lower arch tube stubs was done on Unit 7-2.

Attached as Exhibit 22 is a copy of a Work Order designated as "Construction 37175" and

"Retirement 67175."  The work order was prepared and authorized in August, 1999, to replace

the Unit 7-2 lower arch tube stubs.

139.     Similar to the work order to replace the lower arch tube stubs on Unit 7-1, this

work order provided that the work had already been done and was necessary because "[t]he

Boiler Water Wall tubing at the bot[t]om ring wall header is deteriorated from combined internal and external corrosion resulting in frequent tube leaks and loss of availability."

140.    Additionally, like the work order for the same work on Unit 7-1, Work Order Construction 37175/Retirement 67175 notes that the work included replacing 100% of the tubes connecting to the lower ring wall header and involved removing and replacing the boiler refractory.

141.    As further noted in Work Order Construction 37175/Retirement 67175, the work to replace the lower arch tube stubs on boiler 7-2 was economically justified because the unit was "experiencing frequent tube leaks in this area."

142.    Work Order Construction 37175/Retirement 67175 also predicted that without the work Unit 7-2 would experience "1 tube leak every 3 weeks resulting in loss of this boiler for 2 days to repair (40 MW derate for 16hr per day)," resulting in an equivalent availability factor change of 1.55% and additional O&M costs of $3,500 per repair.

143.    Defendants prepared a justification for treating the work to replace the lower arch tube studs on Unit 7-2 as a capital expenditure.  The documents created by Defendants as part of this analysis are attached as Exhibit 23.

144.    The lower arch tube stub replacement for Units 7-1 and 7-2 was done by Sterling Boiler & Mechanical.  Defendants had one contract with Sterling Boiler & Mechanical for the work to install the replacement tube stubs in both Unit 7-1 and Unit 7-2 boilers.

145.     Attached as Exhibit 24 is a copy of that contract and the bid by Sterling Boiler & Mechanical.

146.     The tubing for the project to replace the lower arch tube stubs on Unit 7-1 and Unit 7-2 boilers was provided by Foster Wheeler, through a contract with Defendants.

147.     The final cost of the lower arch tube stub replacements was $292,783.84 for Unit 7-1.

148.     The final cost of the lower arch tube stub replacements was $314,223.73 for Unit 7-2.

149.     Brad Graves prepared a memo to Hank Hammond, dated August 12, 1999, and titled "Justification for Capitalizing the Lower Arch Tube Replacement Projects on the Edwardsport Boilers 7-1 and 7-2, O&M projects 1999-13 and 1999-121 respectively."

150.     In the memo to Mr. Hammond, Mr. Graves wrote:

> The Edwardsport Station performed identical projects on the 7-1 and 7-2 boilers this spring to replace thin and corroded tubing where the water wall tubes tie in to the lower ring wall header. The Station had been experiencing failure in these tubes at a very high rate making all three of the Riley Coal Fired units unreliable. In 1998 the Unit 8-1 boiler had a catastrophic failure of one of these tubes resulting in a 5 week outage in which a large percentage of the tubes in this area were replaced as an O&M project. Units 7-1 and 7-2 were scheduled for similar work in the spring of 1999 at that time. Subsequent inspection and additional failures revealed that an increased scope of work to replace all the tube stubs tying to the lower water wall header was required to achieve boiler reliability. Increased work scope and cost has created a situation that indicates these projects should be capitalized based on being a replacement of substantial cost with an upgrade to the tube material enhancing the expected life in this high corrosion area.

1. As originally conceived these projects included the complete replacement of tube stubs in the sections of the boiler water wall that tie in to the lower ring water wall header on the front and both sides of the boiler. As well as partial replacement of the bottom row of tubes on the boiler back wall. This work would be identical to the 1998 Unit 8-1 Boiler project. Additional examination of the tubes along the back wall revealed problems making it advisable to replace 100% of the tube stubs all the way around the lower ring waif header. This change brought the water wall replacement area up to approximately 800 sq. ft on Unit 7-1 and 770 sq. ft on Unit 7-2 of contiguous water wall surface, this is close to the required 1000 sq. ft from the Plant Accounting Manual to consider it a property unit. The increase in tube scope added a significant increase in material and labor cost to the tube replacement. Total furnace heating surface area is 13,450 sq. ft. 10% is higher than the 1,000 sq. ft standard.

2. Addition of the 2 other rows on the back of the back wall required removal of Significant amounts of refractory. Preliminary testing indicated this was not Asbestos material, but as the demolition portion of the job got into swing it became clear there was a large amount of castable refractory material in the area that did contain asbestos. Removal of this material added a considerable unexpected cost to the project. In addition replacement of 100% of the tubes all the way into the header an required removal and replacement of 100% of the hand hole covers in the ring header and 100% stress relief of the header.

3. Materials used to replace the tubing were upgraded to a different material specification due to availability. Original material was ASME SA-192 that is no longer in common use and is not readily available. The replacement material is ASME SA-210-A1 that has a higher allowable tensile strength (27-20% over the usable range). This is significant as failures in this area occur from internal and external corrosion actions and this will allow a larger corrosion allowance before failure.

4. This project is of significant cost. Each unit was estimated at a cost of $156,850. The scope increases included 96 additional tube stubs per boiler taking the total up from 137 to 233, asbestos abatement of boiler refractory on the back wall, addition of 26 hand hole covers on the back wall and stress relief of the back wall run of the lower water wall ring header.

> Final cost is $292.783.84 for Unit 7-1 and $314,223.73 for Unit
> 7-2. These totals are taken from Maximo and include 13%
> mark up on materials and 58.5% mark up on Cinergy Labor,
> but do not include any AFUDC or a construction overhead
> mark up.

151.    Replacement of the lower arch tubes on boilers 7-1 and 7-2 was treated as a

capital expenditure for budget and accounting purposes.

152.    Replacement of the lower arch tubes on boilers 7-1 and 7-2 was completed with

outside contractors.

153.    Replacement of the lower arch tubes on boilers 7-1 and 7-2 required materials to

be ordered and brought to the plant because onsite inventory of spare parts did not include all of

the materials required to complete the project.

### Project 5: Reconverting Unit 6 to Coal-Firing

154.    The Defendants performed work on Boiler 6-1 since 1989 to allow the unit to

burn coal.

155.    Unit 6-1 at the Edwardsport Generating Station is a Babcock & Wilcox boiler

originally built in 1943.  It began commercial operation on July 18, 1944.

156.    The original design capacity of Unit 6 was 37,500 kW and a maximum of

400,000 pounds of steam per hour.

157.    The current rating for Unit 6 is 43,000 kW gross and 40,000 kW net.

158.    Unit 6 was originally designed to burn pulverized coal.  In the early 1970s, Unit

6 was changed to allow it to burn Number 2 fuel oil.

159.    Following the conversion to fuel oil, equipment for coal handling and

combustion was either abandoned in place, or removed and used as parts at other units.

160.     Public Service Indiana considered reconverting Unit 6-1 from oil-firing back to coal-firing in the 1980s.

161.     On August 19, 1985, the Babcock & Wilcox Company submitted a budget proposal to Public Service of Indiana to reconvert Unit 6 back to coal firing.  That proposal included replacing the furnace floor, installing new screen tubes to cover openings in the boiler's walls that were made when the unit was converted to oil firing, new soot blowers, three new coal pulverizers, three primary air fans, pulverizer seal air fans, new 14 inch (outside diameter) steel raw coal pipes from the bunker outlet to the pulverizer table feeder, six sets of carbon steel pulverizer coal pipes from the pulverizer outlets to the burner inlet distributors, six new pulverized coal burners, and six lighters.

162.     The proposal by Babcock & Wilcox estimated that the total material cost to convert unit 6 back to coal firing would be $2,000,000.

163.     Several years later, the reconversion to coal firing at Unit 6 was considered again.  One of the projects contained in the April 1989 Report by Babcock and Wilcox was the conversion of Unit 6-1 from oil-firing back to coal-firing.  Regarding this conversion, the April 1989 Report states:

> Boiler 6-1 was originally designed in the early 1940s to burn pulverized coal.  In the early 1970s, boiler 6-1 was converted to burn No. 2 fuel oil.  With this modification, all coal-related equipment was abandoned in place with the exception of the coal piping from the bunker to the mills and the fuel conduit from the mills to the wind boxes.  Burner modifications were made as necessary eliminating the coal burners.  Subsequently, the pulverizers for 6-1 were used as spare parts for the remaining boilers at the Edwardsport Station.  They are currently in disrepair, missing many of the major components.
>
> The reconversion of boiler 6-1 would require an addition of all coal related equipment including pulverizers, coal piping, fuel conduit, sootblowers, coal burners, and primary air fans.  In

- 33 -

addition, a new precipitator is required with the associated ash handling improvements and supports.  As noted in the section entitled "Controls," new controls would be required for the boiler, as spare parts of the existing equipment are no longer available.

With the higher auxiliary power requirements, a new auxiliary transformer would be required to feed the precipitators and the other auxiliary equipment.

… The major addition for the boiler reconversion is the new precipitator.  The conceptual design locates the new precipitator on the Boiler Room roof.  With the existing physical limitations, the existing ID fan must be relocated from the west side of the Boiler Room roof to the east side.  This will permit the ID fan to operate in the "clean" flue gas side of the precipitator.  The addition of the precipitator on the roof requires major Boiler Room steel reinforcement to support the additional estimated weight of 1,000,000 pounds.  Also due to physical constraints, the ID fan will be cantilevered over the Turbine Room room on a new supporting structure.

COST ESTIMATE

The estimated cost for the coal reconversion of boiler 6-1 is $13,504,000.  This estimated cost includes the boiler modifications, the required coal-related equipment modifications, new precipitator, ductwork support steel, the expansion of the auxiliary power system, and other related equipment for a complete reconversion…. This work would take two years to complete.

CATEGORIZATION AND PRIORITIZATION

All associated costs for the coal conversion of boiler 6-1 are considered capital.  Based on the discussions with PSI, the reconversion of boiler 6-1 is considered a low-priority item.  If boiler 6-1 is to remain in operation, we would recommend that boiler 6-1 be converted to gas….

164.    Attached as Exhibit 25 is a true and accurate copy of a document created and maintained by Public Service Indiana.

165.     The document attached as Exhibit 25 projects that the in-service date of the Unit 6-1 boiler conversion as December 31, 1993, describes the project as: "Convert the Edwardsport #6-1 Boiler to Coal Fired Service Including the Addition of Electrostatic Precipitators," and identifies the work order authorizing the project as #1586.

166.     In documents submitted by Public Service Indiana to the United States Department of Energy's Energy Information Administration (EIA), Public Service Indiana states that 38.5 thousand short tons of coal was burned in the Unit 6-1 boiler during 1996.

167.     Attached as Exhibit 26 is a copy of the fuel usage report filed with the EIA for Edwardsport Generating Station Unit 6-1 for 1996.  According to the filing with the EIA, the following amounts of coal, with the following heat and sulfur content were burned in Unit 6-1:

| Month | Coal (in thousands of short tons) | Sulfur content of Coal (nearest 0.01% by weight) | Ash Content of Coal (nearest 0.01% by weight) |
|---|---|---|---|
| January, 1996 | 6.8 | 2.14 | 9.28 |
| February, 1996 | 4.8 | 2.46 | 10.27 |
| March, 1996 | 3.2 | 2.50 | 10.75 |
| April, 1996 | 1.4 | 2.07 | 10.01 |
| May, 1996 | 0.9 | 2.13 | 9.34 |
| June, 1996 | 3.9 | 2.21 | 10.07 |
| July, 1996 | 2.6 | 2.20 | 10.29 |
| August, 1996 | 2.9 | 2.37 | 10.37 |
| September, 1996 | 3.8 | 2.38 | 10.03 |
| October, 1996 | 3.8 | 3.69 | 8.48 |
| November, 1996 | 0.0 | NA | NA |
| December, 1996 | 5.4 | 2.46 | 9.64 |

**Project 6: Rebuilding #8 Turbine**

168.     In the April 1989 Study, Sargent & Lundy made recommendations regarding the turbine on Unit 8 at the Edwardsport Generating Station, including replacement of the first two impulse and the next four reaction rows of high pressure turbine blades, replacement of all seals

on the high pressure turbine, replacement of erosion seals on the L-O blades, replacement of tenons and shrouds on the L-O blades, replacement of the first rows of low pressure turbine blades, replacement of water gland seal system, replacement of the control valve stems, discs and seats, installation of a new lube oil pump, rewinding the generator stator, and replacement of the motor-generator set exciter with a solid-state-type exciter.

169. The April 1989 Report further stated that each of the recommendations for the Unit 8 turbine "are considered capital expenditures."

170. Upon information and belief, Defendants undertook a project to replace turbine blades, seals, tenons and shrouds, oil pump, and exciter on the number 8 turbine, and to rewind the generator stator on the number 8 turbine, after April, 1989.

### Project 7: Replacing Fans and Fan Components

171. Defendants replaced fans and fan components on the Edwardsport Generating Station units.

172. In the April 1989 Report, Sargent & Lundy suggested replacing the bent fan shafts on Units 7-1 and 8-1, replacing all fan casings, and replacing fan fluid drives with more efficient fan drives.

173. Attached as Exhibit 27 is Public Service Indiana's Work Order Authorization for a project to replace the fan wheel and shaft assembly, install a fan housing, and install a set of dampers for the Unit 8 ID fan.

174. As stated in the work order, the purpose of replacing the fan components on the Unit 8-1 ID fan was that the fan housing and dampers had deteriorated beyond repair and the fan wheel had not been replaced since 1967.

175.     The work order for replacing the fan components on Unit 8-1 estimated a total net cost of $209,200, including $140,000 in material and $35,000 in contract labor.

176.     The work to replace the Unit 8-1 ID fan housing, dampers, fan wheel, and shaft assembly was completed and returned to service on October 31, 1993.

177.     Attached as Exhibit 28 is a copy of Public Service Company of Indiana's Work Order Completion Notice for the work to replace the Unit 8-1 fan parts.

178.     Attached as Exhibit 29 is a copy of Public Service Indiana's Work Order Authorization for a project to replace the fan wheel and shaft assembly, install a fan housing, and install a set of dampers for the Unit 7-1 ID fan.

179.     As stated in the work order, the purpose of replacing the fan components on the Unit 7-1 ID fan was that the fan housing and dampers had deteriorated beyond repair and the fan wheel had not been replaced since 1967.

180.     The work order for replacing the fan components on Unit 8-1 estimated a total net cost of $209,200, including $140,000 in material and $35,000 in contract labor.

181.     The work to replace the Unit 7-1 ID fan housing, dampers, fan wheel, and shaft assembly was completed and returned to service on June 30, 1993.

182.     Attached as Exhibit 30 is a copy of Public Service Company of Indiana's Work Order Completion Notice for the work on the fan parts on Unit 7-1.

183.     The work that included replacing the fan components on the boiler 7-1 and boiler 8-1 ID fans was treated as a capital expenditure for budget and accounting purposes.  It was completed with outside contractors.

184.    The work that included replacing the fan components on the boiler 7-1 and boiler 8-1 ID fans required materials to be ordered and brought to the plant because onsite inventory of spare parts did not include all of the materials required to complete the project.

### Projects 8 and 9: Replacement of Burners and Combustion Controls

185.    Defendants replaced the combustion controls on boilers 7-1, 7-2 and 8-1 and the combustion controls and burners on boiler 6-1.

186.    The April 1989 Report suggested replacing controls on the Edwardsport Generating Station units.  The Report stated:

> Modernization of control and instrumentation systems should be included in power plant conversion plans because it would lead to improved performance, higher availability of major equipment through the use of modern monitoring systems, and reduction in maintenance because of extensive self-diagnostic capabilities of the new type of control systems.
>
> When control and instrumentation systems grow older, calibration drifts occur, hysteresis increases, and the systems lose sensitivity. As a result, the station operating personnel lose confidence in the control and monitoring capability of the controls and instrumentation.  Lack of believable or accurate data can be detrimental to the same operation of the unit and can cause unnecessary unit trips and less unit availability.
>
> During the last two decades, significant advances have been made in the type of hardware used for the control systems.  This quite often means that spare parts for systems purchased 10 to 15 years ago are not available because most manufacturers only maintain spare parts for one preceding generation.
>
> "Improved operability" sums up most of the benefits of modernization.  With increased reliability, improved safety, and less maintenance, it is obvious that the unit is more operable.
>
> …
>
> In conclusion, the existing control and instrumentation systems have reached the end of their useful life and should be replaced to achieve acceptable performance and provide proper protection for the safety of the controlled equipment.

187.    According to the April, 1989 Report, referring to the combustion control work: "All control equipment is considered capital."

188.    Attached as Exhibit 31 is a copy of a Cinergy Work Order Authorization designated as "Construction 37176" and "Retirement 67176" for the removal and replacement of the existing burners and controls and the installation of a new distributed control system on Unit 6-1 at the Edwardsport Generating Station.

189.    As noted in the work order, the replacement of the Unit 6-1 burners and combustion controls was approved in September, 1999, and was placed in service on June 1, 2000.

190.    The net cost to replace the Unit 6-1 burners and controls was approximately $400,000 and was treated as a capital expenditure for budget and accounting purposes.

191.    Replace of the combustion controls on boiler 6-1 was completed with more than $70,000 in contract labor.

192.    Replacement of the combustion controls on boiler 6-1required materials to be ordered and brought to the plant because onsite inventory of spare parts did not include all of the materials required to complete the project.

193.    Attached as Exhibits 32, 33, and 34 are work orders from Public Service Indiana for the project or projects to replace the combustion controls on Units 7-1, 7-2 and 8-1.  All three work orders were dated January 1, 1992.

194.    All three work orders were approved by the same four executives of Public Service Indiana on the same day.  The work orders estimated the cost to replace the combustion controls to be between $324,955 for Unit 7-1, $344,955 for Unit 7-2, and $372,104 for Unit 8-1. Each work order included over $70,000 in contract labor.

195.    Attached as Exhibits 35, 36, 37 are Public Service Indiana's Work Order

Completion Notices for the combustion control replacements on units 7-1, 7-2, and 8-1.

196.    As noted in the work order completion notices, the work was completed and

placed into service on the following dates: October 23, 1992 for Unit 7-1; December 4, 1992 for

Unit 7-2; and January 1, 1993 for Unit 8-1.

197.    Replace of the combustion controls on boilers 7-1, 7-2, and 8-1 was treated as a

capital expenditure for budget and accounting purposes.

198.    Replacement of the combustion controls on boilers 7-1, 7-2, and 8-1 was

completed with outside contractors.  The work on the combustion controls on boilers 7-1, 7-2

and 8-1 required materials to be ordered and brought to the plant because onsite inventory of

spare parts did not include all of the materials required to complete the work.

## CITIZEN SUIT ENFORCEMENT PROVISIONS

199.    Section 304(a)(3) of the Act, 42 U.S.C. § 7604(a)(3), provides that "any person

may commence a civil action on his own behalf… against any person who proposes to construct

or constructs any new or modified major emitting facility without a permit required under Part C

of subchapter I of this [the Clean Air Act] (relating to significant deterioration of air quality)…."

200.    Pursuant to Sections 113 and 304, 42 U.S.C. §§ 7413, 7604, the Court may award

civil penalties up to $25,000 per day of violation for violations occurring before January 30,

1997, up to $27,500 per day for each such violation occurring between January 30, 1997 and

March 15, 2004, and up to $32,500 for each such violation occurring after March 15, 2004,

injunctive relief, and Sierra Club's cost of bringing this action, including reasonable attorneys'

fees.

## FIRST CLAIM FOR RELIEF
(Commencing Construction of Major Modifications Without PSD Permits)

201.     Paragraphs 1 through 200 are realleged and incorporated herein by reference.

202.     At various times, Defendants commenced construction of one or more major modifications, including those described above, affecting the boilers and associated equipment at the Edwardsport Generating Station.  Each such major modification resulted in significant net emission increase, as defined by 40 C.F.R. §52.21(b)(3)(i), of one or more pollutants.

203.     Defendants continue to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a), and the PSD regulations set forth in 40 C.F.R. §52.21, by, *inter alia,* their continuing failure to obtain the required PSD permit for major modifications to the Edwardsport Generating Station.

204.     Based upon the foregoing, Defendants have violated and continue to violate Section 165(a) of the Act, 42 U.S.C. §7475(a), and 40 C.F.R. §52.21, as incorporated into the Indiana SIP.  Unless restrained by an order of this Court, these and similar violations of the PSD provisions of the Act will continue at the Edwardsport Generating Station.

## SECOND CLAIM FOR RELIEF
(Failure to Comply with Best Available Control Technology Limits)

205.     Paragraphs 1 through 204 are incorporated herein by reference.

206.     Each of the major modifications to each of the units at the Edwardsport Generating Station, including those described above, constitutes a major modification, which triggered emission limits known as "best available control technology" applicable to the boilers.

207.     Beginning with the first day that the first major modification was completed and returned to service, the Edwardsport Generating Station has emitted one or more pollutants at rates greater than the best available control technology limit for each such pollutant.

208.     Defendants are in continuing violation of the ongoing requirement to comply with best available control technology for each major modification, including those set forth above, as required by 40 C.F.R. § 52.21(j) and 326 IAC 2-2-3(3).

### THIRD CLAIM FOR RELIEF
**(Failure to Demonstrate that Emissions Do Not Cause Or Contribute to Air Pollution)**

209.      Paragraphs 1 through 204 are incorporated here by reference.

210.     Beginning with the first day that the first major modification was completed, Defendants have failed to demonstrate that the emissions from the Edwardsport Generating Station do not cause or contribute to a violation of either national ambient air quality standards, or applicable maximum allowable increases over the baseline concentration, as required by 40 C.F.R. § 52.21(k) and 326 IAC 2-2-5(a).

### FOURTH CLAIM FOR RELIEF
(Violations of Clean Air Act Title V Program)

211.     Paragraphs 1 through 204 are incorporated herein by reference.

212.     Defendants violated Title V of the Clean Air Act by failing to apply for and obtain a Title V permit or permit modification before undertaking the major modifications, set forth above, which occurred after the effective date of the Title V program.

213.     Defendants also violated Title V of the Clean Air Act by failing to apply for and obtain a revised Title V operating permit after each of the major modifications identified above.

214.     Defendants violated Title V of the Clean Air Act by failing to submit an application for a Title V permit that included a compliance plan identifying the violations set forth above and that proposed a schedule of compliance for each such violation and by failing to identify PSD as an applicable requirement for units 6-1, 7-1, 7-2 and 8-1 at the Edwardsport Generating Station.

215.    Defendants further violated Title V by providing certifications to the Indiana Department of Environmental Management stating that the Edwardsport Generating Station was in compliance with all applicable requirements, as required by Title V and each Title V permit issued for the Edwardsport Generating Station, when the facility was not, in fact, in compliance. 42 U.S.C. § 7661a.

FIFTH CLAIM FOR RELIEF
(Declaratory Relief)

216.    Paragraphs 1 through 215 are incorporated herein by reference.

217.    Pursuant to 28 U.S.C. §§ 2201, 2202, Sierra Club is entitled to a declaration that Defendants violated the Clean Air Act by commencing one or more major modifications of the Edwardsport Generating Station without a PSD permit, that the Edwardsport Generating Station is a modified source for purposes of the Clean Air Act PSD program, that the Edwardsport Generating Station is subject to best available control technology limits, and such further necessary or proper relief as may be granted by the Court.

**PRAYER FOR RELIEF**

WHEREFORE, based upon the foregoing, the Sierra Club requests that this Court:

1.  Permanently enjoin Defendants from operating the Edwardsport Generating Station, including the construction of future modifications, except in accordance with the Clean Air Act and any applicable regulatory requirements;

2.  Order the Defendants to apply for permits that are in conformity with the requirements of the PSD provisions of the Clean Air Act for each modification which Defendants commenced without first obtaining a PSD permit;

3. Order the Defendants to remedy their past violations by, *inter alia,* requiring the Defendants to install, as appropriate, the necessary pollution controls to meet best available control technology emission limits;

4. Order Defendants to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Clean Air Act alleged, above;

5. Order Defendants to conduct audits of their operations to determine if any additional modifications have occurred which would require them to meet the requirements of PSD and to report the results of these audits to Sierra Club and the United States Environmental Protection Agency;

6. Order Defendants to pay civil penalties, including a beneficial mitigation project pursuant to 42 U.S.C. § 7604(g)(2);

7. Order Defendants to pay Sierra Club's costs of this case, including reasonable attorneys fees;

8. Declare that the Defendants were required to obtain a PSD permit for major modifications to the Edwardsport Generating Station;

9. Declare that that the Edwardsport Generating Station is a modified source for purposes of the Clean Air Act PSD program;

10. Declare that the Edwardsport Generating Station is subject to best available control technology limits; and

11. Any other relief that the Court finds just and equitable.

Dated: July 10, 2009

MᴄGɪʟʟɪᴠʀᴀʏ Wᴇꜱᴛᴇʀʙᴇʀɢ & Bᴇɴᴅᴇʀ LLC

  /s/ David C. Bender

David C. Bender
Christa O. Westerberg
305 S. Paterson Street
Madison, WI 53703
Tel. 608.310.3560
Fax 608.310.3561
Email: bender@mwbattorneys.com
          westerberg@mwbattorneys.com


Robert Ukeiley
Admitted Pro Hac Vice
Law Office of Robert Ukeiley
435R Chestnut Street, Ste. 1
Berea, KY 40403
Tel: (859) 986-5402
Fax: (866) 618-1017
Email: rukeiley@igc.org

**Certificate of Service**

I hereby certify that on July 14, 2009, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Robert R. Clark rclark@taftlaw.com, docket@taftlaw.com, malexander@taftlaw.com

Julie L. Ezell julie.ezell@duke-energy.com

Scott R. Alexander salexander@taftlaw.com, docket@taftlaw.com

Jayna Morse Cacioppo jcacioppo@taftlaw.com, amichalic@taftlaw.com, docket@taftlaw.com


/s/ David C. Bender