THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA, )
 )
       Plaintiff, )
 )
   and )
 )
ENVIRONMENTAL DEFENSE, ET. AL., )
 )
       Plaintiff-Intervenors, )
 )
       v. )   Civil Action No. 1:00 CV 1262
 )
DUKE ENERGY CORPORATION )
 )
       Defendant. )
_____ )

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

```
Exhibit C
```

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...............................................................................................iii

INTRODUCTION – NATURE OF THE MATTER BEFORE THE COURT ...........................1

STATEMENT OF FACTS ........................................................................................ 2

QUESTIONS PRESENTED ........................................................................................15

ARGUMENT .............................................................................................................15

    I.      Standard of Review .......................................................................................15

    II.     Statutory and Regulatory Background ...........................................................16

          A.    Statutory Overview and Definition of "Modification" .........................16

          B.    The regulatory exemption for "routine maintenance, repair,
              and replacement" is narrow ................................................................17

    III.    Argument Concerning EPA's Interpretation ................................................18

          A.    The Court should defer to EPA's reasonable interpretation
              of its own regulation ...........................................................................18

          B.    EPA's interpretation of the exemption.................................................18

          C.    Duke and other utilities unsuccessfully challenged EPA's
              interpretation in the Seventh Circuit over a decade ............................19

               1.    Wisconsin Electric argued that "routine" means common
                    in the industry ........................................................................19

               2.    EPA rejected Wisconsin Electric's interpretation and
                    focused instead on whether an activity is routine within the
                    life of a generating unit. ........................................................19

               3.    In 1989 and 1990, the utility industry and Duke acknowledged
                    EPA's interpretation of the regulation. ..................................21

               4.    The Seventh Circuit upheld EPA's interpretation. ................22

          D.    EPA continues to follow the interpretation upheld in *WEPCO* .........22

    IV.    Argument Concerning the Defendant's Modifications ..................................23

          A.    Duke's modification of Buck 4 was not routine. ..................................23

               1.    Duke willfully disregarded EPA's test in evaluating

|   | | | the Buck 4 Unit ................................................................................24 |
|---|---|---|---|
|   |   | 2. | The Buck 4 PMP was not "routine" under the WEPCO factors ............26 |
|   | B. | | Duke had fair notice of EPA's interpretation .......................................27 |
|   |   | 1. | Fair notice only requires that a reasonable person know their conduct is at risk ........................................................................27 |
|   |   | 2. | A reasonable person would have known that the Buck 4 project was at risk of falling outside the exemption .............................................29 |
|   |   | 3. | Duke's failure to seek readily available regulatory guidance should preclude it from claiming a lack of fair notice ........................................30 |
|   |   | 4. | Duke's notice of EPA's interpretation of the routine maintenance exemption is confirmed by industry and Duke documents ...................30 |
|   |   | 5. | Nothing has changed EPA's interpretation set forth in WEPCO ...........32 |
| V. | | | Argument Concerning Emissions Increases ....................................................33 |
|   | A. | | The Applicable Emissions Tests ........................................................33 |
|   | B. | | Applicability of the Actual to Projected Actual Test .............................35 |
|   | C. | | Applicability of the Actual to Projected Actual Test to Buck Unit 4 .................36 |
|   | D. | | Duke consciously chose not to apply any defensible test for predicting changes in total emissions ...............................................................36 |
| VI. | | | Argument Concerning Statute of Limitations .................................................37 |
| VII. | | | Conclusion ...............................................................................40 |

preamble itself. Ex. 100 at 49-53. The passage means only that EPA will consider the routineness of an activity by looking at typical sources within the same industry. As stated in the TVA Order, "the language in the 1992 preamble merely explains that in determining whether an activity is 'routine,' the applicability of the exclusion must be assessed in the context of the particular industry in which the activity is planned. "Indeed, the frequency with which certain kinds of activities have been undertaken at another comparable plant can be instructive in determining whether, for example, an activity never before undertaken, or seldom undertaken, at a unit under review should be regarded as routine." *Id.* at 52.

V.     Argument Concerning Emissions Increases

        The second inquiry in determining whether a physical or operational change constitutes a "modification" triggering PSD is whether the change caused a net increase in annual emissions above significance levels. 40 C.F.R. §§ 51.166(b)(2)&(3); *id.* § 52.21(b)(2) & (3). The source must compare a two year average of its actual annual emissions before the project to its predicted future annual emissions after the project and compare the difference to the significance threshold for the pollutant in question. 40 C.F.R. § 51.166(b)(21)&(23); *id.* § 52.21(b)(21)&(23).

        For simplicity, the analysis presented here is limited to a single pollutant: $SO_2$. The threshold for a projected significant increase of $SO_2$ is only 40 tons per year ("TPY"). 40 C.F.R. § 51.166(b)(23)(i); *id.* § 52.21(b)(23)(i). There are only two emission tests under PSD, and the undisputed facts show that under the most favorable test to Duke, the increase in $SO_2$ emissions projected to result from the Buck 4 PMP work would far exceed 40 tons per year, triggering PSD. Duke knowingly refused to apply any test that might measure changes in total emissions, as required under NSR, and instead applied an inappropriate and self-serving test that was selected to yield the result Duke needed. The United States seeks partial summary judgment that PSD emissions analysis requires a projection and must consider future utilization and that the work done at Buck 4 caused a net emissions increase of $SO_2$ above the threshold. This ruling will help clarify emission calculation issues for trial.

        A.     The Applicable Emissions Tests

        There are only two emissions tests that arguably apply to a PSD analysis -- the "Actual to

33

Potential" test or the "Actual to Projected Actual" test.[11]  The rules clearly require a source to *predict* what its emissions will be after a modification to determine whether PSD is triggered.  This requirement is demonstrated by the plain language of the Clean Air Act and the regulations.  *See, e.g.,* 42 U.S.C. § 7475(a)(1)(construction cannot begin until "a permit has been issued"); 40 C.F.R. § 51.166(b)(2); *id.* § 52.21(b)(2)(significant net increase is an increase that "would result" from the change).  Consequently, Duke can not "wait and see" whether PSD is triggered, it must determine whether PSD is applicable *before* the modification.[12]

Since PSD requires a prediction, there are only two ways Duke can evaluate emissions increases for PSD applicability: Duke must either evaluate what *could* happen because of the modification (the "Actual to Potential" test), or what *would* happen because of the modification (the "Actual to Projected Actual" test).  The Actual to Potential test applies to new or modified units that have not "begun normal operations" following construction.  Because such sources have no operating history in its changed state,

---

[11] *See* 63 Fed. Reg. 39857, 39859 ("[t]he NSR regulations contain only two applicability tests for modified units" which are the "actual-to-future-actual approach" and the "actual-to-potential methodology").

[12] *See United States v. Southern Indiana Gas and Electr. Co.,* 2002 WL 1629817, *3 (S.D. Ind. July 18, 2002) (Ex. 105 hereto) ( PSD applicability "must be determined by reviewing evidence of the projected post-project emissions increases, and not by reviewing evidence of the actual post-project emissions data").  In reaching this conclusion, the court found that "any other construction of the Act and its regulations would 'turn the preconstruction permitting program on its head and would allow sources to construct without a permit while they wait and see if it would be proven that emissions would increase.'" *Id.* (emphasis in original)(quoting *In re Tenn. Valley Auth.,* CAA Docket No. 00-06).  The closest thing to a "wait and see" scenario under PSD is the WEPCo Rule's "backstop" provision that requires a utility to submit at least five years of data following a change to confirm a projection that actual emissions would not increase above pre-change levels. 40 C.F.R. § 51.166(b)(21)(v) & (b)(33); 52.21(b)(21)(v) & (b)(33).  This data submission provision is the final safeguard, or "backstop," against deliberate underestimation of or failure to estimate emissions.  WEPCo Rule Preamble; 57 Fed. Reg. 32325 (July 21, 1992).  Duke's actual "backstop" emissions vastly exceeded *any* measure of pre-change emissions. *See* Ex. 110 (showing Duke used Buck 4 extensively more following the work than before PMP and than predicted by the company).  If Duke had submitted the data, Duke "would become subject to NSR requirements at that time." 57 Fed. Reg. 32325.  Duke avoided this consequence by intentionally not submitting the data. Ex. 107 at 134.

post-change emissions are presumed to equal the unit's "potential to emit,"[13] *i.e.*, its maximum annual

capacity to emit air pollution running full-time, unless limited by such practical restraints as de-rating a

unit or limiting hours of operation in the permit. Under the Actual to Projected Actual test, the source

compares its actual pre-change emissions to its *projected* future emissions. The NSR rules specify that

the pre-change actual emissions are generally calculated based on an annual average of total emissions of

the two year period preceding the change. 45 Fed. Reg. 52676, 52705, 52718 (1980).

Here, the United States contends that the Actual to Potential test applies to Duke's Buck 4

project.[14] For purposes of this Motion, however, the United States presents the test most favorable to

Duke – the Actual to Projected Actual test.

    B.    Applicability of the Actual to Projected Actual Test

In 1990, the *WEPCo* court directed EPA to apply the Actual to Projected Actual test on remand

to evaluate WEPCo's like-kind replacement because the unit had "begun normal operations." WEPCo,

893 F.2d 901, 916-18 (7th Cir. 1990). Specifically, the court instructed EPA to recalculate post-change

emissions by considering past operating conditions. On remand, the EPA evaluated the projects by

examining the company's predictions of increased capacity factors (*i.e.*, utilization) due to the

modifications. Ex. 106. Relying solely on projected emissions increases attributable to this increased

---

[13] *See, e.g.*, 40 C.F.R. §§ 51.166(b)(4); 51.166(21)(iv); 52.21(b)(21)(iv); 52.21(b)(4); *see also* 57 Fed. Reg. 32,314, 32317 (July 21, 1992).

[14] The United States contends that the more stringent Actual to Potential test is applicable to Duke for several reasons. The WEPCo Rule does not apply because the North Carolina SIP did not adopt the WEPCo Rule until October 4, 1995. 60 FR 51923. EPA enforces the SIP's rule until the SIP is revised. *General Motors Corp. v. United States*, 496 U.S. 530, 540, 110 S.Ct. 2528, 2533, 110 L.Ed.2d 480 (1990). Therefore, the Actual to Projected Actual test is available for Buck 4 only if the unit has "begun normal operations." The United States contends that Buck 4 had not begun normal operations because of the extensive scope of the PMP and the fact that the unit was shut down for such an extended period. Therefore, the Actual to Potential test applies. Moreover, as described in detail below, the regulations under the WEPCo Rule require, as prerequisite to using the Actual to Projected Actual test, that for at least 5 years following the change, the utility submit emissions data confirming that actual emissions did not increase above pre-change levels. Duke did not supply the data; instead, it "opted out" of the WEPCo calculus. Ex. 107 at 134. Although Duke claims entitlement to many of the benefits of the 1992 Rule, Duke did not satisfy a basic regulatory prerequisite provided in that Rule for the use of the Actual to Projected Actual test. Ex. 108 at 153-159; Ex. 4, Response nos. 1609, 1610, & 1611.

of construction, it would be cost-effective in many instances for sources like Duke to avoid the permit obligation altogether and, if caught, litigate the claim endlessly with little incentive to settle and no downside risk of an increasing fine – in direct contravention of the statutory command to recover the economic benefit of noncompliance. *See* 42 U.S.C. § 7413(e). Duke's perverse interpretation is not found in the CAA. Because PSD permits impose continuing obligations relating to operation, the claims for penalties for days of violation up to five years prior to the filing of the Complaint are not time-barred.

Injunctive Relief. By its plain terms, 28 U.S.C. § 2462 has no application to injunctive relief. It pertains only to actions for "any civil fine, penalty, or forfeiture, pecuniary or otherwise." Id.; *see also United States v. Am. Electr. Power Serv. Corp.*, 136 F. Supp.2d 808, (S.D. Ohio 2001) ("That Section does not mention injunction or equitable relief of any kind"). The CAA specifically allows both "a civil penalty" and a separate "permanent or temporary injunction." 42 U.S.C. §§ 7413(b) & 7477. The courts have therefore held that Section 2462 does not bar injunctive relief as a matter of law. *See United States v. Telluride Co.*, 146 F.3d 1241 (10th Cir. 1998); *United States v. Banks*, 115 F.3d 916 (11th Cir. 1997); *United States v. Hallmark Constr. Co.*, 14 F. Supp. 2d 1069, 1077 (N.D. Ill. 1998). Tellingly, even the courts that Duke relied upon for its penalty argument have each rejected any limitations bar to injunctive relief. *United States v. Campbell Soup Co.*, 1997 WL 258894 at * 2 (E.D. Cal. Mar. 11, 1997) (Ex. 117 hereto); *United States v. Westvaco Corp.*, 144 F. Supp.2d 439, 443 n. 2 (D. Md. 2001); *United States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054, 1087 (W.D. Wisc. 2001). Judgment is appropriate as a matter of law.

VII.    Conclusion

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment should be granted.

Dated:   January 31, 2003

Respectfully submitted,

FOR THE UNITED STATES

THOMAS L. SANSONETTI
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

40

Daniel C. Beckhard
Jason A. Dunn
Deborah Behles
Katherine E. Konschnik
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 616-7921


ANNA MILLS WAGONER
United States Attorney
Gill P. Beck
Assistant U.S. Attorney
NCSB #13175
P. O. Box 1858
Greensboro, NC 27402
(336) 333-5351


OF COUNSEL

ALAN DION
Assistant Regional Counsel
U.S. Environmental Protection Agency
U.S. EPA, Region 4
61 Forsyth Street, S.W.
Atlanta, GA 30303