IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

and

STATE OF NEW YORK, STATE OF CONNECTICUT, STATE OF NEW JERSEY, HOOSIER ENVIRONMENTAL COUNCIL, AND OHIO ENVIRONMENTAL COUNCIL,

Plaintiff-Intervenor Appellees,

v.

CINERGY CORPORATION, PSI ENERGY, INC., CINCINNATI GAS & ELECTRIC CO., AND CINERGY SERVICES, INC.,

Defendants-Appellants.

Appeal from the United States District Court for the Southern District of Indiana
No. 1:99-CV-01693, Hon. Larry J. McKinney, Presiding

## APPELLANTS' BRIEF AND REQUIRED SHORT APPENDIX

Marc E. Manly
  Executive Vice President and
  Chief Legal Officer
Catherine S. Stempien
  Associate General Counsel
Julie L. Ezell
  Senior Counsel
Cinergy Services Corp.
139 East Fourth Street, AT II
Cincinnati, Ohio 45201
(513) 287-3019

Constantine L. Trela, Jr.
Chad W. Pekron
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Thomas C. Green
Mark D. Hopson (*Counsel of Record*)
Kathryn B. Thomson
Stephen M. Nickelsburg
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000

Attorneys for Appellants

Exhibit E

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No. ___ 06-1224 ___

Short Caption: __ United States et al. v. Cinergy Corp. et al. __

  To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

  The Court prefers that the disclosure statement be filed immediately following docketing; but the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Cinergy Corp.; PSI Energy, Inc.; Cinergy Services, Inc.; The Cincinnati Gas & Electric Company

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court.

    Sidley Austin LLP (formerly Sidley Austin Brown & Wood LLP); Porter, Wright, Morris & Arthur, LLP;, Sommer Barnard Attorneys, PC; Hogan & Hartson, LLP; Plews, Shadley, Racher & Braun

(3)   If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

    Cinergy Corp. is the parent corporation of PSI Energy, Inc., Cinergy Services, Inc., and The Cincinnati Gas & Electric Company

   ii)   list any publicly held company that owns 10% or more of the party's or amicus' stock:

    Cinergy Corp. owns 10% or more of the stock of PSI Energy, Inc., Cinergy Services, Inc., and The Cincinnati Gas & Electric Company

Attorney's Signature: _____   Date: _____ March 29, 2006 _____

Attorney's Printed Named: __ Constantine L. Trela, Jr. __

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ___ No. _X_

Address: Sidley Austin LLP
     One South Dearborn Street
     Chicago, IL 60603

Phone Number: (312) 853-7000     Fax Number: (312) 853-7036
E-Mail Address: _____ ctrela@sidley.com

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

JURISDICTIONAL STATEMENT ......................................................... 1

ISSUE PRESENTED FOR REVIEW ....................................................... 1

STATEMENT OF THE CASE.............................................................. 2

    I.      Introduction. ................................................................. 2

    II.     This Litigation.................................................................. 4

STATEMENT OF FACTS ................................................................ 6

    I.      Cinergy's Generating System. ......................................... 6

    II.     The Clean Air Act's NSPS and NSR Programs........................ 8

        A.    The 1970 Amendments Established the CAA's Basic Framework. ........... 9

            1.    Existing Sources Receive Permits to Operate 24 Hours Per Day, 365 Days Per Year, Subject to Emissions Limitations........... 9

            2.    New Sources and "Modified" Sources Must Satisfy NSPS............ 9

        B.    EPA Promulgated the First NSR Program in 1974.................................. 11

        C.    Congress Codified the NSR Programs in the 1977 Amendments. ........... 11

        D.    EPA Promulgated the Applicable NSR Rules in 1980. ........................... 13

        E.    In *WEPCo*, This Court Rejected EPA's Application of the 1980 Rules to a Power Plant Renovation............................................................ 15

        F.    EPA Ignored the *WEPCo* Remand Instruction. ........................................ 16

        G.    EPA Re-Interpreted NSR in Its 1999 "Enforcement Initiative." .............. 18

        H.    In October 2005, EPA Abandoned Its Enforcement Position.................... 19

SUMMARY OF ARGUMENT ............................................................ 21

ARGUMENT ........................................................................................................ 22

I.    Standard of Review ................................................................................. 22

II.   Congress's Clear Intention Was to Apply New Source Review Only to
      Existing Sources that Become New Sources by Increasing Their Actual
      Emissions Capacity ................................................................................. 22

      A.    The Plain Text of the 1977 Amendments Requires the Scope of a
            "Modification" Under NSR To Be Congruent with a
            "Modification" Under NSPS ...................................................... 22

      B.    Congress Intended the Specific NSPS "Emissions Increase" Test to
            Apply to "Modifications" under NSR ....................................... 26

      C.    The Statutory Language and Legislative History Give No
            Indication That Congress Contemplated or Authorized EPA's
            Revolutionary Interpretation of "Modification." ....................... 28

III.  The NSR Rules Effectuate Congress's Intent to Reach Only New
      Emissions. ............................................................................................. 31

      A.    The 1980 Rules Require Evaluation of Emissions Under Constant,
            Representative Operating Hours to Identify Changes in Hourly
            Emissions Rates. ...................................................................... 32

            1.    The 1980 Rules Incorporate the NSPS Hourly Emissions
                  Rate Test. ...................................................................... 32

            2.    The 1980 Rules' Use of "Tons Per Year" for
                  "Significance" and "Netting" Purposes Does Not Alter the
                  Fundamental Requirements of the Statute or EPA's Rules. ......... 34

      B.    EPA's Contemporaneous Interpretations of the 1980 Rules
            Confirm that an "Emissions Increase" Occurs Only if an Hourly
            Rate Increase Occurs ................................................................ 35

IV.   EPA's Litigating Position Does Not Deserve Deference. ...................... 37

CONCLUSION .................................................................................................. 45

# TABLE OF AUTHORITIES

## CASES

*Alabama Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1980) .......................................................11

*Atchison, Topeka & Santa Fe Ry. Co. v. Pena*, 44 F.3d 437 (7th Cir. 1994) .................................37

*Bethlehem Steel Corp. v. EPA*, 723 F.2d 1303 (7th Cir. 1983) ....................................................30

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ..............................................................39

*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945) ........................................................38

*Bragdon v. Abbott*, 524 U.S. 624 (1998) ......................................................................................26

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984).......................................................................................19, 22, 38, 43

*Chisom v. Roemer*, 501 U.S. 380 (1991) ................................................................................29, 30

*Cleveland Elec. Illuminating Co. v. EPA*, 572 F.2d 1150 (6th Cir. 1978).......................................9

*Contract Courier Servs., Inc. v. Research & Special Programs Admin.*,
    924 F.2d 112 (7th Cir. 1991) ...............................................................................................44

*Davis v. United States*, 495 U.S. 472 (1990) ................................................................................37

*Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999)................................30

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) .............................................29

*Gonzales v. Oregon*, 126 S. Ct. 904 (2006)..................................................................................39

*Harrison v. PPG Indus., Inc.*, 446 U.S. 578 (1980).......................................................................36

*Homemakers N. Shore, Inc. v. Bowen*, 832 F.2d 408 (7th Cir. 1987)...........................................38

*Hotel Equities Corp. v. Comm'r*, 546 F.2d 725 (7th Cir. 1978) ....................................................23

*IBP, Inc. v. Alvarez*, 126 S. Ct. 514 (2005)...................................................................................23

*In re Merchants Grain, Inc.*, 93 F.3d 1347 (7th Cir. 1996)...........................................................24

*Mosely v. Board of Educ. of Chicago*, 434 F.3d 527 (7th Cir. 2006) ...........................................22

*New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005) .............................................................................27

*New York v. EPA*, 2006 WL 662746 (D.C. Cir. Mar. 17, 2006).....................................27

*Northern Ind. Pub. Serv. Co. v. Colorado Westmoreland, Inc.*,
    667 F. Supp. 613 (N.D. Ind. 1987) .............................................................7

*PPG Indus. Inc. v. Harrison*, 587 F.2d 237 (5th Cir. 1979) .........................................36

*Paragon Health Network, Inc. v. Thompson*, 251 F.3d 1141 (7th Cir. 2001) ...............37

*Rodriguez v. United States*, 480 U.S. 522 (1987) .........................................................44

*Rowan Cos. v. United States*, 452 U.S. 247 (1981) ................................................24, 39

*Skelton v. General Motors Corp.*, 660 F.2d 311 (7th Cir. 1991)...................................24

*Sullivan v. Stroop*, 496 U.S. 478 (1990) ...............................................................23, 24

*In re TVA*, 9 E.A.B. 357 (EAB Sept. 15, 2000) ...........................................................41

*TVA v. Whitman*, 336 F.3d 1236 (11th Cir. 2003) .......................................................19

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994)............................................37

*Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) .........................26

*United States v. Alabama Power Co.*, 372 F. Supp. 2d 1283 (N.D. Ala. 2005) .................... *passim*

*United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619 (M.D.N.C. 2003)....................... *passim*

*United States v. Duke Energy Corp.*, 411 F.3d 539 (4th Cir. 2005)...................................... *passim*

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ................................................38, 39

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829 (S.D. Ohio 2003) ...................19

*U.S. Freightways Corp. v. Comm'r*, 270 F.3d 1137 (7th Cir. 2001) .......................38, 39

*Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001) .......................................29

*Wisconsin Bell, Inc. v. Bie*, 340 F.3d 441 (7th Cir. 2003) ...........................................44

*Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990)...................................... *passim*

**STATUTES**

28 U.S.C. § 1292(b) .................................................................................................1

28 U.S.C. § 1331 ......................................................................................................1

28 U.S.C. § 1345 ......................................................................................................1

42 U.S.C. § 7401 ......................................................................................................1

42 U.S.C. § 7401(b) .................................................................................................9

42 U.S.C. § 7409 ......................................................................................................9

42 U.S.C. § 7411 ....................................................................................................12

42 U.S.C. § 7411(a) .....................................................................................12, 19, 23

42 U.S.C. § 7411(a)(2) ...........................................................................................10

42 U.S.C. § 7411(a)(4) .......................................................................3, 5, 10, 12, 23, 24

42 U.S.C. § 7411(b) .................................................................................................9

42 U.S.C. § 7413 ......................................................................................................1

42 U.S.C. § 7470 ....................................................................................................11

42 U.S.C. § 7475(a) ..........................................................................................23, 32

42 U.S.C. § 7475(a)(4) ...........................................................................................11

42 U.S.C. § 7477 ......................................................................................................1

42 U.S.C. § 7479(1) ...............................................................................................14

42 U.S.C. § 7479(2)(C) .................................................................................3, 12, 23

42 U.S.C. § 7501 ....................................................................................................11

42 U.S.C. § 7501(4) .......................................................................................3, 12, 23

42 U.S.C. § 7503(a)(2) ...........................................................................................11

42 U.S.C. § 7661 ......................................................................................................9

Ind. Code § 8-1-2-4 (2005) ..................................................................6

Ohio Admin. Code § 4901:1-10-02 (2005) ...........................................6

**REGULATIONS**

40 C.F.R. § 51.100 ...................................................................13, 32

40 C.F.R. § 51.165 ...........................................................................13

40 C.F.R. § 51.166 ...........................................................................13

40 C.F.R. § 51.166(b)(21)(iv) ..........................................................16

40 C.F.R. § 51.24 .............................................................................13

40 C.F.R. § 52.01 .............................................................................13

40 C.F.R. § 52.01(d) ...................................................................13, 32

40 C.F.R. § 52.01(d)(2)(ii) ...............................................................13

40 C.F.R. § 52.21 .............................................................................13

40 C.F.R. § 52.21(b)(2) ....................................................................14

40 C.F.R. § 52.21(b)(2)(i) ..........................................................14, 33

40 C.F.R. § 52.21(b)(2)(ii) ...............................................................33

40 C.F.R. § 52.21(b)(2)(iii) ..............................................................33

40 C.F.R. § 52.21(b)(2)(iii)(f) ..........................................................14

40 C.F.R. § 52.21(b)(3) ....................................................................14

40 C.F.R. § 52.21(b)(3)(i)(a) ............................................................33

40 C.F.R. § 52.21(b)(8) ...............................................................13, 32

40 C.F.R. § 52.21(b)(21)(ii) .........................................14, 16, 33, 35

40 C.F.R. § 52.21(b)(21)(v) ..............................................................17

40 C.F.R. § 52.21(i)(1) ................................................................14, 32

40 C.F.R. § 52.21(i)(2)............................................................14, 32

40 C.F.R. § 60.14.............................................................10, 27

40 C.F.R. § 60.2..................................................................10

40 C.F.R. § 60.2(h)................................................................27

**ADDITIONAL AUTHORITIES**

123 Cong. Rec. 18,021 (June 8, 1977)..........................3, 8, 30

123 Cong. Rec. 26,841 (Aug. 4, 1977)...............................12

123 Cong. Rec. 36,250 (Nov. 1, 1977)...............................29

H.R. Rep. No. 95-294 (1977)....................................29, 31

H.R. Rep. No. 95-564 (1977)..........................................30

S. Rep. No. 91-1196 (1970)...........................................10

S. Rep. No. 95-127 (1977)............................................30

39 Fed. Reg. 36,946 (Oct. 15, 1974) ...........................25, 27

39 Fed. Reg. 42,510 (Dec. 5, 1974)...................11, 13, 26, 27

43 Fed. Reg. 26,388 (June 19, 1978)..................................28

45 Fed. Reg. 52,676 (Aug. 7, 1980)........................13, 34, 35

49 Fed. Reg. 43,211 (Oct. 26, 1984).............................28, 40

57 Fed. Reg. 32,314 (July 21, 1992)............................17, 28

61 Fed. Reg. 38,250 (July 17, 1996)...................................17

63 Fed. Reg. 39,857 (July 24, 1998)...................................17

67 Fed. Reg. 80,186 (Dec. 31, 2002)..................................27

70 Fed. Reg. 61,081 (Oct. 20, 2005)................................ *passim*

## JURISDICTIONAL STATEMENT

The district court has jurisdiction under 28 U.S.C. § 1331 (federal question) and § 1345 (United States as plaintiff) because plaintiff-appellees brought claims under 42 U.S.C. §§ 7413 and 7477 alleging violations of the Clean Air Act, 42 U.S.C. § 7401 *et seq.*

This Court has jurisdiction over this appeal under 28 U.S.C. § 1292(b). On September 8, 2005, the district court entered an order regarding the standard for determining whether an emissions increase will occur under the New Source Review provisions of the Act. *See* RSA01.[1] On October 4, 2005, the court certified its order for review. *See* RSA15. On October 18, 2005, Cinergy[2] timely filed a petition for permission to appeal, which this Court granted on January 3, 2006. *See* RSA19.

## ISSUE PRESENTED FOR REVIEW

Whether, under the New Source Review provisions of the Clean Air Act and its implementing regulations, a physical change is a "modification" only if the change causes an increase in a facility's actual emissions capacity, as under the New Source Performance Standards provisions of the same Act.

---

[1] This Brief will cite the Required Short Appendix as "RSA__" and the Supplemental Appendix as "APP__." For the convenience of the Court, the Supplemental Appendix includes excerpts from the record below, as well as copies of the principal statutes, regulations, and legislative materials cited in this Brief.

[2] This Brief will use "Cinergy" to mean appellants Cinergy Corporation, Cinergy Services, Inc., PSI Energy, Inc., and Cincinnati Gas & Electric Co.

## I.    Introduction.

This case is one of the last remnants of the so-called "utility enforcement initiative,"

which the Environmental Protection Agency ("EPA") launched in 1999. The utility enforcement

initiative was an "unprecedented" attempt to extend the New Source Review ("NSR")

requirements of the Clean Air Act ("CAA") to commonplace maintenance, repair, and

replacement projects conducted at existing coal-fired electric power plants for the purpose of

maintaining those plants' existing operating capabilities. APP210 (DOJ Press Release). The

positions EPA adopted in pursuit of its enforcement initiative were truly "unprecedented." EPA

did not interpret the NSR requirements to apply to such projects in the two decades before it

launched the enforcement initiative. And EPA does not interpret those requirements to apply to

such projects today. This case is a regulatory anomaly, based on short-lived, made-for-litigation

legal theories that conflict with plain statutory language, thwart clear congressional intent, and

contradict EPA's original *and* current interpretations of the Act.

The NSR provisions require proposed "new sources" of air emissions to obtain

preconstruction permits and install state-of-the-art pollution controls, a massive undertaking

which EPA acknowledges "is very costly and can present significant technical challenges."

70 Fed. Reg. 61,081, 61,093 (Oct. 20, 2005). EPA's attempt to apply NSR to the maintenance

projects at issue in this case thus has profound ramifications. If these projects triggered NSR,

then Cinergy was required to obtain a preconstruction permit before starting each project and to

retrofit each power plant with state-of-the-art controls during the maintenance work. Indeed,

because many of the cited projects occurred at the same generating units, under EPA's theory

each of those units would have had to undergo multiple rounds of NSR permitting. Because the

permit approval process can take years and cost hundreds of thousands of dollars to complete, this would be unworkable for ordinary and necessary maintenance at existing facilities.

Congress never intended NSR to apply in this manner. To the contrary, to ensure that the NSR requirements apply only when it makes economic and practical sense to do so, Congress applied NSR as a general matter "to new major emitting facilities and . . . not . . . existing facilities." 123 Cong. Rec. 18,021 (June 8, 1977) (Sen. Muskie) (APP175). To that end, NSR applies only to "construction" of a "major emitting facility" — which includes existing facilities only when they undergo a "modification." *See* 42 U.S.C. §§ 7479(2)(C), 7501(4). A "modification" occurs only when a "physical change" to a facility will cause an emissions increase. *Id*. § 7411(a)(4). And a project causes an "emissions increase" only if it increases a facility's actual capacity to emit pollutants, in effect creating a new emissions source. *See, e.g., Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901, 918 n.14 (7th Cir. 1990) ("*WEPCo*").

EPA adopted an entirely different approach in its 1999 enforcement initiative, arguing that commonplace maintenance and repair projects cause NSR emissions increases even without increasing a facility's actual emissions capacity, because they allow a facility to avoid breakdowns and thus to operate more hours in the future. This position is contrary to the "new source" provisions of the statute and Congress's intent. It is also contrary to EPA's original and current interpretations of the CAA and EPA's regulations. Indeed, after six years of litigation, EPA admitted in October 2005 in a notice-and-comment rulemaking that its enforcement position "leads to outcomes that have not advanced the central policy of the . . . NSR program." *See* 70 Fed. Reg. at 61,088. In that rulemaking, EPA abandoned its enforcement position and proposed a uniform national rule adopting Cinergy's position in this case. *Id*. at 61,081. Even before that rulemaking, EPA had effectively terminated the 1999 enforcement initiative, stating

that it would bring no new enforcement cases under its pre-2003 rules. *See United States v. Alabama Power Co.*, 372 F. Supp. 2d 1283, 1306 n.44 (N.D. Ala. 2005). Consistent with these decisions, the United States has urged the Supreme Court not to review a Fourth Circuit decision rejecting the very position that EPA advances here. *See Environmental Defense v. Duke Energy Corp.*, No. 05-848 (U.S. Opp'n to Petition for Writ of Certiorari) (filed March 2006) ("Cert. Opp.") (APP213); *see also United States v. Duke Energy Corp.*, 411 F.3d 539 (4th Cir. 2005) ("*Duke Energy II*").

As a result, EPA's position in this case is not only at odds with plain statutory language and clear congressional intent, it also conflicts with the Agency's prospective rule for the Nation and with the rule that applies in the Fourth Circuit today. Nevertheless, EPA continues to advocate its otherwise abandoned litigating position here. There is no reason in law or policy for this Court to retreat from *WEPCo*, create a conflict with the Fourth Circuit, and carve out for the Seventh Circuit an odd geographic and temporal exception to what should be a uniform nationwide rule. This Court should reject EPA's effort to apply its discredited litigating position to the ordinary maintenance projects at issue in this case.

## II.     This Litigation.

EPA filed its complaint in November 1999, as part of its initial salvo of "unprecedented" utility enforcement lawsuits. EPA contended that 55 projects at six of Cinergy's existing midwestern power plants between 1984 and 2001 violated NSR. Each of these projects involved the maintenance, repair, or like-kind replacement of equipment. None of these projects expanded a unit's capacity or altered a unit's design. Each simply allowed Cinergy to continue to run its existing facilities as they were designed and licensed to run. Thus, at the time these projects occurred, no one at Cinergy believed that they triggered NSR. Nor, evidently, did the

4

various federal, state, and local officials who oversaw and inspected Cinergy's facilities.[3]
Nonetheless, EPA is attempting to impose hundreds of millions of dollars of equipment
retrofitting obligations and penalties, based on Cinergy's completion of these projects as long as
20 years ago.

The question in this appeal is whether the CAA and EPA's regulations permit EPA's
litigation-tailored interpretation of the "emissions increase" standard, which is a core component
of the statutory and regulatory definition of "modification." *See* 42 U.S.C. § 7411(a)(4)
(defining "modification" as a "physical change" that causes an emissions increase). EPA first
raised the "emissions increase" issue in this case by moving for partial summary judgment. U.S.
Mot. S.J. (Docket #295). EPA contended that it has the discretion to adopt an emissions increase
test for NSR based on projected changes in a unit's hours of operation, even without a change in
the facility's actual emissions capacity as measured by the facility's hourly emissions rate. *Id.* at
2. Cinergy filed a cross-motion for partial summary judgment, contending that the statute and
regulations provide that a project causes an emissions increase *only* if emissions are greater
"under present hours and conditions," *WEPCo*, 893 F.2d at 918 n.14 — meaning that an
emissions increase occurs only if a project causes an increase in a unit's hourly rate of
emissions — because only then will the unit's emissions capacity increase. Cinergy Mot. S.J. at
2-3 (Docket #397).

---

[3] The utility industry operates under the continuous oversight of EPA, state environmental
agencies, and state utility commissions. Indeed, EPA and state officials inspected Cinergy's
plants during some of the projects that EPA now contends required preconstruction permits,
without raising any issue regarding NSR. *See* APP226 (1988 EPA inspection report describing a
"life extension" project that EPA now claims violated NSR); APP229 (1984 state inspection
report identifying economizer tube replacements that EPA cited in its original complaint).

In an order issued on August 28 and corrected on September 8, 2005, the district court granted plaintiffs' motions and denied Cinergy's cross-motion. *See* RSA01. The district court summarily rejected Cinergy's position, distinguished this Court's *WEPCo* decision, and held that EPA had the authority to adopt its present litigating position — notwithstanding contrary official Agency interpretations issued when the NSR statute and regulations were first promulgated. *See* RSA08-12. The court held that Congress's express incorporation of the "modification" definition from the CAA's New Source Performance Standards ("NSPS") provisions into the Act's NSR provisions "did not limit the EPA's authority to further define 'modification' in the regulations as it deemed fit," rejected the Agency's original interpretations (which were consistent with the NSPS definition) as "contrary to" the Act, and adopted EPA's new, litigation-based test for NSR emissions increases. *Id.*

On Cinergy's timely motion and petition, the district court certified its order for interlocutory review, and this Court granted permission to appeal. This appeal followed.

## STATEMENT OF FACTS

## I.    Cinergy's Generating System.

Cinergy is a public utility company providing electricity to millions of homes and businesses in Indiana, Ohio, and Kentucky. Cinergy has a legal obligation to generate an adequate and reliable supply of electricity to meet the needs of the public. *See, e.g.,* Ind. Code § 8-1-2-4 (2005); Ohio Admin. Code § 4901:1-10-02 (2005). Electricity cannot be stored, and Cinergy therefore must operate a well-maintained system of generating "units" to meet the public's ever-increasing demand for electricity, especially during peak demand periods.

Cinergy's power plants are each made up of multiple generating units, and each unit has an air emissions permit that allows it to operate at its full design capacity 24 hours per day, 365 days per year, subject to certain emissions limitations. *See, e.g.,* http://www.epa.gov/region5/

air/permits/epermits.htm (EPA permit database). Of course, many factors determine whether a particular unit runs at any given moment. Each Cinergy unit is part of the integrated electricity grid, and changes in the cost of fuel, each unit's cost of operation, congestion on the grid, and the demand for electricity (which, in turn, depends on time of day, weather, and economic factors) determine when and for how long a given unit is run. *See Northern Ind. Pub. Serv. Co. v. Colorado Westmoreland, Inc.*, 667 F. Supp. 613, 616-19 (N.D. Ind. 1987) (Easterbrook, J., by designation) (describing an electric generating system).

Notwithstanding these unpredictable fluctuations, Cinergy's units must be ready to run whenever they are called upon — particularly during peak periods, such as the hottest summer weekdays. Thus, Cinergy must constantly maintain and repair its units to keep them available. A generating unit consists of tens of thousands of separate components, including economizers (where water is initially heated), superheaters (where the steam temperature is elevated before the steam is sent to a turbine), and reheaters (where the steam from the turbine is reheated). *See, e.g., United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 623 (M.D.N.C. 2003) ("*Duke Energy I*") (describing a coal-fired electric generating unit). These components are under extreme stress from their harsh operating environment of thousand-degree temperatures, corrosive gases, high-velocity particles, and tremendous pressures. Not surprisingly, Cinergy and other utilities must repair and replace thousands of small and large components every year to ensure the ongoing reliability of their generating units.

Even as Cinergy has worked to meet these legal and practical requirements, its total emissions have decreased dramatically. Between 1990 and 2000, Cinergy spent more than $650 million to reduce emissions, largely pursuant to CAA programs that — unlike NSR — apply generally to existing emissions units. *See, e.g.,* 70 Fed. Reg. at 61,083-88 (describing these

programs). In that period, Cinergy reduced by 25% and 47% respectively its emissions of sulfur dioxide and nitrogen oxides, two major pollutants regulated under the CAA. *See* APP241-247. Total particulate emissions also have decreased substantially. *Id.* Notably, Cinergy achieved these reductions during a decade of steadily increasing consumer demand for electricity — indeed, Cinergy increased its annual coal consumption during this period by 42%. *See id.* Cinergy's emissions reduction efforts continue today. *Id. See also, e.g.,* http://www.in.gov/iurc/ portal/Modules/Ecms/Cases/Docketed_Cases/ViewDocument.aspx?DocID=0900b631800a3a49 (rate commission filing identifying PSI Energy plans for compliance with Clean Air Interstate and Clean Air Mercury Rules).

In the enforcement initiative, EPA ignored these basic realities of the electric power industry. If EPA's litigating position is correct, then the entire industry has been violating NSR for years as a result of utilities' continuous efforts to maintain their units within their existing operating capacities. Indeed, EPA's enforcement initiative originally targeted more than 500 maintenance projects at 60 power plants. The notion that utility companies should have applied for and obtained NSR permits for more than 500 maintenance projects at existing plants when Congress as a general matter intended NSR "not [to] affect existing facilities" defies logic. 123 Cong. Rec. 18,021 (APP175). The interpretation EPA advances in this case is wrong.

## II. The Clean Air Act's NSPS and NSR Programs.

The statute and regulations governing this case were enacted over 25 years ago. During the intervening years (and before the enforcement initiative), EPA only once determined that an equipment replacement project at an existing power plant triggered NSR — and this Court vacated that determination in *WEPCo*. To understand the parties' positions in this case requires a brief overview of the statutory and regulatory provisions at issue.

8

## A. The 1970 Amendments Established the CAA's Basic Framework.

### 1. Existing Sources Receive Permits to Operate 24 Hours Per Day, 365 Days Per Year, Subject to Emissions Limitations.

The CAA Amendments of 1970 established the basic framework of federal air pollution regulation. Congress passed these Amendments to promote two purposes: "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare *and* the productive capacity of its population." 42 U.S.C. § 7401(b) (emphasis added). Congress directed EPA to develop National Ambient Air Quality Standards ("NAAQS"), which protect public health and welfare by establishing maximum pollutant concentrations for the ambient air, with "an adequate margin of safety." 42 U.S.C. § 7409. To achieve the NAAQS, Congress directed each state to develop State Implementation Plans ("SIPs"). The SIPs established emissions limits for existing sources and timetables for meeting those limits. *See id.* Individual sources must comply with operating permits containing SIP emissions limits, which are designed to achieve the NAAQS and other applicable CAA requirements with the sources operating continuously at full capacity, every hour of every day of the year. *See* 42 U.S.C. § 7661 *et seq.*; *see also Cleveland Elec. Illuminating Co. v. EPA*, 572 F.2d 1150, 1160 (6th Cir. 1978) ("The model [used to calculate SIP limits] is operated on the assumption that the plants concerned operate 24 hours a day at full capacity and predictions are made for every day of the year.").

### 2. New Sources and "Modified" Sources Must Satisfy NSPS.

The 1970 Amendments also directed EPA to issue New Source Performance Standards, or "NSPS," to minimize the effect of newly-constructed emissions capacity on ambient air quality. 42 U.S.C. § 7411(b). Under NSPS, "new sources" in several specific "source categories" had to meet strict new emissions control standards.

Congress decided not to apply NSPS to existing facilities as a general matter, however, because retrofitting uniform new technologies onto existing facilities is extraordinarily difficult and expensive. *See* S. Rep. No. 91-1196, at 16 (1970) (APP164) ("The overriding purpose of this section would be to prevent new air pollution problems, and toward that end, maximum feasible control of new sources at the time of their construction is seen by the committee as the most effective and, in the long run, the least expensive approach."). Thus, "Congress was concerned about regulating new sources of emissions caused by expanded or modified capacity." 70 Fed. Reg. at 61,095. Accordingly, Congress applied NSPS to newly constructed emissions units and to "modifications" to existing units that cause new emissions. 42 U.S.C. § 7411(a)(2). A "modification" is "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." *Id.* § 7411(a)(4).

In 1971, EPA promulgated a "modification" regulation that tracked the language of the statute. *See* 40 C.F.R. § 60.2. In 1974 EPA proposed, and in 1975 it promulgated, an additional regulation clarifying that the "emissions increase" required for an NSPS "modification" is an increase in a unit's *hourly* emissions rate. *See* 40 C.F.R. § 60.14(a)-(b). In doing so, EPA "did not create a new definition of modification," but rather "define[d] how to determine an actual emissions increase based on the facility's maximum hourly emissions rate." 70 Fed. Reg. at 61,096. Of course, an increase in a facility's maximum hourly emissions rate is an increase in the facility's actual capacity to emit pollutants. *Id.* at 61,100.

## B.    EPA Promulgated the First NSR Program in 1974.

Also in 1974, EPA promulgated regulations adopting the first NSR program: the regulatory "Prevention of Significant Deterioration," or "PSD," program. *See* 39 Fed. Reg. 42,510 (Dec. 5, 1974).  According to EPA, the regulatory PSD program differed from the existing NSPS program by requiring more stringent control technologies. *Id.* at 42,512.  With respect to "modified source[s]," however, EPA explained that it intended the PSD definition of "modification" "to be consistent with the final definition of this term under" NSPS. *Id.* at 42,513.  Accordingly, the 1974 PSD regulations defined "modification" in the same way as the NSPS regulations, thus applying regulatory PSD requirements to existing sources *only* when their actual emissions capacities — as demonstrated by their hourly emissions rates — increased. *See id.* at 42,514.

## C.    Congress Codified the NSR Programs in the 1977 Amendments.

In 1977, Congress amended the CAA to create NSR, codifying EPA's PSD program for areas that had attained the NAAQS and adding a similar program — the Nonattainment New Source Review, or "NNSR," program — for areas that had not. *See* 42 U.S.C. §§ 7470-7492 (PSD); *id.* §§ 7501-7515 (NNSR) (collectively "NSR").  The NSR programs apply to "major emitting facilities" and "modifications" to such facilities, and their goal is "to minimize emissions increases from new source growth." 70 Fed. Reg. at 61,088.  Thus, the NSR programs impose "[p]reconstruction requirements," which require covered facilities to obtain permits before commencing "construction."  Those permits require sources to install state-of-the-art pollution controls at the time of "construction." *See* 42 U.S.C. §§ 7475(a)(4), 7503(a)(2).[4]

---

[4] NSR differs from the pre-existing NSPS program in several ways. *See Alabama Power Co. v. Costle*, 636 F.2d 323, 347-49 (D.C. Cir. 1980) (describing these differences); *WEPCo*, 893 F.2d at 904-05 (same).  For example, unlike NSPS, NSR requires new sources to show that emissions

Like NSPS and EPA's pre-1977 regulatory PSD, the 1977 NSR program was "not designed to cut back on emissions from existing major stationary sources through limitations on their productive capacity, but rather to ensure that they will install state-of-the-art pollution controls at a juncture where it otherwise makes sense to do so" — *i.e.*, upon "construction." 70 Fed. Reg. at 61,088. Like most legislation, NSR therefore reflects a compromise among different purposes: "to protect public health and welfare from any actual or potential adverse effect" of air pollutants and "to insure that economic growth will occur . . . consistent with the preservation of existing clean air resources." 42 U.S.C. § 7470; *see also* 123 Cong. Rec. 26,841 (Aug. 4, 1977) (Sen. Muskie) (APP184) ("[T]he conference agreement on the Clean Air Act . . . is a compromise in every sense of the term."). Indeed, at that time one of the Nation's chief concerns was to ease the energy crisis, including by increasing existing power plant efficiency and facilitating the use of domestic coal. *See, e.g.*, APP248 (1977 National Energy Plan).

Implementing these competing goals, Congress defined "construction" to include "modifications" at existing sources by expressly incorporating the pre-existing NSPS definition of "modification" from § 7411. *See* 42 U.S.C. § 7479(2)(C) (PSD) ("The term 'construction' when used in connection with any source or facility, includes the modification (as defined in section 7411(a) of this title) of any source or facility."); *id.* § 7501(4) (NNSR) (defining "modification" to "mean the same as the term 'modification' as used in section 7411(a)(4)"). By

---

will not reduce air quality by more than an allowable amount from "baseline" clean-air levels and will not cause a violation of the NAAQS. *Id.* In addition, while NSPS imposes a variety of technology-based emissions control standards, PSD requires new sources to install the "Best Available Control Technology" ("BACT"), which is at least as stringent as technology required under NSPS, and NNSR requires even more restrictive technology. *Id.* NSR also applies to more "industrial categories" and more pollutants than NSPS. *Id.*

incorporating the NSPS definition of "modification" into NSR, Congress ensured that an NSR "modification" occurs only if a physical change will increase a unit's actual emissions capacity.

### D. EPA Promulgated the Applicable NSR Rules in 1980.

In 1980, EPA promulgated and revised the regulations that apply to the projects at issue in this case. *See* 45 Fed. Reg. 52,676 (Aug. 7, 1980) (the "1980 Rules"); *see also* Mem. Supp. U.S. Mot. S.J. (Docket #296), at 6 n.4 ("EPA's . . . regulations relevant to this case were promulgated in 1980."). In promulgating the 1980 Rules, EPA followed Congress's instruction to apply NSR only to "new sources" of emissions. Thus, the 1980 Rules apply to new "construction," which includes "modification[s]." 40 C.F.R. § 52.21(b)(8). A "modification," as under NSPS, is "any physical change in, or change in the method of operation of, a stationary source which increases the emission rate of any pollutant." 40 C.F.R. § 52.01(d) (Part 52); *see also id.* § 51.100 (Part 51) ("[A]ll terms not defined herein will have the meaning given them in the Act . . . .").[5] These regulations mirror and incorporate EPA's prior definition of "modification" — and thus apply only to a physical change that would increase an existing unit's hourly rate of emissions. Also consistent with EPA's prior definitions under NSPS and regulatory PSD, the regulations provide that the term "modification" does not include "[a]n increase in the hours of operation" of the unit. *Id.* § 52.01(d)(2)(ii); *see also id.*

---

[5] EPA originally promulgated its pre-1977 PSD regulations as revisions to 40 C.F.R. §§ 52.01 and 52.21. *See* 39 Fed. Reg. at 42,514. The 1980 Rules were promulgated as further revisions to 40 C.F.R. §§ 51.24 (SIP plan revisions) and 52.21 (federal PSD). *See* 45 Fed. Reg. at 52,729. The regulations governing SIP plans were later recodified and are now found at 40 C.F.R. § 51.165 (NNSR) and § 51.166 (PSD). As the regulations applicable in this case are largely identical, this Brief will generally refer to the regulations promulgated at 40 C.F.R. Part 52. The Supplemental Appendix includes copies of relevant portions of Parts 51 and 52 from the 1987 (post-recodification) version of the C.F.R.

§ 52.21(b)(2)(iii)(f) (the term "physical change or change in the method of operation shall not include . . . [a]n increase in the hours of operation").

In addition, consistent with the statute's focus on "major emitting facilities," 42 U.S.C. § 7479(1), the NSR provisions require preconstruction permitting only for "modifications" that are "major."[6] A "major modification" is "any physical change . . . that would result in a *significant net* emissions increase." 40 C.F.R. § 52.21(b)(2)(i) (emphasis added). This definition requires a three-step analysis. First, the project must cause an "emissions increase," meaning an increase in the unit's "actual emissions" of a regulated pollutant. *See* 40 C.F.R. § 52.21(b)(2)-(3). "Actual emissions" are calculated based on a constant, representative operating period. *See* 40 C.F.R. § 52.21(b)(21)(ii); *WEPCo*, 893 F.2d at 918 n.14. Using constant, representative hours of operation for the "actual emissions" calculation ensures that an "emissions increase" is found only if the hourly rate of emissions increases as a result of a physical change, reflecting an increase in the unit's actual capacity to emit pollutants. *See Alabama Power Co.*, 372 F. Supp. 2d at 1293 ("The practical effect [of holding hours of operation constant] is that a net emissions increase can result only from an increase in the hourly rate of emissions.").

The second and third steps of the "major modification" test — which are not at issue in this appeal — determine whether a "net" emissions increase will occur (by offsetting emissions increases with contemporaneous emissions decreases at the facility), and whether that "net" increase will exceed certain "significance" thresholds. To carry out these calculations, the NSR emissions increase regulations are expressed in terms of "total annual emissions, expressed in

---

[6] *See* 40 C.F.R. § 52.21(i)(1), (2) (requiring preconstruction permitting only for "modification[s] to which the requirements of paragraphs (j) through (r) of this section apply," and stating that "[t]he requirements of paragraphs (j) through (r) of this section" apply only to "major modification[s]").

tons per year." *See WEPCo*, 893 F.2d at 915 (noting the "tons-per-year" calculation); *Duke Energy I*, 278 F. Supp. 2d at 643 ("[M]easuring emissions in tons per year makes possible netting (addition and subtraction) of emissions rates between various units at a plant."). However, the "tons per year" measurement for netting and significance purposes does not change the basic requirement that a project cause a change in a unit's actual emissions capacity (*i.e.*, its hourly emissions rate) to trigger NSR. Indeed, "[i]mmediately after the promulgation of the [NSR] regulations in 1980," EPA issued two written interpretations stating "that the requirements of [NSR] would be implicated only by an increase in the hourly rate of emissions." *Duke Energy I*, 278 F. Supp. 2d at 641; *see also* APP279, APP 281 (Reich Memoranda I and II, described *infra*).

E.    **In *WEPCo*, This Court Rejected EPA's Application of the 1980 Rules to a Power Plant Renovation.**

The first judicial decision addressing the application of the 1980 Rules' definition of "modification" to an existing facility was this Court's decision in *WEPCo*. *WEPCo* involved EPA's application of the NSPS and NSR rules to renovations at the Wisconsin Electric Power Company's Port Washington power plant. *See WEPCo*, 893 F.2d at 905-06. Although much of the opinion focuses on questions relating to the application of the NSPS rules and a provision of the NSR rules not at issue here — questions on which this Court gave EPA substantial deference — this Court also reviewed *and rejected* EPA's attempt to apply a novel NSR emissions increase test to the WEPCo units.

Specifically, EPA claimed that WEPCo's renovation would be expected to cause an NSR emissions increase by comparing the facility's "actual emissions" before the project to its expected "potential emissions" after the project. *Id.* at 915-16. As discussed above, "actual emissions" means the rate at which the facility actually emitted pollutants during a representative

15

pre-project period, "using the unit's actual operating hours [and] production rates." 40 C.F.R. § 52.21(b)(21)(ii). By contrast, EPA calculated "potential emissions" assuming that the units "operate continuously" after the project, 24 hours per day, 365 days per year. *WEPCo*, 893 F.2d at 915-16. In the real world, generating units do not operate continuously. Thus, by comparing the emissions of an actual unit operated part of the time with those of a hypothetical unit operated continuously, EPA's calculation was guaranteed to find an emissions increase, even if the project would not cause the unit's actual emissions capacity to increase.

This Court rejected EPA's approach as contrary to the 1980 Rules and common sense. Because the 1980 Rules by their terms allow EPA to use "potential emissions" only for units that "ha[ve] not begun normal operations," 40 C.F.R. § 51.166(b)(21)(iv), and because the WEPCo units *had* begun normal operations, EPA's approach was contrary to its own regulations. *WEPCo*, 893 F.2d at 917. Moreover, because a comparison of pre-project "actual emissions" to post-project "potential emissions" would *always* result in a "net emissions increase," this Court concluded that EPA's test was rigged to trigger NSR. *Id.* This Court remanded the case to EPA with orders to determine "whether the renovated plant would cause a significant net emissions increase *if it were operated under present hours and conditions*" — that is, to apply the "actual emissions" test specified in EPA's regulations — and determine "*on that basis*" whether NSR applied. *Id.* at 918 n.14 (emphases added). "This remand instruction explicitly sets forth the . . . test advocated by [Cinergy] and previously applied by the EPA" under the 1980 Rules. *Duke Energy I*, 278 F. Supp. 2d at 645.

### F. EPA Ignored the *WEPCo* Remand Instruction.

On remand, EPA dismissed this Court's instructions as "incorrect" and declared it would "not rely on the present hours and conditions as conclusive of post-renovation emissions." APP264-265 ("Rosenberg Letter," at 6-7). An EPA attorney later wrote that the "*WEPCo*

remand instruction" was "absurd" and that "EPA properly ignored it in the *WEPCo* remand." *See Duke Energy I*, 278 F. Supp. 2d at 646 (quotation omitted). Thus, instead of comparing pre- and post-project hourly emissions rates under "present hours and conditions," EPA invented and applied on remand a new "emissions increase" calculation that could be triggered by mere changes in hours of operation.[7] EPA also continued to attempt to apply the "actual-to-potential" test to existing sources, in defiance of this Court's ruling.[8]

EPA's efforts caused widespread concern in the industry and in Congress that EPA was attempting to expand the NSR program to commonplace maintenance activities at existing sources. To allay these concerns, EPA officials repeatedly stated that WEPCo's situation was unusual and that the NSR programs would not apply to existing units. For example, in 1989, EPA Administrator William Reilly told Congress that the WEPCo determination did not foreshadow the widespread application of NSR to existing facilities, and that EPA's own internal survey of so-called utility "life extension" projects — which included at least one of the Cinergy projects challenged by EPA in this case —"did not result in the detection of any violations" of NSR. APP277 ("Reilly Letter," at 2). These representations were consistent with prior EPA

---

[7] In 1992, EPA promulgated the so-called "WEPCo Rule," or "1992 Rules," which allowed electric utilities to "opt in" to its new method for calculating emissions increases. *See* 57 Fed. Reg. 32,314, 32,336 (July 21, 1992) (promulgating 40 C.F.R. § 52.21(b)(21)(v)). If the utility opts into this approach, then for five years after the change it must submit annual records demonstrating that the change "did not result in an emissions increase." *Id.* If a utility does not "opt in" to the WEPCo Rule, then the default test remains the calculation set forth in the 1980 Rules. *See Duke Energy I*, 278 F. Supp. 2d at 647 n.25 (noting that Duke Energy had "opted out of the WEPCo calculus"). Cinergy did not opt into the WEPCo approach, so the emissions test applicable to this case is set forth in the 1980 Rules.

[8] *See* 70 Fed. Reg. at 61,099 n.49 (stating that "[t]he 1980 rules . . . retained potential-to-emit for measuring post-change emissions"); 63 Fed. Reg. 39,857, 39,858 (July 24, 1998) (stating that the test for existing units is the "'actual-to-potential' methodology"); 61 Fed. Reg. 38,250, 38,267 (July 17, 1996) (purporting to "solicit comments on whether to retain the actual-to-potential test").

testimony regarding the limits of NSR — indeed, in 1987, EPA Administrator Lee Thomas had testified that EPA saw no "basis to go in and suggest that all of those old sources should put on very stringent control requirements." APP274 ("Thomas Testimony," at 27). To the contrary, to persuade Congress of the need to adopt the Acid Rain Program — which "requires major reductions of $SO_2$ and $NO_x$ emissions" through a "market-based cap-and-trade mechanism," 70 Fed. Reg. at 61,084 — Administrator Thomas testified that the NSR programs did *not* require utilities to install pollution controls on existing power plants and thus could not be used to achieve the desired emissions reductions. *See* APP274.

## G. EPA Re-Interpreted NSR in Its 1999 "Enforcement Initiative."

In an abrupt reversal of these public statements, EPA initiated its utility enforcement initiative in November 1999, filing lawsuits against electric power companies for engaging in maintenance practices long known to EPA. In launching this enforcement initiative, EPA claimed for the first time that the entire industry has been violating the CAA for decades.

The courts have not agreed. Three courts have held that the re-interpretation of EPA's NSR regulations embodied in the enforcement initiative is contrary to the CAA, to EPA's regulations, and to the Agency's prior interpretation of those regulations. In *Duke Energy I*, the district court flatly rejected EPA's arguments, holding that Congress's express incorporation of the NSPS definition of "modification" into NSR, the plain language of the 1980 Rules, EPA's prior interpretations, and this Court's *WEPCo* decision demonstrate that EPA's litigating position is wrong. 278 F. Supp. 2d at 640-48. Thus, the court concluded that "a net emissions increase [for NSR purposes] can result only from an increase in the hourly rate of emissions." *Id.* at 640.

The Fourth Circuit reached the same conclusion in *Duke Energy II* — resting entirely on the plain text of the CAA. Rejecting EPA's contention that the Agency has "discretion" to interpret the term "modification" differently for NSR than for NSPS, the Fourth Circuit

concluded that "Congress has . . . 'directly spoken to the precise question at issue.'" *Duke Energy II*, 411 F.3d at 546 (quoting *Chevron USA, Inc. v. NRDC*, 467 U.S. 837, 842 (1984)). Observing that Congress "expressly defined 'modification' in the NSPS provisions of the Clean Air Act, 42 U.S.C. § 7411(a), and then expressly directed that the [NSR] provisions of the Act employ this same definition," the Fourth Circuit held that Congress gave EPA no discretion to interpret the term differently for the two programs. *Id.* at 546-47. Instead, EPA "must . . . interpret its [NSR and NSPS] regulations . . . congruently" — an interpretation, the Fourth Circuit held, that the NSR rules support. *Id.* at 550 & n.3.

The U.S. District Court for the Northern District of Alabama reached the same conclusion. In particular, the court rejected EPA's call for *Chevron* deference, observing that the Agency "has not spoken with one voice, or a consistent voice, or even a clear voice, on this issue" throughout the history of NSR, and is now attempting "to redefine [NSR] through enforcement actions and litigation." *Alabama Power Co.*, 372 F. Supp. 2d at 1306-07. The court concluded that, contrary to EPA's litigating position, an NSR "modification" requires an increase in hourly emissions rates. *Id.*[9]

## H.    In October 2005, EPA Abandoned Its Enforcement Position.

In October 2005, EPA published a proposal to resolve the confusion created by its enforcement initiative and to return to the NSR hourly emissions rate test on a nationwide basis — an emissions test that properly "is the same as that in the . . . NSPS program." 70 Fed.

---

[9] Without reaching the statutory interpretation question, a fourth court vacated EPA's attempt to impose its new standard on the Tennessee Valley Authority through an "exceedingly unusual," "ad hoc" administrative proceeding as violating basic principles of due process and "entirely ignoring the concept of the rule of law." *TVA v. Whitman*, 336 F.3d 1236, 1240-41 & n.9, 1245-46 (11th Cir. 2003). And even the one court to grant deference to EPA's position lambasted the Agency for its "abysmal breakdown" in administering the Act. *United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 832-33 (S.D. Ohio 2003).

Reg. at 61,081. According to EPA, "[t]he proposed regulations would establish a uniform emissions test nationally under the NSPS and NSR programs for existing EGUs" (or "electric generating units"). *Id.* Thus, under the proposed rule, existing EGUs will "use the same maximum achievable hourly emissions test we apply under NSPS to determine whether a physical change in or change in the method of operation . . . results in an emissions increase under the major NSR program." *Id.* at 61,088. This is the interpretation required by the CAA.

EPA admitted in its rulemaking that the "major NSR approach we have been taking leads to outcomes that have not advanced the central policy of the major NSR program." *Id.* In particular, EPA's litigating position "discourages sources from replacing components, and encourages them to replace components with inferior components or to artificially constrain production in other ways," and "has impeded or resulted in the cancellation of projects that would have maintained and improved the reliability, efficiency, or safety of existing energy capacity." *Id.* at 61,094. This perverse effect occurs because the emissions increase test developed for EPA's enforcement initiative *assumes* that any repair or replacement of a component will reduce post-project "down time" for the unit as a whole, and thereby cause the unit to run more hours and produce more emissions, even if the unit's actual emissions capacity will not change. *See Alabama Power Co.*, 372 F. Supp. 2d at 1297. Thus, like the emissions increase test this Court rejected in *WEPCo*, EPA's enforcement initiative approach "assume[s] what [it] seek[s] to prove." 893 F.2d at 917. By contrast, the "hourly rate" test focuses on increases in actual emissions capacity, and thus "allow[s] owner/operators to make changes that, without increasing existing capacity, promote the safety, reliability, and efficiency of EGUs." 70 Fed. Reg. at 61,093.

Consistent with EPA's October 2005 rulemaking, the United States has opposed a petition for certiorari filed by various states and environmental organizations seeking Supreme Court review of the Fourth Circuit's *Duke Energy II* decision, which adopted Cinergy's position in this case. In its opposition, the United States explained that the Fourth Circuit did not invalidate EPA's 1980 Rules but rather rejected EPA's enforcement interpretation of those rules. *See* APP213. The United States further explained that the Fourth Circuit's decision does not conflict with the ruling of any other court of appeals and that, in light of EPA's 2005 proposed rulemaking, the Fourth Circuit's ruling is of "limited practical import." APP224. Unfortunately for the utilities still mired in the last remaining enforcement initiative cases, the proposed rule "would only apply prospectively." 70 Fed. Reg. at 61,081. Thus, EPA's continued pursuit in this Court of a position it has abandoned virtually everywhere else is of substantial "practical import" to Cinergy.

## SUMMARY OF ARGUMENT

The interpretation of the "emissions increase" test that EPA advances in this enforcement case is unlawful, and the district court's order should be reversed, because Congress clearly required the scope and meaning of a "modification" under NSR — including the essential emissions increase element of that term — to be congruent with that under NSPS. Congress's clear intent not to expand NSR to existing units that merely maintain their existing capacity is evident in Congress's express incorporation of the NSPS statutory definition into NSR. Moreover, Congress was aware when it enacted NSR that the NSPS regulatory program applied only to the creation of expanded emissions capacity as reflected by hourly emissions rates, and Congress incorporated that meaning directly into NSR. Congress's clear intent also is evident from the affirmative statements of legislators at the time the NSR provisions were enacted, as

21

well as from the fact that no one suggested at the time of enactment that the CAA's "new source" provisions would have the widespread application to existing sources that EPA asserts here.

In accordance with this statutory requirement, the applicable NSR regulations (when properly interpreted and applied) impose a threshold hourly rate test for "modifications." The Agency's effort to extend NSR to existing units that merely maintain their existing capacity, by substituting a new "hourly rate *or* hours of operation test" through enforcement actions and litigation, is contrary to the statute and finds no basis in the regulations. Therefore — and particularly in light of the variety of inconsistent and vacillating positions the Agency has taken — it is entitled to no deference.

## ARGUMENT

### I.    Standard of Review.

This appeal involves review of the district court's determination of a pure question of law, which this Court considers *de novo*. *See Mosely v. Board of Educ. of Chicago*, 434 F.3d 527, 529 (7th Cir. 2006). Moreover, in reviewing the district court's decision, this Court owes no deference to the Agency's *ad hoc* interpretations and litigation-based arguments. Instead, where, as here, "Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron U.S.A., Inc.*, 467 U.S. at 843 n.9.

### II.   Congress's Clear Intention Was to Apply New Source Review Only to Existing Sources that Become New Sources by Increasing Their Actual Emissions Capacity.

#### A.    The Plain Text of the 1977 Amendments Requires the Scope of a "Modification" Under NSR To Be Congruent with a "Modification" Under NSPS.

The text of the CAA makes clear that a "modification" for NSR purposes requires a "modification" under NSPS. The statute thus bars EPA's "enforcement initiative" position,

which interprets the NSR emissions increase standard in a way that creates radically different rules for NSR and NSPS.

The statutory NSR provisions prohibit facilities "on which construction is commenced" from beginning new source "construction" without undergoing NSR review and installing state-of-the-art emissions controls. 42 U.S.C. § 7475(a). Recognizing that certain changes to existing facilities are tantamount to the "construction" of a new source — as it did seven years earlier in enacting the NSPS program — Congress defined "construction" to include "modifications" to existing sources, as the term "modification" is "defined" and "used" under NSPS. *See* 42 U.S.C. § 7479(2)(C) (PSD) ("The term 'construction' when used in connection with any source or facility, includes the modification (as defined in section 7411(a) of this title) of any source or facility."); *id.* § 7501(4) (NNSR) (defining "modification" to "mean the same as the term 'modification' as used in section 7411(a)(4)").

By incorporating the NSPS term "modification" and its definition into NSR, Congress limited the scope of NSR "modifications" to those covered by NSPS. It is a fundamental principle of statutory construction that "identical words used in different parts of the same act are intended to have the same meaning." *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (citations omitted). Here, not only did Congress use identical terms in two related parts of the CAA, but the NSR "modification" provisions expressly cross-reference and incorporate the NSPS "modification" provision. This cross-reference to the existing NSPS provisions makes the presumption of uniform statutory usage irrebutable. *See IBP, Inc. v. Alvarez*, 126 S. Ct. 514, 523 (2005) (concluding, in light of one part of a statute's "explicit reference to the use of [an]

identical term" from another part of the statute, that "there is no plausible argument that these terms mean something different"); *Duke Energy II*, 411 F.3d at 547-50 (same).[10]

"When Congress mandates that two provisions of a single statutory scheme define a term identically, the agency charged with administering the statutory scheme cannot interpret these identical definitions differently." *Duke Energy II*, 411 F.3d at 546-47. Congress mandated in the CAA that a "modification" for both NSR and NSPS purposes is (in relevant part) a "physical change in, or change in the method of operation of, a stationary source *which increases the amount of any air pollutant emitted by such source.*" 42 U.S.C. § 7411(a)(4) (emphasis added). Whether a project "increases the amount of any air pollutant emitted by such source" thus is an essential element of a "modification" for both the NSR and NSPS programs. Having directed that "modification" be given the same meaning in both programs, Congress intended that the controlling "emissions increase" element of that term likewise be given a consistent and clear meaning. *See Skelton*, 660 F.2d at 322 (observing that "it is important that [a] term" used throughout a statute "have a single, precise meaning" when the term's "central function" is to "identify the particular [activities] that are subject to the Act's . . . requirements"). The need for a clear and consistent rule is especially true for the *preconstruction* permitting program at issue here, because industry engineers and managers must "predict," based on the information

---

[10] The Fourth Circuit placed particular emphasis on the Supreme Court's decision in *Rowan Cos. v. United States*, 452 U.S. 247 (1981), which held that "when Congress itself provided 'substantially identical' statutory definitions of a term . . . the agency charged with enforcing the statutes could not interpret the statutory definitions 'differently.'" *Duke Energy II*, 411 F.3d at 547. The parallels between *Rowan* and the provisions at issue here are indeed "striking[]." *Id. at* 547-49 (noting the strong similarities in the statutory use of the term, the supporting legislative history, and the inconsistent agency interpretations observed in *Rowan* and those in EPA's NSR enforcement cases). But *Rowan* is just one of many cases applying this fundamental rule of statutory construction. *See Sullivan*, 496 U.S. at 484; *see also In re Merchants Grain, Inc.*, 93 F.3d 1347, 1356 (7th Cir. 1996); *Skelton v. General Motors Corp.*, 660 F.2d 311, 322 (7th Cir. 1991); *Hotel Equities Corp. v. Comm'r*, 546 F.2d 725, 728 (7th Cir. 1978).

available to them at the time a project is proposed, whether the project will cause an emissions increase and thus require a permit.

EPA cannot and does not dispute that it has determined that NSPS "modifications" include only those projects that increase a source's actual emissions capacity by increasing its hourly emissions rate. In fact, EPA adopted the hourly rate test *because* it is a manageable test that properly confines NSPS "modifications" to the "new sources" of emissions that Congress authorized EPA to regulate. 39 Fed. Reg. 36,946, 36,946-47 (Oct. 15, 1974). As EPA later explained, the hourly emissions rate test "eliminates the burden of projecting future emissions and distinguishing between emissions increases caused by the change from those due solely to demand growth, because any increase in the emissions under the maximum achievable emissions test would logically be attributed to the change," while emissions increases due to other factors would not. 70 Fed. Reg. at 61,094; *see also supra* at 6-7 (identifying the multiplicity of factors that can cause a single generating unit's hours of operation to change). In other words, the "hourly rate" test properly identifies those projects, and only those projects, that cause *new* emissions. Thus, the hourly rate test effectuates Congress's purpose to "regulat[e] new sources of emissions caused by expanded or modified capacity," 70 Fed. Reg. at 61,095, and to avoid imposing new requirements on existing sources until it makes economic sense to do so.

"[B]ecause Congress mandated that the [NSR] definition of 'modification' be identical to the NSPS definition of 'modification,' the EPA cannot interpret 'modification' under the [NSR] inconsistently with the way it interprets that term under the NSPS." *Duke Energy II*, 411 F.3d at 547. Having adopted and maintained the hourly rate emissions test as the essential determinant of an NSPS "modification," EPA cannot now apply a substantially broader test for the purposes of NSR. For this reason alone, the district court's decision should be reversed.

## B.   Congress Intended the Specific NSPS "Emissions Increase" Test to Apply to "Modifications" under NSR.

Congress intended not only that EPA interpret "modification" in the same fashion under NSPS and NSR, but also that EPA apply for NSR purposes the particular NSPS definition in effect at the time Congress enacted the NSR statutory program. EPA has admitted that "Congress was likely aware, before it enacted the 1977 Amendments, that [EPA] calculated emissions increases in terms of kg/hr to determine whether a project resulted in a 'modification.'" 70 Fed. Reg. at 61,100. When Congress enacted the 1977 Amendments, EPA's NSPS regulations were well-established, and EPA had adopted the NSPS "emissions increase" approach into its regulatory PSD program. *See* 39 Fed. Reg. at 42,510, 42,513. These facts underscore that Congress did not intend to create two different categories of "modifications" — NSPS "modifications" and NSR "modifications" — but rather defined "modification" consistently for purposes of both programs. Indeed, these facts confirm that Congress intended a "modification" to occur only where a project causes an increase in the unit's hourly emissions rate.

"Congress' repetition of a well-established term carries the implication that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations." *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998) (holding that Congress's use in the Americans with Disabilities Act of the definition of "handicap" from another statute evinced an intent to incorporate the prior regulatory meaning into the new statute); *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 193-94 (2002) (same). Congress's express incorporation of the term "modification," "as used" under NSPS, "indicates that Congress intended to ratify [the prior] interpretation" and incorporate it into NSR. *Bragdon*, 524 U.S. at 644-45.

Relying on *New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005), the district court held that Congress had not incorporated the NSPS definition of "modification" into the NSR program. *See* RSA08. Reviewing EPA's 2002 NSR rule, 67 Fed. Reg. 80,186 (Dec. 31, 2002), which is not at issue here, the D.C. Circuit had relied on the misconception that EPA's pre-1977 definitions of "modification" were themselves internally inconsistent. *New York*, 413 F.3d at 19; *see also New York v. EPA*, 2006 WL 662746, at *6 (D.C. Cir. Mar. 17, 2006) (same). However, the D.C. Circuit misconstrued the relevant regulations. The first regulation cited by the court (40 C.F.R. § 60.2(h)) repeats the general statutory definition of "modification." The second regulation (§ 60.14(b)) "clarifies" and describes in detail the method for determining whether an emissions increase and thus a "modification" will occur. *See* 39 Fed. Reg. at 36,947; *see also* 70 Fed. Reg. at 61,096 ("We did not create a new definition of modification in § 60.14, but instead used § 60.14 to define how to determine an actual emissions increase based on the facility's maximum hourly emissions rate considering controls."). Far from offering "two separate glosses on 'modification,'" *New York*, 413 F.3d at 12, EPA's regulations are perfectly harmonious and implement EPA's original stated purpose of providing consistent definitions of "modification" under NSPS and NSR. *See* 39 Fed. Reg. at 42,513. They provide no support for EPA's claim of "discretion" to adopt different interpretations of a term that Congress has given one statutory definition.[11]

Outside the litigation context, EPA consistently has agreed that Congress intended to conform the NSR and NSPS concepts of "modification." EPA observed shortly after the 1977

---

[11] In any event, the D.C. Circuit ultimately "express[ed] no opinion as to whether Congress intended to require that EPA use identical regulatory definitions of modification across the NSPS and NSR programs," as the Fourth Circuit held in *Duke Energy II*. *New York*, 413 F.3d at 20; *see also* APP224 (Cert. Opp.) (citing "no square conflict between the Fourth Circuit's statutory holding and the holding of any other court of appeals").

Amendments were enacted that "[t]he phrase 'usage in other parts of the Act'" — which appears in the NSR statutory provision that incorporates the NSPS definition of "modification" — "most probably refers, not only to [the NSPS "modification" provision], but also to the EPA regulations . . . that were in effect at the time." 49 Fed. Reg. 43,211, 43,213 (Oct. 26, 1984). EPA has reiterated that same position many times.[12] Because NSPS "modifications" include only those changes that increase a unit's actual emissions capacity, the "explicit reference by Congress incorporating the concept of NSPS modification into [NSR] compels the result that [NSR] is triggered only by an increase in a unit's hourly emissions rate." *Duke Energy I*, 278 F. Supp. 2d at 644. For this additional reason, the district court's decision should be reversed.

### C. The Statutory Language and Legislative History Give No Indication That Congress Contemplated or Authorized EPA's Revolutionary Interpretation of "Modification."

Further evidence that Congress intended the NSR program for existing facilities to be congruent with the pre-existing NSPS program is the absence of any suggestion that Congress intended or expected NSR to apply to a far broader category of existing sources than NSPS did. Simply put, if Congress in 1977 intended to expand NSR to tens of thousands of projects at existing power plants that neither NSPS nor regulatory PSD then reached, one would expect Congress to have said so. There is not a word in the statute suggesting that Congress intended such a revolution — as EPA itself has observed. *See* 49 Fed. Reg. at 43,213 ("If Congress had intended a change as to modifications [when it created NSR] it probably would have said so explicitly, yet it said nothing.").

---

[12] *See, e.g.*, 57 Fed. Reg. at 32,320 ("Congress intended to conform the meaning of 'modification' for PSD purposes to the usage under the NSPS program.") (citations omitted); 43 Fed. Reg. 26,388, 26,396 (June 19, 1978) ("In adding Section 169(2)(C) to the Act, Congress indicated that it intended to conform the meaning of 'modification' to 'usage in other parts of the Act.'") (citations omitted).

The district court acknowledged Congress's silence, but interpreted it as a failure to "limit the EPA's authority to further define 'modification' . . . as it deemed fit." RSA08. This analysis is exactly backwards. Courts do not presume that Congress authorizes weighty or wide-ranging changes through statutory language that strongly suggests stability. *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) ("Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."); *Chisom v. Roemer*, 501 U.S. 380, 396 & n.23 (1991) ("[I]f Congress had such an intent, [it] would have made it explicit in the statute . . . ."). As the Supreme Court has put it, "Congress . . . does not . . . hide elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The "modification" provision is a "mousehole" — indeed, the provision was of such little moment that the congressional drafters *forgot to include it* in the PSD portion of the NSR statute, originally applying PSD only to "construction." Congress corrected this oversight in a "technical and conforming" amendment, adding "modification (as defined in section 7411(4))" to the PSD statute three months after the original enactment. 42 U.S.C. § 7479(2)(C); *see* 123 Cong. Rec. 36,250, 36,331 (Nov. 1, 1977) (APP207). According to the legislative record, however, "[i]t [was] not the purpose of these amendments to re-open substantive issues in the Clean Air Act." 123 Cong. Rec. at 36,252 (APP202).

The legislative history also confirms Congress's clear intent to *limit* the application of NSR to new and expanded sources, just as it had done in NSPS. Congress consistently expressed its intention not to impose the cost of retrofitting new NSR controls on existing units that simply maintain their existing capabilities, while ensuring that newly constructed or expanded units installed the best available controls. *See, e.g.,* H.R. Rep. No. 95-294, at 185 (APP170) ("Building control technology into new plants at time of construction will plainly be less costly

than requiring retrofit when pollution ceilings are reached."). Thus, the sponsor of the Senate bill stated that the NSR requirements would "apply only to new major emitting facilities and do not affect existing facilities." 123 Cong. Rec. 18,021 (June 8, 1977) (Sen. Muskie) (APP175). Statements throughout the legislative history are in accord. *See* S. Rep. No. 95-127, at 29 (1977) (APP166) (the PSD provision "applies only to new major emitting facilities, not affecting existing facilities"); 123 Cong. Rec. 18,040 (1977) (Sen. Randolph) (APP181) ("[T]he nondeterioration section applies only to major new emission sources. It does not relate to sources already in existence."). Indeed, legislative discussions of the NSR provisions frequently use the term "expansion" interchangeably with "modification," demonstrating Congress's understanding that "modification" means the creation of new emissions capacity.[13]

Nothing in the legislative record suggests that Congress intended to extend NSR to existing sources that merely maintain their existing capacity. "[I]t tests the limits of reason to suggest that despite such silence, Members of Congress voting for those amendments intended to enact what would arguably be the single most significant change in" the application of the CAA emissions control requirements to existing sources. *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 342-43 (1999); *see also Chisom*, 501 U.S. at 396 & n.23 ("[I]f Congress had such an intent . . . at least some of the Members would have identified or mentioned it at some point in the unusually extensive legislative history . . . ."); *Bethlehem Steel Corp. v. EPA*, 723 F.2d 1303, 1309 (7th Cir. 1983) (rejecting EPA's proposed interpretation of a

---

[13] *See, e.g.*, S. Rep. No. 95-127, at 55 (1977) (APP167) ("Some mechanism is needed to assure that before new *or expanded* facilities are permitted, a State demonstrate that these facilities can be accommodated within its overall plan to provide for attainment of air quality standards."); H.R. Rep. No. 95-564, at 537 (1977) (APP173) ("Facilities seeking to locate *or expand* in areas not meeting air quality health standards should be required to use the best control technology and processes available.") (emphases added).

provision that was "described . . . as 'not controversial,'" because "[i]t would have been extremely controversial had the EPA's interpretation been foreseen").

In short, the NSR provisions reflect a congressional policy choice "not . . . to cut back on emissions from existing major stationary sources through limitations on their productive capacity, but rather to ensure that they will install state-of-the-art pollution controls at a juncture where it otherwise makes [economic] sense to do so." 70 Fed. Reg. at 61,088. To effectuate this policy judgment, Congress directed EPA not to apply NSR to existing facilities, "since they and their emissions capacity are 'grandfathered.'" H.R. Rep. No. 95-294, at 144 (1977) (APP169). To limit the application of NSR to "modifications" that expand an existing facility's actual emissions capacity, Congress incorporated the NSPS definition of "modification" into NSR.

### III.  The NSR Rules Effectuate Congress's Intent to Reach Only New Emissions.

Notwithstanding Congress's clear statutory direction, EPA attempts in this case to interpret its NSR regulations very differently than its NSPS rules, to encompass its litigation-induced "hourly rate *or* hours of operation" test. As adopted and as EPA interpreted them at the time of their promulgation, however, the NSR rules implement the plain statutory text and clearly expressed intent of Congress, and preclude EPA's revisionist interpretation. Indeed, because the NSR rules "*can* be interpreted consistently with pre-existing principles — the NSPS regulations —" EPA *must* so interpret them. *Duke Energy II*, 411 F.3d at 549 n.7 (emphasis added). In keeping with Congress's command, the 1980 Rules ensure that NSR applies to existing units only where projects will cause new emissions by increasing the units' hourly emissions rates.

## A. The 1980 Rules Require Evaluation of Emissions Under Constant, Representative Operating Hours to Identify Changes in Hourly Emissions Rates.

### 1. The 1980 Rules Incorporate the NSPS Hourly Emissions Rate Test.

The 1980 Rules parallel the Act. Like the CAA, the 1980 Rules require sources to obtain a permit before "begin[ning] actual construction" on a project that is subject to NSR. 40 C.F.R. § 52.21(i)(l). "Construction" means the "fabrication, erection, installation, demolition or modification" of a facility "which would result in a change in actual emissions." *Id.* § 52.21(b)(8). A "modification," in turn, is defined as it is under the Act. *See* 40 C.F.R. § 52.01(d) (defining "modification" as "any physical change in, or change in the method of operation of, a stationary source which increases the emission rate of any pollutant"); *see also id.* § 51.100 ("[A]ll terms not defined herein will have the meaning given them in the Act . . . ."). Thus, like the NSR statute, the NSR regulations incorporate the pre-existing meaning of "modification" from the NSPS statutory and regulatory program. As set forth in detail above, a physical change causes an emissions increase under the NSPS standard *only* if it increases a unit's actual emissions capacity, as measured by the hourly rate of emissions. *See supra* pp. 9-10. Thus, a project at an existing facility does not trigger NSR unless it would increase a unit's actual emissions capacity by increasing its hourly emissions rate.

The NSR rules include an additional requirement, which limits the applicability of NSR to a subset of those projects that increase actual emissions capacity. Consistent with the NSR statute's application to "major emitting facilities," 42 U.S.C. § 7475(a), EPA's NSR rules apply only to "*major* modifications." *See* 40 C.F.R. § 52.21(i)(2) ("The [NSR permitting] requirements . . . shall apply to any major stationary source and any major modification . . . ."). A "modification" is a "major modification" only if it causes a "significant net emissions

32

increase" at the "major emitting facility" (*i.e.*, the entire plant) at which a "modified" unit is located. *Id.* § 52.21(b)(2)(i)-(iii).

Under the 1980 Rules, a three-step test applies to determine whether a "modification" is "major" because it will cause a "significant net emissions increase." Only the first step is at issue here. Under that step, the project must cause an increase in the unit's "actual emissions."[14] Under the 1980 Rules, "actual emissions" are determined based on the average annual emissions during a period that is "representative of normal source operation"— generally the two-year period immediately before the date of the physical change. 40 C.F.R. § 52.21(b)(21)(ii). The definition further provides that "actual emissions" are determined using the unit's actual "operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period." *Id.* To determine whether an emission increase will occur as a result of the proposed project — and, if so, how large the annual emissions increase will be — "actual emissions" after the project are determined using the same representative hours of operation. *Id.*

In *WEPCo*, this Court confirmed that the 1980 Rules provide that the "emissions increase" determination is made under representative operating hours and conditions. As set forth above, *WEPCo* involved EPA's attempt to apply an "actual-to-potential" emissions test to a facility renovation — in other words, EPA compared pre-project "actual emissions" to post-project "potential to emit," without holding operating hours constant. 893 F.2d at 917. Applying EPA's own rules, this Court rejected EPA's approach and ordered the Agency to determine "whether the renovated plant would cause a significant net emissions increase if it were operated

---

[14] *See* 40 C.F.R. § 52.21(b)(2)(i) (a "major modification" is a "physical change . . . or change in the method of operation . . . that would result in a significant net emissions increase"); *id.* § 52.21(b)(3)(i)(a) (a "net emissions increase" is an increase in "actual emissions," after netting).

under present hours and conditions" and determine "on that basis" whether the renovation would trigger NSR. *Id.* at 918 n.14.

Using "present hours and conditions" means that an "emissions increase" will occur *only* if a unit's actual emissions capacity increases because its hourly emissions rate increases. *See Alabama Power Co.*, 372 F. Supp. 2d at 1293 ("The practical effect [of the 'present hours and conditions' requirement] is that a net emissions increase can result only from an increase in the hourly rate of emissions."). Thus, *WEPCo* confirms that the 1980 Rules require that "a net emissions increase can result only from an increase in the hourly rate of emissions." *Duke Energy I*, 278 F. Supp. 2d at 640.

### 2. The 1980 Rules' Use of "Tons Per Year" for "Significance" and "Netting" Purposes Does Not Alter the Fundamental Requirements of the Statute or EPA's Rules.

Upon determining that an emissions increase will occur as the result of a change, the second and third steps of the NSR "major modification" analysis examine whether a "net" emissions increase will occur — and, if so, whether it will be "significant." To facilitate these calculations, the NSR "emissions increase" regulations speak in terms of "total annual emissions, expressed in tons per year." *See WEPCo*, 893 F.2d at 915 (noting the "tons-per-year calculation); *Duke Energy I*, 278 F. Supp. 2d at 643 ("[M]easuring emissions in tons per year makes possible netting (addition and subtraction) of emissions rates between various units at a plant.").

Thus, the NSR regulations allow sources that conduct projects that increase a unit's hourly rate of emissions nonetheless to avoid NSR by offsetting, or "netting," that emissions increase with contemporaneous emissions decreases at the facility. *See* 45 Fed. Reg. at 52,698. For this netting process to work, emissions increases and decreases must be expressed in total

pollutant loads (tons per year), rather than in short-term emissions rates (kilograms per hour).[15] Moreover, any "net emissions increase" must be "significant." *Id.* The regulations express their "significance" thresholds and "netting" calculations in "tons per year."

Nowhere do the statute or rules suggest that the use of "tons per year" for "significance" and "netting" purposes expands NSR to apply to a new universe of existing sources — as EPA's position in this case would do. Instead, for the "net emissions increase" calculation, hourly emissions rates (for threshold NSR applicability) are simply converted into annual emissions rates (for netting and significance levels) by multiplying the hourly rate by constant annual hours of operation. *See WEPCo*, 893 F.2d at 918 n.14; 40 C.F.R. § 52.21(b)(21)(ii). As noted above, the practical effect of holding hours and operating conditions constant is to trigger NSR only if a unit's hourly emissions rate increases. Thus, whether stated in terms of the unit's hourly emissions rate in kilograms-per-hour (as in the NSPS program), or the unit's total annual emissions in tons-per-year under constant, representative hours of operation (as in the NSR program), an "emissions increase" occurs under EPA's regulations only when a project increases a unit's hourly emissions rate, thereby causing new emissions.

**B.      EPA's Contemporaneous Interpretations of the 1980 Rules Confirm that an "Emissions Increase" Occurs Only if an Hourly Rate Increase Occurs.**

EPA's contemporaneous interpretations of the 1980 Rules confirm that an "emissions increase" occurs for NSR purposes only if a unit's hourly emissions rate increases. Immediately after the promulgation of the 1980 Rules, EPA confirmed in two authoritative applicability

---

[15] For example, if a unit running 2000 hours per year increases its hourly emissions rate by 1 kg/hr, an annual emissions increase of 2000 kg/year will occur. If a second unit at the same facility that runs 100 hours per year contemporaneously decreases its hourly emissions rate by 5 kg/hr, annual emissions from that unit will decrease by 500 kg/year. This decrease will offset only 25% of the emissions increase from the first unit, even though the second unit's hourly rate will decrease by five times the hourly rate increase at the base load unit.

determinations that the Rules incorporate an hourly rate test. In January 1981, Edward Reich, the Director of EPA's Division of Stationary Source Enforcement ("DSSE"), ruled that an increase in hours of operation, even when coupled with a physical change, was not a "modification." APP279 ("Reich Memorandum I"). In June 1981, Reich ruled again that a project that would not cause an increase in a unit's hourly rate of emissions did not trigger NSR. APP281 ("Reich Memorandum II"). Mr. Reich "was the head of the division at the EPA responsible for provid[ing] guidance for interpretations which address the implementation of [the NSR] regulations." *Duke Energy I*, 278 F. Supp. 2d at 642 (quotation omitted). He thus spoke for the Agency when he issued these determinations. *See Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 583 n.2 (1980), and *PPG Indus. Inc. v. Harrison*, 587 F.2d 237, 241-42 (5th Cir. 1979) (reviewing as "final agency action" a DSSE applicability determination).

Nor was Mr. Reich the only EPA representative to confirm that the hourly rate test controlled. In July 1982, the Chief of the Air Management Branch in EPA Region 4 issued a guidance memorandum stating that a project that did not cause an "increase in . . . hourly particulate emissions" could not trigger NSR. APP285 ("Wilburn Memorandum," at 3). In question-and-answer format, this guidance memorandum hypothesized a physical change that would allow a source to increase its hours of operation nearly 100%, with "no increase in the hourly particulate emissions." *Id.* Asked whether this would "be judged a significant increase in particulate emissions, and cause the source to be subject to PSD for particulate," EPA responded: "No." *Id.* According to EPA, "[s]ince the modification does not cause any increase in emissions, no increase in annual emissions should be calculated." *Id.* In short, EPA determined that no "emissions increase" for PSD purposes could occur because the hourly emissions rate would not change.

These public interpretations of the 1980 Rules were — and are — binding on the Agency. *See Paragon Health Network, Inc. v. Thompson*, 251 F.3d 1141, 1147 n.4 (7th Cir. 2001) (noting that an "interpretive change could be considered arbitrary and capricious if it does not take account of legitimate reliance on [the] prior interpretation") (quotation omitted). Indeed, Agency interpretations issued shortly after regulations are promulgated are the best evidence of the regulations' true meaning and intent. *See, e.g., Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Atchison, Topeka & Santa Fe Ry. Co. v. Pena*, 44 F.3d 437, 442 (7th Cir. 1994); *see also Davis v. United States*, 495 U.S. 472, 484 (1990) (contemporaneous statutory interpretation). The district court was therefore wrong simply to sweep these statements aside as "not authoritative." Rather, these Agency interpretations — which confirm EPA's contemporaneous position that "the same order of magnitude and scale needed to trigger NSPS would apply to the PSD and NNSR programs," *Duke Energy I*, 278 F. Supp. 2d at 631 n.11 (quotation omitted) — are dispositive here.

## IV. EPA's Litigating Position Does Not Deserve Deference.

Notwithstanding the language of the statute and regulations, EPA's own prior interpretations, and the Agency's return to those interpretations in its October 2005 nationwide rulemaking, EPA contends in this litigation that its idiosyncratic enforcement-based interpretation is entitled to deference. *See, e.g.,* U.S. Mem. Supp. Mot. Partial S.J. (Docket #296), at 27. And, having concluded that EPA may interpret the NSR provisions "as it deem[s] fit," the district court provided little analysis of EPA's interpretation and conflicting positions. RSA08. Both approaches are wrong.

As an initial matter, the issue here is not whether EPA's regulations, as adopted, are invalid or inconsistent with the statute. As adopted and originally construed and applied, the 1980 Rules faithfully implement Congress's directive — and EPA must interpret them

accordingly. *See Chevron*, 467 U.S. at 842-43 & n.9 (If "Congress had an intention on the precise question at issue, that intention is the law and must be given effect."); *Duke Energy II*, 411 F.3d at 547 n.3 ("Since Congress has directly spoken to the precise question at issue . . . [a] court need not, indeed cannot, go further.") (citations omitted); *see also Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945) (agency interpretations that are "plainly erroneous or inconsistent with the regulation[s]" are not entitled to deference).

Instead, the issue here is whether EPA's made-for-litigation test — which is inconsistent with the clear congressional directive expressed in the CAA, does not appear in any regulation, cannot be found in the Federal Register, and was never published in any policy or guidance document — carries the weight of law. It does not. It is simply EPA's enforcement team's own interpretation, which emerged in the utility enforcement cases in 1999. Thus, "the interpretive methodologies [the Agency] has used have been informal," and "[t]he interpretation with which we are concerned has emerged inferentially" — in this case, solely "through the litigating positions the [Agency] has taken." *U.S. Freightways Corp. v. Comm'r*, 270 F.3d 1137, 1141-42 (7th Cir. 2001). Under these circumstances, even if Congress had not spoken directly to the question at issue — and it has — "full *Chevron* deference is not appropriate." *Id.* at 1142. Instead, "more informal agency statements and positions" such as this "receive a more flexible respect, in which factors like 'the degree of the agency's care, its consistency, formality, and relative expertness, and . . . the persuasiveness of the agency's position,' are all relevant." *Id.* at 1141 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001)).

Under *Mead*'s "flexible framework," agency interpretations that change without rational explanation or vacillate between positions receive little deference. *See, e.g., Mead Corp.*, 533 U.S. at 219-20; *Homemakers N. Shore, Inc. v. Bowen*, 832 F.2d 408, 412 (7th Cir. 1987) ("When

an agency waffles without explanation, taking one view one year and another the next," courts are "less willing to accept the agency's latest word as authoritative . . . ."). Agency positions adopted for litigation purposes are especially suspect, and are entitled to no deference at all. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-13 (1988). Thus, where, as here, the Agency interpretation was adopted during and for the purpose of enforcement proceedings, it is "a clear case for the flexible approach *Mead* described." *U.S. Freightways*, 270 F.3d at 1142.

EPA's interpretations of the CAA and its implementing regulations have been neither "consistent [nor] reasonable." *Rowan*, 452 U.S. at 263. Instead, even though the applicable statute and rules have not changed, EPA's interpretation of the NSR emissions increase standard has vacillated from year to year, and even from NSR enforcement case to enforcement case. As a result, EPA recently admitted that "it can be difficult for the owner or operator to know with reasonable certainty whether a particular activity would trigger major NSR." 70 Fed. Reg. at 61,093. EPA's interpretive "zigs and zags," including its "contradictory post-*WEPCO* statements and rules" and its unpredictable litigating positions, are the antithesis of the sort of reasoned decision-making that deserves judicial deference. *Alabama Power Co.*, 372 F. Supp. 2d at 1306.

EPA's position was not always so erratic. In the years immediately following the enactment of the 1977 Amendments, EPA's published rules and authoritative interpretations consistently stated that an "emissions increase" would occur only if a unit's hourly emissions rate increased, thereby increasing the unit's actual emissions capacity. *See* APP279, APP281 (Reich Memoranda I & II); APP285 (Wilburn Memorandum). Not only are these interpretations authoritative, they provide strong grounds for denying deference to the Agency's contrary, litigation-based interpretations. *See Gonzales v. Oregon*, 126 S. Ct. 904, 916 (2006) (the fact

"[t]hat the current interpretation runs counter to the intent at the time of the regulation's promulgation is an additional reason why . . . deference is unwarranted") (citation omitted).

Throughout most of the 1980s, EPA continued to assert that "modifications" under NSR were intended to be congruent with "modifications" under NSPS. For example, in October 1984, EPA rejected a proposed change to the "modification" rule as it applied to surface mines on the ground that Congress did not change the meaning of "modification" when it incorporated that term into NSR. *See* 49 Fed. Reg. at 43,213. And in April 1987, EPA Administrator Thomas told Congress that the NSR programs did not require industry to retrofit pollution controls onto existing coal-fired power plants, and that he saw no basis under the statute or regulations to do so. APP273-275. *See also supra* pp. 17-18.

EPA's position changed dramatically with the WEPCo determination in 1988 — 10 years after Congress enacted the NSR program and eight years after EPA promulgated its regulations. Contrary to its prior interpretations, EPA applied the emissions test for newly-constructed sources to the existing WEPCo units. APP292-294 ("Clay Memorandum," at 7-9). EPA did not apply the hourly rate test. Nor did it apply the emissions test the Agency now claims the 1980 Rules require (the "hourly rate *or* hours of operation" test) — indeed, EPA claimed at the time that the "regulations provide no support" for that test. *Id.* This Court rejected EPA's position in *WEPCo*, as described above. *See supra* pp. 15-16, 33.

At the same time, EPA "released or provided information to Congress and the electric industry that can be fairly characterized as saying *WEPCo* would have limited applicability at most." *Alabama Power Co.*, 372 F. Supp. 2d at 1305. In April 1989, EPA Administrator Reilly assured Congress that NSR did not apply to most existing electric generating units. He further stated that a survey of life extension projects — including Cinergy's Beckjord project, which

EPA has charged as a violation in this case — "did not result in the detection of any violations" of NSR. APP276 (Reilly Letter).

In June 1990, although chastised for applying a rigged test and ordered to re-compute projected future emissions using "present hours and conditions," EPA dismissed this Court's instruction as "incorrect" and instead applied the test EPA itself had rejected as unauthorized in 1988. *See* APP259 (Rosenberg Letter). Shortly thereafter, EPA promulgated the so-called WEPCo Rule. For companies not choosing the WEPCo Rule's optional test, EPA left the 1980 Rules — and thus the "hourly rate" test — unchanged. Consistent with this framework, in September 1999, the Chief of EPA's Air Permitting and Compliance Branch in Region 7 — apparently unaware of the Agency's litigators' plans to file the "enforcement initiative" lawsuits based on newly-minted interpretations of NSR — informed a company that the "basis" for determining whether an NSR emissions increase would occur at a unit was the unit's hourly emissions rate. APP298 (Toensing Letter).

In late 1999, EPA launched this enforcement initiative, alleging that more than 500 utility repair projects that did nothing to increase emissions capacities nevertheless required NSR permits. But EPA's vacillation did not stop even then. To the contrary, the Agency has proffered at least five separate NSR emissions increase tests in the various proceedings. *See Alabama Power Co.*, 372 F. Supp. 2d at 1299 n.32. In the *TVA* and *Duke Energy* cases, EPA initially asserted that post-project emissions should be calculated using the "actual-to-potential" test that this Court rejected in *WEPCo*. *See Duke Energy I,* 278 F. Supp. 2d at 640 & n.17; *In re TVA,* 9 E.A.B. 357, 380 (EAB Sept. 15, 2000). EPA officials even testified that the "actual-to-potential" test "is *the* methodology that the [1980] regulation requires." APP303 (emphasis added). EPA later abandoned that position, and argued for the retroactive application of the test

41

it adopted after the *WEPCo* remand. *See Duke Energy I*, 278 F. Supp. 2d at 640 & n.17. EPA's litigation team subsequently offered a variety of other tests as the enforcement initiative cases proceeded. *See, e.g.*, APP307 (describing "three [other] methods of emissions calculations").

EPA personnel have admitted that they created their emissions increase tests solely for these lawsuits. Bonnie Bush, an environmental engineer with EPA Region 5 (which includes Indiana and Ohio), testified that the Agency's emissions increase theories were "derived as a result of discussions among members of [the so-called NSR] work group" in 1999, never appeared in any regulations, policy memoranda, or guidance document, but rather were written down "on a piece of paper at [her] desk." APP311-312. Spiros Bourgikos, another Region 5 engineer, testified that he had not heard of the NSR work group's test before he became a participant in that group. APP328. John Hewson, a senior environmental engineer with Region 4, testified that EPA "did not have a standard procedure for evaluating representative [future] actual emissions before [the work group's] meetings" in 1999. APP337.

EPA's final change in position is the most telling. After six years of litigation, EPA announced in October 2005 that "it is desirable to change the [Agency's] approach to major NSR." 70 Fed. Reg. at 61,094. EPA acknowledged that its vacillating interpretations made it "difficult for the owner or operator to know with reasonable certainty whether a particular activity would trigger major NSR," *id.* at 61,093, "impeded or resulted in the cancellation of projects that would have maintained and improved the reliability, efficiency, or safety of existing energy capacity," *id.* at 61,094, and thus led "to outcomes that have not advanced the central policy of the major NSR Program." *Id.* at 61,088. Consequently, EPA has come full circle, now returning to "the same maximum achievable hourly emissions test we apply under NSPS to determine whether a physical change . . . or change in the method of operation . . . results in an

emissions increase under the major NSR program." *Id.* As a result, EPA has asked the Supreme Court to leave the *Duke Energy II* decision undisturbed. *See* APP213.

As this tortured history makes clear, EPA's position in this case is far from longstanding or consistent. Indeed, EPA devised its "hourly rate *or* hours of operation" test solely to fit its litigation strategy in the enforcement initiative cases. EPA's search for a favorable legal standard is simply a search for a different result in this case, making this litigation "a sport, which is not exactly what one would expect to find in a national regulatory enforcement program." *Alabama Power Co.*, 372 F. Supp. 2d at 1306 n.44. EPA's effort "to redefine [NSR] through enforcement actions and litigation" is "not the type of regulatory activity entitled to *Chevron* deference." *Id.* at 1306. Because EPA's position in this case is merely litigation counsel's interpretation, it is entitled to no deference at all.

* * *

The history of EPA's regulatory interpretations and of the 1999 enforcement initiative exposes a simple truth: The enforcement initiative was an attempt to force existing, older power plants into an NSR program to which they are not subject, based on the occurrence of commonplace maintenance projects that do not increase actual emissions capacity. EPA originally was attempting to use this litigation to change the statute through a new regulatory interpretation. Now that EPA has abandoned that litigation-based interpretation, proposed a rule returning to the original interpretation of the Act, and dropped its parallel effort to impose its emissions increase test in the *Duke Energy* proceedings, EPA's continuing stance in Cinergy's case is simply a mystery.

Whatever its purpose, EPA's stance is contrary to the balance Congress struck among the competing objectives of the CAA. EPA launched this enforcement initiative under the now-

rejected belief that extending NSR to every existing source would further the Agency's goal, even if contrary to the balance struck by Congress. "[T]o identify the policy underlying a statute and then run with it is a dangerous method of interpretation," however, as "it is likely to run roughshod over the compromise between interest groups that enabled the statute to be passed in the first place." *Wisconsin Bell, Inc. v. Bie*, 340 F.3d 441, 445 (7th Cir. 2003). "Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice — and it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law." *Contract Courier Servs., Inc. v. Research & Special Programs Admin.*, 924 F.2d 112, 115 (7th Cir. 1991) (quoting *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987)). Because EPA's litigation position is contrary to the language and intent of Congress and is not entitled to deference, this Court should reverse the judgment of the district court.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order granting plaintiffs' motion for partial summary judgment and denying Cinergy's motion for partial summary judgment.

Dated: March 29, 2006

Respectfully submitted,

Constantine L. Trela, Jr.
Chad W. Pekron
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Marc E. Manly
  Executive Vice President and
  Chief Legal Officer
Catherine S. Stempien
  Associate General Counsel
Julie L. Ezell
  Senior Counsel
Cinergy Services Corp.
139 East Fourth Street, AT II
Cincinnati, Ohio 45201
(513) 287-3019

Thomas C. Green
Mark D. Hopson (*Counsel of Record*)
Kathryn B. Thomson
Stephen M. Nickelsburg
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000

Attorneys for Appellants

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned counsel hereby certifies that the foregoing brief complies with the volume limitation of Rule 32(a)(7)(B)(i) in that the brief contains 13,939 words, as measured by the word-processing system used to prepare the brief (Microsoft Word 2003).

_____
Constantine L. Trela, Jr.

# CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

Pursuant to Circuit Rule 30(d), the undersigned counsel hereby certifies that all materials required by Circuit Rules 30(a) and 30(b) are included in the Appendices.

_____
Constantine L. Trela, Jr.

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 31(e)(1)

Pursuant to Circuit Rule 31(e)(1), the undersigned counsel hereby certifies that appendix materials required by Circuit Rules 30(a) and 30(b) are not available in searchable digital format.

Constantine L. Trela, Jr.

## TABLE OF CONTENTS OF
## APPELLANTS' REQUIRED SHORT APPENDIX

Order on Cross-Motions for Partial Summary Judgment Regarding the
Applicable Test for Emissions Increases in No. 99-Civ-01693 (September 8, 2005)...........RSA01

Order on Defendants' Motion to Certify (October 4, 2005)...................................................RSA15

Order on Defendants' Petition for Permission to Appeal (January 3, 2006)..........................RSA19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| STATE OF NEW YORK, STATE OF | ) | 1:99-cv-01693-LJM-VSS |
| CONNECTICUT, STATE OF NEW JERSEY, | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| HOOSIER ENVIRONMENTAL COUNCIL, | ) | |
| OHIO ENVIRONMENT COUNCIL, | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CINERGY CORPORATION; PSI ENERGY, | ) | |
| INC.; CINCINNATI GAS & ELECTRIC CO., | ) | |
| Defendants. | ) | |

**ORDER ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT
REGARDING THE APPLICABLE TEST FOR EMISSIONS INCREASES**

This matter is before the Court on the parties' request for the Court to decide the purely legal

question of what test applies to determine whether an emissions increase occurs so as to trigger the

Clean Air Act's ("CAA") New Source Review ("NSR") permit provisions. The United States of

America (the "USA") filed a Motion for Partial Summary Judgment on Emissions Test. In response,

defendants Cinergy Corporation; PSI Energy, Inc.; and Cincinnati Gas & Electric Co. (collectively,

"Cinergy") filed a Motion for Summary Judgment on the Applicable Test for Emission Increases.

The parties have fully briefed the issue and it is now ripe for ruling. For the reasons explained

herein, the USA's motion is **GRANTED**, and Cinergy's motion is **DENIED**.

# I. BACKGROUND

The USA has brought this action against Cinergy alleging, *inter alia*, that it violated NSR[1]

provisions when it made physical changes to its units that were "modifications" without first having

obtained a pre-construction permit. The Prevention of Significant Deterioration ("PSD") program

requires that: "No major emitting facility on which construction [or modification] is commenced

after August 7, 1977, may be constructed [or modified] . . . unless (1) a permit has been issued for

such proposed facility in accordance with this part . . . ." 42 U.S.C. § 7475(a). The Nonattainment

New Source Review ("NNSR") program requires "permits for the construction or operation of new

or modified major stationary sources anywhere in the nonattainment area." *Id.* § 7502(c)(5). Central

to this lawsuit, then, is whether the changes Cinergy made to its emitting sources were modifications.

Congress enacted the CAA in 1970, including the New Source Performance Standard

("NSPS") provisions, which directed the Environmental Protection Agency ("EPA") to promulgate

technology-based performance standards for new or modified emitting facilities. *Id.* § 7411. The

EPA promulgated the regulatory PSD program in 1974, in response to litigation over its obligation

under the CAA to require states to implement plans to prevent significant deterioration of air quality

in areas where minimum standards had been attained. *See Alabama Power Co. v. Costle*, 636 F.2d

323, 347 (D.C. Cir. 1980). The "NSPS" regulatory definition of "modification" specifically directed

that emission rates be measured in kilograms per hour, 40 C.F.R. § 60.14, but the PSD regulatory

definition of "modification" did not. Rather, the PSD regulation defined "modification" as "any

physical change in, or change in the method of operation of, a stationary source which increases the

---

[1]NSR includes both the Prevention of Significant Deterioration ("PSD") provisions and
the Nonattainment New Source Review ("NNSR") provisions.

RSA02

emission rate of any [regulated] pollutant." 39 Fed. Reg. 42,510, 42,514 (Dec. 5, 1974). In 1977, Congress amended the CAA to include a statutory PSD program, as well as the NNSR program.

When Congress first enacted the statutory PSD program in 1977, the permit provisions applied only to the "construction" of major emitting facilities. *See* Clean Air Act Amendments of 1977, Pub. L. No. 95-95, 91 Stat. 685, 735 (1977). Just a few months later, Congress passed "technical and conforming amendments" to the CAA, which added to the "Definitions" section of the PSD provisions the following: "The term 'construction' when used in connection with any source or facility, includes the modification (as defined in section 7411(a) of this title) of any source or facility." Pub. L. No. 95-190, 91 Stat. 1293, 1402 (1977); *see* 42 U.S.C. § 7479(1)(C). Section 7411(a), part of the NSPS provisions, defines "modification" as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. § 7411. The definition of "modification" in NNSR also refers to section 7411(a). *Id.* § 7501(4).

EPA regulations further define "modification" for NSPS purposes as "any physical or operational change to an existing facility which results in an increase in the emissions rate to the atmosphere of any [regulated] pollutant . . . expressed as kg/hr." 40 C.F.R. § 60.14(a) & (b). In 1980, after several rule changes that defined "modification" for NSR purposes, the final regulation defined the term "major modification" as "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act." 45 Fed. Reg. 52,676, 52,735 (Aug. 7, 1980); see *New York v. U.S. EPA*, 413 F.3d 3, 12 (D.C. Cir. 2005) for discussion of regulation's history.

3

After it promulgated the 1980 rule, EPA advocated using an "actual-to-potential" test to measure increased emissions for PSD permitting purposes. The actual-to-potential test compared a source's past annual emissions to its potential future annual emissions after the physical change, assuming the source would operate at full capacity in the future. *See Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901, 916-18 (7th Cir. 1990). The Seventh Circuit rejected the actual-to-potential test in *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990). Instead, the court agreed with Defendant WEPCO that the EPA should measure future emissions based on a projection of future actual emissions. This has become known as the "actual-to-projected-actual" test.

Following *WEPCO*, Congress amended the CAA in 1990. The 1990 Amendments included some changes related to NSR, but did not address the issue raised in *WEPCO* of the correct way to measure future emissions, and did not revisit the statutory definition of modification. *See New York*, 413 F.3d at 15-16. The EPA subsequently adopted the actual-to-projected-actual test. *See* 40 C.F.R. § 52.21 (a)(2)(iv)(c) (2004).

The issue to be decided herein is the purely legal question of what is the appropriate method of determining whether a physical change at a source has caused an increase in emissions for purposes of NSR. The parties and their experts may then apply this method to the facts of this case in preparation for trial.

## II. STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal procedural rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett*, 477 U.S.

4

317, 327 (1986); *see United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990). Summary judgment is granted if the all the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the opposing party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. *See id.*

The moving party has the initial burden to show the absence of genuine issues of material fact. *See Wollin v. Gondert*, 192 F.3d 616, 620 (7th Cir. 1999); *Schroeder v. Barth, Inc.*, 969 F.2d 421, 423 (7th Cir. 1992). This burden does not entail producing evidence to negate claims on which the opposing party has the burden of proof. *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n.3 (7th Cir. 1994). The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of material fact exists. *See Wollin*, 192 F.3d at 621.

When considering a summary judgment motion, a court must draw all reasonable inferences "in the light most favorable" to the opposing party. *Id.* at 621; *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998); *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992). If a reasonable fact finder could find for the opposing party, then summary judgment is inappropriate. *Stop-N-Go of Madison, Inc. v. Uno-Ven Co.*, 184 F.3d 672, 677 (7th Cir. 1999); *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992). When the standard embraced in Rule 56(c) is met, summary judgment is mandatory. *Celotex Corp.*, 477 U.S. at 322; *Thomas & Betts Corp.*, 138 F.3d at 291; *Shields Enters., Inc.*, 975 F.2d at 1294.

RSA05

### III. <u>DISCUSSION</u>

The appropriate test for measuring emissions under the PSD program has been the subject of numerous judicial opinions over the years, including one from this Court, *United States of America v. Southern Indiana Gas and Electric Co.*, No. IP 99-1692-C-M/F, 2002 WL 1629817 (S.D. Ind. July 18, 2002) ("*SIGECO*"), and from the Seventh Circuit Court of Appeals, *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ("*WEPCO*"). In *SIGECO* this Court held that the PSD program requires an owner or operator to determine whether a preconstruction permit is required *before* construction begins. *SIGECO*, at *3. In *WEPCO* the Seventh Circuit addressed *inter alia*, how to assess emissions increases for PSD purposes. Specifically, the court ruled that the EPA could not assume a unit would operate at its full potential after physical change, but must consider past operating conditions. *WEPCO*, at 917-18.

More recently the District of Columbia and Fourth Circuit Courts of Appeals have issued opinions that bear directly on this issue. In *United States v. Duke Energy Corp.*, 411 F.3d 539 (4th Cir. 2005), the Fourth Circuit Court of Appeals found that once Congress incorporated the statutory definition of "modification" from the NSPS program into the PSD statute, the EPA could not interpret the definitions differently. *Duke Energy*, 411 F.3d at 546-47. The court looked to the plain language of the CAA to find that because the terms are defined identically, Congress could not have intended contradictory interpretations. *Id.* at 548 (relying on *Rowan Cos. v. United States*, 452 U.S. 247 (1981)). The court also found that the legislative history of the PSD statutes supported the view that Congress intended EPA to use the same definition for both programs. *Id.* (citing 123 Cong. Rec. 36,253 (Nov. 1, 1977) (amending the statute to "conform to usage in other parts of the Act")).

6

In *New York v. U.S. EPA*, 413 F.3d 3 (D.C. Cir. 2005), the District of Columbia Court of Appeals held that nothing in the statutory language or history suggested that in enacting the 1977 CAA Amendments Congress intended to incorporate the NSPS regulatory definition of "modification" into the PSD statute. *New York*, 413 F.3d at 19-20. However, the court purposefully did not address whether Congress intended to require the EPA to provide identical regulatory definitions for "modification" throughout the NSPS and NSR programs. *Id.* at 20.

### A. PROJECTED EMISSIONS

The first part of determining the correct emission test is whether the post-project emissions should be determined by a pre-project projection or a post-project measurement. The USA argues that the EPA must estimate post-project emissions before construction begins. Cinergy does not raise this argument in its own cross-motion, but recognizes in its reply memorandum that this Court has previously decided the issue. *See SIGECO.* Thus, in line with the purpose and logical interpretation of the PSD permit requirement, this Court reaffirms that an owner or operator must make a preconstruction projection of whether and how much emissions will increase at a particular unit following construction.

### B. EMISSIONS CALCULATION

The second and more complicated issue is whether an owner or operator under the NSR provisions must calculate an "increase[ in] the amount of any air pollutant emitted" by a source based on an hourly or yearly emissions rate. *See* 42 U.S.C. § 7411. This Court previously has adopted the view that the PSD permit provisions apply when there will be an increase in the total

7

annual emissions. *See United States v. Southern Ind. Gas & Elec. Co.*, 245 F. Supp.2d 994, 998 (S.D. Ind. 2003).

### 1. Congressional Language and Intent

The parties' most formidable dispute is about how Congress intended the EPA to make the calculation. This Court begins by following the line of analysis the District of Columbia Circuit used in *New York*. When Congress altered the definition of "construction" to include "modification" under PSD as it is used for NSPS, it did not, expressly or otherwise, incorporate the regulatory definition. *See New York*, 413 F.3d at 19-20. Nothing in the Congressional history indicates Congress intended to incorporate the regulatory definition. *See id.* By contrast, Congress did expressly incorporate regulatory provisions in other areas of the CAA. *See id.* at 19 (citing Pub. L. No. 95-95, § 129(a)(1), 91 Stat. 685, 745 (1977)).

Further, Congress did not limit the EPA's authority to further define "modification" in the regulations as it deemed fit to serve the purposes of the PSD program. *See, e.g., Alabama Power*, 636 F.2d at 397-98 (recognizing that the EPA had the authority to adopt different regulatory definitions for "source" in NSR and NSPS in light of the "differences in the purpose and structure of the two programs"). Nor did Congress direct the EPA to change its regulatory definition, which differed from the NSPS regulatory definition at the time Congress promulgated NSR in 1977. *See, e.g.*, 39 Fed. Reg. 42,510, 42,514 (Dec. 5, 1974). Finally, nothing about the EPA's definition of "modification" contradicts the statutory definition.

8

## 2. EPA's Language and Intent

Next, the Court must address Cinergy's argument that the EPA's own rules require it to hold the hours of operation and production rates constant when determining whether a net emissions increase will occur. Cinergy first argues that EPA's current litigation position is contrary to its own earlier acknowledgments that Congress intended for the EPA to conform the meaning and usage of "modification" in PSD to that in NSPS. Second, Cinergy argues that EPA's current litigation position is contrary to its own rules.

### a. Prior Construction

The Court rejects Cinergy's argument that the EPA's current litigation position is contrary to earlier acknowledgments that Congress intended for the EPA to define "modification" for NSR as it does for NSPS. Cinergy has mistaken the circumstances surrounding some of these "acknowledgments." For example, when the EPA stated in 1984 that Congress intended the NSPS statute to also apply to EPA regulations implementing section 111(a)(4), the EPA was referring to the inclusion of "fugitive emissions" in the concept of overall emissions. *See* 49 Fed. Reg. 43, 211, 43,213 (Oct. 26, 1984). When the EPA stated in 2003 that "We have understood [Congress' statements] to be a reference to our preexisting rules interpreting the term 'modification' in the NSPS context" it was a reference to what is excluded from "modification," specifically, the routine maintenance, repair and replacement exception. 68 Fed. Reg. 61248, 61269 (Oct. 27, 2003). Later in that same rulemaking, the EPA reiterated that it takes the same general approach to what constitutes an increase in emissions for NSPS and NSR, *except* that the NSR rule uses an *annual* measurement. *Id.*

9

RSA09

The 1980 rule defines "major modification" as a change that causes a significant net increase in a unit's "actual emissions." *See* 45 Fed. Reg. 52,676, 52,698 (Aug. 7, 1980). "Actual emissions" are to be measured using the unit's actual operating hours and production rates. 40 C.F.R. § 52.21(b)(21)(ii). The Court disagrees with both Cinergy and the *Duke Energy* court that the EPA's definition of "actual emissions," means that "a net emissions increase can result only from an increase in the hourly rate of emissions." *See Duke Energy*, 278 F. Supp. 2d at 640. Consistent with the 1980 rule defining "actual emission," in an actual-to-projected-actual comparison, the projected actual emissions would be measured using projected actual operating hours and projected actual production rates. Thus, if a physical change will result in a unit increasing its operating hours, the projected actual operating hours would include the increase.

Cinergy argues that the *WEPCO* decision and the EPA's own interpretation of the 1980 rules compels that a net emissions increase under NSR must be measured holding hours of operation and production rates constant. This Court reads *WEPCO* only to have rejected the actual-to-potential comparison and EPA's assumption in that case of continuous operations. *See WEPCO*, 893 F.2d at 917. Instead, the Seventh Circuit thought "'a more realistic assessment of [a source's] impact on ambient air quality levels is possible.'" *Id.* (quoting *Alabama Power*, 636 F.2d at 379). The issue in that case was not the same issue this Court must address; the issue was simply whether the actual-to-potential comparison was appropriate. Nothing in the *WEPCO* decision directed EPA to ignore the impact a physical change would have on the actual future operating hours of a unit. The Seventh Circuit in *WEPCO* recognized that for NSPS purposes, the EPA would determine whether a source's hourly rate increased and that for PSD purposes, the EPA would determine whether a source's total amount of emissions would increase. *See id.* at 905.

**b. Increased Hours Exclusion**

Cinergy fears that allowing the EPA to interpret "modification" this way for NSR will eliminate a causation element. Cinergy argues that the EPA would not be able to discern when an increase in emissions was caused by a "modification" rather than another factor, such as demand. Cinergy's fear is unfounded. The definition of "modification" in NSR and NSPS has several exceptions, including routine maintenance, repair and replacement, as well as an increase in hours or emissions not tied to a physical change. *See* 40 C.F.R. § 52.21(b)(2).

The PSD regulations state that an increase in hours or production rate are not considered physical changes. *Id.* § 52.21(b)(2)(iii)(f). A reference back to the definition of "major modification" demonstrates that it is a physical change that results in an emissions increase. *Id.* § 52.21(b)(i). Thus, the plain meaning of the increased hours exclusion is that an increase in hours or production rate are not a "physical change" and thus cannot, alone, be a modification. Increased hours and production rate are not excluded from the definition of "modification"; that is, if a physical change results in an increase in hours of operation that causes a net emissions increase, a modification has occurred. Not only is this the plain and most logical reading of the regulation, it prevents the very situation about which Cinergy is concerned – that in which an increase in hours or production rate *unrelated to any physical change* would be considered a modification and subject the source to PSD review. The EPA confirmed this view by way of the "Clay Memorandum" issued on September 9, 1988.[2]

---

[2]"The preamble to the rule (45 FR 52676, 52704 (August 7, 1980)), makes it clear that this exclusion is intended to allow a company to lawfully increase emissions through a simple change in hours or rate of operation up to its potential to emit . . . without having to obtain a PSD permit. . . . However, . . . the exclusion for increases in hours of operation or production rate does not take the project beyond the reach of PSD coverage if those increases to not stand alone but

Cinergy argues that two statements Edward Reich, then-Director of EPA's Division of Stationary Source Enforcement, made in 1981 (the "Reich Memos") indicate otherwise, and also that the Reich Memos demonstrate an EPA interpretation that is contrary to its current litigation position. This Court agrees with the Southern District of Ohio's view that the Reich Memos are contrary to the plain language of the CAA and EPA's regulations. *See United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 877 (S.D. Ohio. 2003). The Reich Memos are not authoritative here.

## IV. CONCLUSION

For all of the reasons set forth above, the USA's motion for summary judgment is **GRANTED** and Cinergy's motion for summary judgment is **DENIED**.

IT IS SO ORDERED this 8th day of September, 2005.

                                   _____

                                   LARRY J. MCKINNEY, CHIEF JUDGE
                                   United States District Court
                                   Southern District of Indiana

Distribution attached.

---

rather are associated with non-excluded physical or operational changes." Clay Memorandum at 6-7.

RSA12

Distributed to:

Scott R. Alexander
SOMMER BARNARD ATTORNEYS, PC
salexander@sommerbarnard.com

Kevin P. Auerbacher
STATE OF NEW JERSEY, DEPT. OF LAW & PUBLIC
SAFETY
auerbkev@law.dol.lps.state.nj.us

Christopher D. Ball
NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
christopher.ball@dol.lps.state.nj.us

Deborah Nicole Behles
U.S. DEPARTMENT OF JUSTICE
deborah.behles@usdoj.gov

Samuel B. Boxerman
SIDLEY AUSTIN BROWN & WOOD LLP
sboxerman@sidley.com

David T. Buente
SIDLEY AUSTIN BROWN & WOOD LLP
dbuente@sidley.com

Robert R. Clark
SOMMER BARNARD ATTORNEYS, PC
rclark@sommerbarnard.com

Larry Martin Corcoran
ENVIRONMENTAL AND NATURAL RESOURCES
DIVISION
larry.corcoran@usdoj.gov

Michael E. DiRienzo
KAHN DEES DONOVAN & KAHN
miked@k2d2.com

Steven David Ellis
ENVIRONMENTAL & NATURAL RESOURCES
steven.ellis@usdoj.gov

Julie L. Ezell
CINERGY SERVICES INC
julie.ezell@cinergy.com

Richard Mark Gladstein
U.S. DEPARTMENT OF JUSTICE
richard.gladstein@usdoj.gov

Thomas Charles Green
SIDLEY AUSTIN BROWN & WOOD LLP
tcgreen@sidley.com

Maurice A. Griffin
NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
maurice.griffin@dol.lps.state.nj.us

R. Keith Guthrie
kgmail@comcast.net

Sarah Dale Himmelhoch
U.S. DEPARTMENT OF JUSTICE
sarah.himmelhoch@usdoj.gov

Ann Renfrew Johnston
LAW OFFICE OF ANN JOHNSTON
annrjohnston@aol.com

Eugene J. Kelly Jr.
NEW YORK STATE ATTORNEY GENERAL
epaejk@oag.state.ny.us

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

James A. King
PORTER WRIGHT MORRIS & ARTHUR LLP
jking@porterwright.com

Christine F. Lewis
NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
christine.lewis@dol.lps.state.nj.us

James A. Lofton
U.S. DEPARTMENT OF JUSTICE
jim.lofton@usdoj.gov

Debra McVicker Lynch
SOMMER BARNARD ATTORNEYS, PC
dlynch@sommerbarnard.com

Jon C. Martin
STATE OF NEW JERSEY
martijon@law.dol.lps.state.nj.us

Carmel Alicia Motherway
CONNECTICUT ATTORNEY GENERAL
carmel.motherway@po.state.ct.us

13

Michael Joseph Myers
NEW YORK STATE DEPARTMENT OF LAW
michael.myers@oag.state.ny.us

Stephen M. Nickelsburg
SIDLEY AUSTIN BROWN & WOOD LLP
snickels@sidley.com

Scott E. North
PORTER WRIGHT MORRIS & ARTHUR LLP
snorth@porterwright.com

John D. Papageorge
SOMMER BARNARD ATTORNEYS, PC
jpapageorge@sommerbarnard.com

Crissy Lyn Pellegrin
ENVIRONMENTAL PROTECTION AGENCY
pellegrin.crissy@epa.gov

Jean Patrice Reilly
STATE OF NEW JERSEY
reillica@law.dol.lps.state.nj.us

Robert T. Rosenthal
NEW YORK ATTORNEY GENERAL'S OFFICE
robert.rosenthal@oag.state.ny.us

Jeffrey K. Sands
UNITED STATES DEPT. OF JUSTICE
jeffrey.sands@usdoj.gov

J. Jared Snyder
OFFICE OF THE ATTORNEY GENERAL
jared.snyder@oag.state.ny.us

Jose A. Suarez
OFFICE OF THE ATTORNEY GENERAL
jose.suarez@po.state.ct.us

Kathryn B. Thomson
SIDLEY AUSTIN BROWN & WOOD LLP
kthomson@sidley.com

Katherine Lynn Vanderhook
UNITED STATES DEPARTMENT OF JUSTICE
katherine.vanderhook@usdoj.gov

Gaylene Vasaturo
UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY
vasaturo.gaylene@epa.gov

Frank R. Volpe
SIDLEY AUSTIN BROWN & WOOD LLP
fvolpe@sidley.com

Distributed via U.S. Postal Service to:

Barbara Fruehling Gambill
CINERGY SERVICES INC.
Atrium II 25th Floor
P O Box 960
Cincinnati, OH 45201-0960

14

RSA14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| STATE OF NEW YORK, STATE OF NEW | ) | |
| JERSEY, STATE OF CONNECTICUT, | ) | |
| HOOSIER ENVIRONMENTAL COUNCIL, | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| vs. | ) | 1:99-cv-1693-LJM-VSS |
| | ) | |
| CINERGY CORP., PSI ENERGY, INC., and | ) | |
| THE CINCINNATI GAS & ELECTRIC | ) | |
| COMPANY, | ) | |
| Defendants, | ) | |

## ORDER ON DEFENDANTS' MOTION TO CERTIFY

This matter is before the Court on the motion of the defendants, Cinergy Corp., PSI Energy,

Inc., and The Cincinnati Gas & Electric Company (collectively "Cinergy"), for the Court to amend

its order of September 8, 2005 (the "Order"), pursuant to 28 U.S.C. § 1292(b) and Rule 5(a)(3) of

the Federal Rules of Appellate Procedure, to permit interlocutory appeal. The Court hereby

**GRANTS** Cinergy's motion.

The current motion follows this Court's resolution of whether, under the Clean Air Act (the

"Act") and the Act's New Source Review ("NSR") permit provisions, a source modification occurs

only when the hourly emissions increase, or when the yearly emissions increase as a result of

increased hours of productions. *See* 42 U.S.C. 7475(a). Cinergy had argued that an emissions

increase that constitutes a modification under the Act can occur only if the hourly rate of emissions

increased. In the Order, this Court ruled that "if a physical change results in an increase in hours of

operation that causes a net emissions increase, a modification has occurred." Cinergy now seeks to

immediately appeal the Order.

The Court will certify an order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) if the Court is of the opinion that "(1) the appeal presents a question of law; (2) it is controlling; (3) it is contestable; (4) its resolution will expedite the resolution of the litigation, and (5) the petition to appeal is filed in the district court within a reasonable amount of time after entry of the order sought to be appealed." *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1007 (7th Cir. 2002).

The Order addressed a purely legal issue of interpreting the Act. The resolution of that issue controls how the parties must calculate emissions increases to determine the facts of this case for trial. Whether Cinergy violated NSR permitting provisions is central to this litigation. Cinergy's position was not without support, as the Court noted in the Order; thus, the issue is reasonably contested. A Seventh Circuit Court of Appeals ruling will aid these parties, as well as other similarly-situated litigants. The Court also believes an appellate ruling on the issue will expedite the resolution of this case. Once the parties make final emissions calculations, it may be possible for the parties to stipulate some facts, leading to settlement or judgment on some claims without a trial. Finally, Cinergy filed the present motion within two days of the Order, which this Court finds is a reasonable period of time.

Thus, Cinergy's motion is **GRANTED**. The Court hereby certifies as appealable its Order of September 8, 2005.

IT IS SO ORDERED this 4th day of October, 2005.

LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

RSA16

Distributed electronically to:

Scott R. Alexander
SOMMER BARNARD ATTORNEYS, PC
salexander@sommerbarnard.com

Kevin P. Auerbacher
STATE OF NEW JERSEY
DEPT. OF LAW & PUBLIC SAFETY
auerbkev@law.dol.lps.state.nj.us

Christopher D. Ball
NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
christopher.ball@dol.lps.state.nj.us

Deborah Nicole Behles
U.S. DEPARTMENT OF JUSTICE
deborah.behles@usdoj.gov

Samuel B. Boxerman
SIDLEY AUSTIN BROWN & WOOD LLP
sboxerman@sidley.com

David T. Buente
SIDLEY AUSTIN BROWN & WOOD LLP
dbuente@sidley.com

Robert R. Clark
SOMMER BARNARD ATTORNEYS, PC
rclark@sommerbarnard.com

Larry Martin Corcoran
ENVIRONMENTAL AND NATURAL RESOURCES
DIVISION
larry.corcoran@usdoj.gov

Michael E. DiRienzo
KAHN DEES DONOVAN & KAHN
miked@k2d2.com

Steven David Ellis
ENVIRONMENTAL AND NATURAL RESOURCES
steven.ellis@usdoj.gov

Julie L. Ezell
CINERGY SERVICES INC
julie.ezell@cinergy.com

Richard Mark Gladstein
U.S. DEPARTMENT OF JUSTICE
richard.gladstein@usdoj.gov

Thomas Charles Green
SIDLEY AUSTIN BROWN & WOOD LLP
tcgreen@sidley.com

Maurice A. Griffin
NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
maurice.griffin@dol.lps.state.nj.us

R. Keith Guthrie
kgmail@comcast.net

Sarah Dale Himmelhoch
U.S. DEPARTMENT OF JUSTICE
sarah.himmelhoch@usdoj.gov

Mark Hopson
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, NW
Washington, DC 20005

Ann Renfrew Johnston
LAW OFFICE OF ANN JOHNSTON
annrjohnston@aol.com

Eugene J. Kelly Jr.
NEW YORK STATE ATTORNEY GENERAL
epaejk@oag.state.ny.us

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

James A. King
PORTER WRIGHT MORRIS & ARTHUR LLP
jking@porterwright.com

Christine F. Lewis
NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
christine.lewis@dol.lps.state.nj.us

James A. Lofton
U.S. DEPARTMENT OF JUSTICE
jim.lofton@usdoj.gov

Debra McVicker Lynch
SOMMER BARNARD ATTORNEYS, PC
dlynch@sommerbarnard.com

Jon C. Martin
STATE OF NEW JERSEY
martijon@law.dol.lps.state.nj.us

RSA17

Carmel Alicia Motherway
CONNECTICUT ATTORNEY GENERAL
carmel.motherway@po.state.ct.us

Michael Joseph Myers
NEW YORK STATE DEPARTMENT OF LAW
michael.myers@oag.state.ny.us

Stephen M. Nickelsburg
SIDLEY AUSTIN BROWN & WOOD LLP
snickels@sidley.com

Scott E. North
PORTER WRIGHT MORRIS & ARTHUR LLP
snorth@porterwright.com

John D. Papageorge
SOMMER BARNARD ATTORNEYS, PC
jpapageorge@sommerbarnard.com

Crissy Lyn Pellegrin
ENVIRONMENTAL PROTECTION AGENCY
pellegrin.crissy@epa.gov

Jean Patrice Reilly
STATE OF NEW JERSEY
reilljea@law.dol.lps.state.nj.us

Robert T. Rosenthal
NEW YORK ATTORNEY GENERAL'S OFFICE
robert.rosenthal@oag.state.ny.us

Jeffrey K. Sands
U.S. DEPARTMENT OF JUSTICE
jeffrey.sands@usdoj.gov

J. Jared Snyder
OFFICE OF THE ATTORNEY GENERAL
jared.snyder@oag.state.ny.us

Jose A. Suarez
OFFICE OF THE ATTORNEY GENERAL
jose.suarez@po.state.ct.us

Kathryn B. Thomson
SIDLEY AUSTIN BROWN & WOOD LLP
kthomson@sidley.com

Katherine Lynn Vanderhook
U.S. DEPARTMENT OF JUSTICE
katherine.vanderhook@usdoj.gov

Gaylene Vasaturo
U.S. ENVIRONMENTAL PROTECTION AGENCY
vasaturo.gaylene@epa.gov

Frank R. Volpe
SIDLEY AUSTIN BROWN & WOOD LLP
fvolpe@sidley.com

Distributed via U.S. Postal Service to:

Barbara Fruehling Gambill
Cinergy Services Inc.
Atrium II 25th Floor
P O Box 960
Cincinnati, OH 45201-0960

4

RSA18

# United States Court of Appeals

For the Seventh Circuit
Chicago, Illinois 60604

January 3, 2006

*Before*

Hon. RICHARD A. POSNER, *Circuit Judge*

Hon. KENNETH F. RIPPLE, *Circuit Judge*

Hon. DIANE P. WOOD, *Circuit Judge*

| | |
|---|---|
| IN RE:<br><br>    CINERGY CORPORATION, CINERGY<br>    SERVICES, INCORPORATED, PSI<br>    ENERGY, INCORPORATED, et al.,<br>        Petitioners.<br><br><br>No. 05-8029 | ] Petition for Permission<br>] to Appeal Pursuant to<br>] 28 U.S.C. S 1292 (b)<br>] Southern District<br>] of Indiana, Indianapolis<br>] Division.<br>]<br>] Larry J. McKinney,<br>]       Chief Judge.<br>] |

The following are before the court:

1. **DEFENDANTS/PETITIONERS CINERGY CORP., CINERGY SERVICES, INC., PSI ENERGY, AND CINCINNATI GAS & ELECTRIC COMPANY'S PETITION FOR PERMISSION TO APPEAL,** filed on October 18, 2005, by counsel for the petitioners.

2. **UNITED STATES' RESPONSE TO PETITION FOR PERMISSION TO APPEAL,** filed on November 3, 2005, by counsel for respondent United States of America.

3. **RESPONSE OF PLAINTIFF-INTERVENOR/RESPONDENT STATES AND ENVIRONMENTAL GROUPS TO DEFENDANT/PETITIONERS' PETITION FOR PERMISSION TO APPEAL,** filed on November 3, 2005, by counsel for respondents State of New York, State of New Jersey, State of Connecticut, and Hoosier Environmental Council.

RSA19

IT IS ORDERED that #1 is GRANTED. The petitioners shall pay the required appellate fees to the clerk of the district court within 10 days from the entry of this order pursuant to Federal Rule of Appellate Procedure 5(d)(1). Once the district court notifies this court that the fees have been paid, the appeal will be entered on this court's general docket.

RSA20

# CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2006, I caused one copy of the foregoing

Appellants' Brief and Required Short Appendix to be served on the following counsel by

facsimile and e-mail, and two copies and one digital copy of the Brief and Required Short

Appendix to be served on the following counsel by delivering said copies and digital copy to a

commercial overnight delivery service with instructions for delivery on the next business day.

Katherine J. Barton
Attorney, Appellate Section
Environment & Natural Resources Division
U.S. Department of Justice
PHB Mailroom 2121
601 D Street NW
Washington, DC 20004
Phone: (202) 353-7712
Fax: (202) 353-1873

**Attorney for the United States of America**

Carmel Alicia Motherway
Connecticut Attorney General's Office
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120
Phone: (860) 808-5101
Fax: (860) 808-5386

**Attorney for the State of Connecticut**

Eugene J. Kelly, Jr.
New York State Attorney General's Office
The Capitol
Albany, NY 12224
Phone: (518) 474-8480
Fax: (518) 473-2534

**Attorney for the State of New York**

Maurice A. Griffin
New Jersey Office of the Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, NJ 08625
Phone: (609) 633-8713
Fax: (609) 341-5031

**Attorney for the State of New Jersey**

Ann R. Johnston
Clean Air Task Force
65 Bow Street
Lexington, MA 02420
Phone: (781) 862-5411
Fax: (781) 862-5411

**Attorney for the Hoosier Environmental Council and the Ohio Environmental Council**

Constantine L. Trela, Jr.