## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

SIERRA CLUB,                )
                             )
          Plaintiff,       )
                             )
     v.                    )    Case No. 1:08-cv-00437-SEB-TAB
                             )
DUKE ENERGY INDIANA, Inc., et al.   )    Cause: 893 (Environmental)
                             )
         Defendants.     )
                             )
                             )

## SIERRA CLUB'S RESPONSE IN OPPOSITION TO DUKE
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This is a Clean Air Act "citizen suit" against Duke Energy Indiana, Inc. *et al*. ("Duke" or "Defendants") for illegally emitting tons of excess air pollution from its Edwardsport Generating Station coal-fired power plant. Duke has moved for summary judgment because, it argues, technical reasons exempt it from this Clean Air Act enforcement action. (Duke Mot., Br., Dkt. 70, 71.) If accepted, Duke's argument would allow Duke and other major polluters who have violated the Clean Air Act to continue emitting illegal amounts of pollution. For the reasons stated below, Duke's attempts to find a short cut out of its prior and continuing illegal conduct must be denied.

I.      **REGULATORY BACKGROUND**.

This Court has previously discussed the statutory scheme in this case, which is founded in the Clean Air Act ("CAA"). (Order Denying Mot. to Dismiss at 3-5, Dkt. 35.) To briefly summarize, EPA has promulgated National Ambient Air Quality Standards ("NAAQS") for various pollutants, including particulate matter, sulfur dioxide, and nitrogen dioxide pursuant to Congress' directive to establish maximum pollution levels protective of public health and welfare. 42 U.S.C. § 7409; 40 C.F.R. pt. 50. Congress, EPA and the states have also established

1

programs and pollution control measures sufficient to achieve and maintain the NAAQS. 42 U.S.C. § 7410; *see also Gen. Motors Corp. v. U.S*, 496 U.S. 530, 533 (1990); *Union Elec. Co. v. EPA*, 427 U.S. 246, 249-50 (1976).  At issue in this case is the CAA's Prevention of Significant Deterioration ("PSD") program, which was added to the CAA in 1977 because Congress was disappointed in the nation's progress in reducing air pollution.  *See* S. Rep. No. 95-127 at 55 (1977); 123 Cong. Rec. 18022 (June 8, 1977).  EPA finalized rules in 1980 to implement the statutory PSD program codified in the 1977 Amendments, 45 Fed. Reg. 52676 (Aug. 7, 1980), and has modified those regulations over time.  57 Fed. Reg. 32,314 (July 12, 1992); 67 Fed. Reg. 80,186 (December 31, 2002).

Central to the PSD program are permitting, analysis of air quality impacts prior to construction or modification of  "major emitting facilities," and stringent emission limits called "best available control technology" ("BACT").  42 U.S.C. §§ 7475(a), 7479(1), (3).  Before a new major pollution source can be constructed or an existing source can be modified, it must obtain a permit, undertake a "complete" assessment of pre-project ("baseline") air quality in the locality and predict the impact from the proposed source on air quality.  *Id.* § 7475(a), (e).  The source must provide that it will not "cause" or "contribute to" air pollution in violation of the NAAQS or any applicable PSD pollution "increment."  42 U.S.C. §§ 7473, 7475(a)(3), (d).  Additionally, after construction or modification, the source must meet BACT pollution limits determined through a "case-by-case" determination of the maximum degree of pollution reduction achievable.  42 U.S.C. §§ 7475(a)(4), 7479(3); *Nat'l Parks Cons. Assoc. v. Tenn. Valley Auth.*, 480 F.3d 410, 413 n.2 (6th Cir. 2007); *see also* Order Denying Defs.' Mot. to Dismiss, 2/11/09, at 3 & n.2, Dkt. 35.

The CAA requires states to adopt a SIP that contains PSD regulations.  40 C.F.R. § 51.166.  If a state does not have a PSD program that has been approved by EPA, the federal PSD regulations set forth at 40 C.F.R. § 52.21 apply.  40 C.F.R. § 52.21(a).  "[A]t all times relevant to this cause of action, Indiana did not have an EPA-approved PSD program.  Rather, the PSD program in Indiana was governed expressly by the Clean Air Act and the EPA's regulations." (Order Denying Defs.' Mot. to Dismiss, 2/11/09, at 9-10, Dkt. 35.)[1]

In 1990, Congress added Title V to the Clean Air Act, which established an operating permit program to ensure that all "applicable requirements" for each major pollution source, including PSD requirements such as BACT limits, are collected in one place.  42 U.S.C. § 7661-7661f.  EPA's implementing regulations are codified in 40 C.F.R. part 70.  57 Fed. Reg. 32,250 (July 21, 1992).  Indiana submitted its Title V program to U.S. EPA on August 10, 1994.  60 Fed. Reg. 57,188 (Nov. 14, 1995).  U.S. EPA granted interim approval of the Indiana Title V program on November 14, 1995, and final approval of Indiana's Title V program, retroactive to November 1, 2001.  *Id.*; 66 Fed. Reg. 62,969 (Dec. 4, 2001).

The Act and Indiana's Title V operating permit program require that applications for Title V permits be complete and include, *inter alia*, the citation to and description of each Clean Air Act requirement applicable to the source and a plan to come into compliance with any requirement the source is not complying with.  42 U.S.C. § 7661b(c), 40 C.F.R. §§ 70.5(a) and (c), and 326 IAC 2-7-4(c)(3)(A), (G), (4)(A), (5), (10)(A), (B).  The Act and Indiana regulations also make it unlawful for any person to violate any requirement of a permit issued under Title V

---

[1] The PSD program was revised in early 2003.  67 Fed. Reg. 80,186 (Dec. 31, 2002).  Those changes were not in effect at the time of the projects at issue in this case.  67 Fed. Reg. at 80,240 ("All of these changes will take effect in the federal PSD program (codified at § 52.21) on March 3, 2003.").  This motion applies the version of 40 C.F.R. § 52.21 in effect between July 21, 1992 and March 3, 2003.

or to operate a major source except in compliance with a permit issued under Title V.  42 U.S.C. § 7661a; 40 C.F.R. § 70.7(b); 326 IAC 2-7-3.

## II.    FACTS

### A.  Statement of Material Facts in Dispute.

There are no disputes of material fact that would preclude the Court from granting or denying Defendants' motion based on applicable law.[2]  While several "Facts" in Defendants' brief are incorrect, these statements are not "material," such that they would preclude a decision on the legal issues raised in Defendants' Motion.  It is worthwhile, however, to address one of these incorrect statements:  that the only projects that occurred at the Edwardsport Generating Station ("Edwardsport") are the nine discussed in Defendants' brief.  (*See, e.g.*, Duke Br. at 5-8, Dkt. 71.)  The First Amended Complaint alleges modifications that include those discussed in Defendants' brief, but is not limited to those modifications.  (Am. Compl. ¶¶ 202, 206, Dkt. 55.) Duke has produced over 130,000 pages in discovery, which is still on-going.  Sierra Club has been reviewing this production and is continually assessing and narrowing the case to bring about as timely a resolution as possible.  Towards this end, Sierra Club has recently notified Defendants' counsel of the eight projects that Sierra Club currently plans to pursue in this case; all of which occurred after 1991 and prior to March 2003.

### B.  Statement of Material Facts Not in Dispute.

1.    The owners of the Edwardsport plant submitted the first application for a Title V permit on November 20, 1996 ("1996 application").  (Westerberg Dec., Ex. 1.)

---

[2] Plaintiff previously informed Defendants' counsel that Plaintiff would not pursue and would stipulate to dismiss claims related to reconverting the Edwardsport Unit 6 from oil fueled to coal fueled.  (*See* Def. Br. at 1 n.2.)

2.      In the 1996 application, the PSD program requirements in 42 U.S.C. §§ 7470-7492 and 40 C.F.R. § 52.21, including best available control technology limits, are not listed as applicable requirements for boilers 7-1, 7-2 or 8-1.  (Westerberg Dec. Ex. 1.)

3.      In the 1996 application, there is no disclosure of non-compliance by boiler 7-1, 7-2, or 8-1 with the PSD program requirements.  (Westerberg Dec. Ex. 1.)

4.      In the 1996 application, there is no proposed compliance plan for boilers 7-1, 7-2 or 8-1 related to the PSD program requirements, including best available control technology limits.  (Westerberg Dec. Ex. 1.)

5.      There is no evidence that the November 10, 1996 permit application for the Edwardsport plant was ever corrected, supplemented, amended, or revised to identify the PSD program requirements in 42 U.S.C. §§ 7470-7492 and 40 C.F.R. § 52.21, including best available control technology limits, as applicable requirements for boilers 7-1, 7-2 or 8-1, to disclose non-compliance with those requirements, or to propose a compliance schedule for those requirements.  (Westerberg Dec., ¶ 3.)

6.      The Indiana Department of Environmental Management ("IDEM") issued the first Title V permit for the Edwardsport Generating Station, Permit No. 083-7243-0003, on August 10, 2004 ("2004 Permit").  (Westerberg Dec. Ex. 2.)

7.      Section B.12 of the 2004 Permit contains a "permit shield," which provides in relevant part:

> compliance with the conditions of this permit shall be deemed compliance with any applicable requirements as of the date of permit issuance, provided that either the applicable requirements are included and specifically identified in this permit or the permit contains an explicit determination or concise summary of a determination that other specifically identified requirements are not applicable… The issuance or possession of this permit shall not alone constitute a defense against an alleged violation of any law, regulation or standard, except for the requirement to obtain a Part 70 permit under 326 IAC 2-7 or for applicable requirements for which a permit shield has been granted.

(Westerberg Dec. Ex. 2, § B.12.)

8.      Section B.12(c) of the 2004 Permit also provides that "No permit shield shall apply to any permit term or condition that is determined after issuance of this permit to have been based on erroneous information supplied in the permit application.  Erroneous information means information that the Permittee knew to be false, or in the exercise of reasonable care should have been known to be false, at the time the information was submitted."  (Westerberg Dec. Ex. 2, § B.12(c).)

9.      Section B.12(d)(2) of the 2004 Permit further states that nothing in the permit alters or affects "[t]he liability of the Permittee for any violation of applicable requirements prior to or at the time of this permit's issuance."  (Westerberg Dec. Ex. 2 at § B.12(d)(2).)

10.     Section B.16 of the 2004 Permit provides in relevant part:

(a) The application for renewal shall be submitted using the application form or forms prescribed by IDEM, OAQ, and **shall include the information specified in 326 IAC 2-7-4**. Such information shall be included in the application for each emission unit at this source, except those emission units included on the trivial or insignificant activities list contained in 326 IAC 2-7-1(21) and 326 IAC 2-7-1(40). The renewal application does require the certification by the "responsible official" as defined by 326 IAC 2-7-1(34)…

(Westerberg Dec. Ex. 2, § B.16.) (emphasis added)

11.     Section B.9 of the 2004 permit requires the permittee to "annually submit a compliance certification report which addresses the status of the source's compliance with the terms and conditions contained in [the] permit."  Such certification must be made by July 1st of each year.  (Westerberg Dec. Ex. 2, § B.9.)

12.     The owners of the Edwardsport plant submitted an application for a revision to the 2004 permit on August 18, 2006 ("2006 Application").  (Westerberg Dec. Ex. 3.)

13.     The 2006 Application states that there are no unpermitted emission sources at the Edwardsport facility.  (Westerberg Dec. Ex. 3 at 9)

14.     The 2006 Application does not state that the PSD program requirements, including best available control technology limits, are applicable requirements for boilers 7-1, 7-2 or 8-1, disclose non-compliance with those requirements, or propose a compliance schedule for those requirements.  (Westerberg Dec. Ex. 3.)

15.     On March 11, 2008, the IDEM issued Permit No. T083-23531-0000, ("2008 Permit Revision"), a revision to the 2004 permit.  (Westerberg Dec. Ex. 4.)

16.     Section B.9 of the 2008 permit revision (annual compliance certification) is the same as section B.9 of the 2004 permit set forth above.  (Westerberg Dec. Ex. 4 at § B.9.)

17.     Section B.12 of the 2008 permit revision (the "permit shield") is the same as Section B.12 of the 2004 permit set forth above.  (Westerberg Dec. Ex. 4 at § B.12.)

18.     Section B.17 of the 2008 permit revision is the same as Section B.16 of the 2004 permit set forth above.  (Westerberg Dec. Ex. 4 at § B.17.)

19.     On November 13, 2008, the owners and operators of the Edwardsport plant submitted a permit renewal application for the 2008 permit revision ("November 2008 application").  (Westerberg Dec. Ex. 5 at 1.)

20.     There is no evidence that the November 2008 application identified the PSD program requirements in 42 U.S.C. §§ 7470-7492 and 40 C.F.R. § 52.21, including best available control technology limits, as applicable requirements for boilers 7-1, 7-2, or 8-1, disclosed non compliance with those requirements, or proposed a compliance schedule for those requirements, or that these deficiencies have since been corrected.  (Westerberg Dec., ¶¶ 7-8 & Ex. 5.)[3]

---

[3] The available permit documents indicate this information is not contained in the 2008 application, but Plaintiff has not yet received a copy of the actual application.  (Westerberg Dec., ¶ 8.)  Should the Court determine

III.     STANDARD FOR SUMMARY JUDGMENT.

Summary judgment is appropriate if the evidence on record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Genuine" issues are those upon which "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). "Material" facts are identified by the substantive law of the case. *Id.* In considering summary judgment, all inferences must be drawn in the light most favorable to the non-moving party. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999).

Defendants' motion for summary judgment here is limited to legal issues, and Defendants concede the Court "need not decide" whether the projects identified in Plaintiff's complaint are major modifications for purposes of deciding these legal issues.  (Duke Br. at 8, n.7.)  Therefore, the Court must assume, for purposes of this motion, that Duke's modifications were major and triggered the requirement to comply with PSD. *Nat'l Parks Cons. Ass'n v. Tenn. Valley Auth.*, 480 F.3d 410, 418 (6th Cir. 2007) (assuming that modifications were major for purposes of resolving statute of limitations issue "[b]ecause on summary judgment we are required to view all evidence in the light most favorable to the opponents of the motion") (hereinafter "*Nat'l Parks-6th Cir.*"); *Nat'l Parks Cons. Ass'n v. Tenn. Valley Auth.*, 502 F.3d 1316, 1321 (11th Cir. 2007) (same) (hereinafter "*Nat'l Parks-11th Cir.*").

IV.     ARGUMENT.

A.  *Plaintiff's Claims for Civil Penalties are Timely.*

Defendants argue Plaintiff's claims for civil penalties are time-barred because

---

this information is necessary at this stage, Plaintiff requests that the Court either deny Duke's motion or order a continuance of Duke's motion until this information is received.  Fed. R. Civ. P.  56(f).

they accrued prior to the five-year statute of limitations set forth in 28 U.S.C. § 2462.  Duke's argument ignores the language of applicable federal and state statutes and rules and glosses over distinctions in these rules and case law that defeat its claims.

As an initial matter, Plaintiff agrees that since the CAA lacks its own statute of limitations for civil penalties, the general federal statute of limitations in 28 U.S.C. § 2462 applies to Plaintiff's request for civil penalties.  That statute provides that enforcement actions for civil fines and penalties "shall not be entertained unless commenced within five years from the date when the claim first accrued."  28 U.S.C. § 2462.  A claim accrues when the violation giving rise to the penalty occurs.  *3M Co. v. Browner*, 17 F.3d 1453, 1462-63 (D.C.Cir. 1994).  Thus, a court's analysis must begin "with a careful examination of the specific conduct prohibited by the statute at issue."  *Nat'l Parks-6th Cir.*, 480 F.3d at 418.

1)   *Plaintiff has Timely Pled Duke's Failure to Obtain a PSD Permit for the Edwardsport Modifications.*

Defendants argue that Sierra Club's claims based on Defendants' failure to obtain a PSD permit accrued only at the time that Defendants were modifying the plant.  Yet many courts have held--including the court to most recently address the issue--that the PSD program imposes numerous operating (not just construction) requirements and, therefore, "each day a facility operates absent a PSD permit and absent BACT constitutes a discrete violation of the CAA." *Sierra Club v. Portland Gen. Elec. Co.*, Case No. 08-1136-HA, 2009 U.S.Dist. LEXIS 91623, *25 (D.Ore. Sept. 30, 2009); *see also Nat'l Parks-6th Cir*, 480 F.3d at 416-17; *United States v. East Ky. Power Coop., Inc.*, 498 F. Supp. 2d 970 (E.D.Ky. 2007); *United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 651 (M.D.N.C. 2003), *aff'd on other grounds*, *United States v. Duke Energy Corp.*, 411 F.3d 539 (4th Cir. 2005), *vacated by Envt'l. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007); *United States v. Ohio Edison Co.*, Case No. 2:99-CV-1181, 2003 U.S.Dist.

LEXIS 2357, *19-22 (S.D.Ohio 2003); *United States v. Am. Elec. Power Serv. Corp.*, 137 F.

Supp. 2d 1060, 1065-1068 (S.D.Ohio 2001).  The fact that PSD obligations are ongoing once

triggered means Defendants have been violating those obligations since the date(s) they made

major modifications to Edwardsport.[4]  Plaintiff's claim for civil penalties is thus not time-barred

by the statute of limitation in 28 U.S.C. § 2462, and Defendants' motion must be denied.

    a.    **The Language of the Clean Air Act and Applicable Federal Regulations Show That the Failure to Obtain a PSD Permit is an On-Going Violation**.

The PSD statute and its implementing regulations impose operating requirements on

owners and operators that last long after construction.  The PSD statute states, in relevant part:

> No major emitting facility on which construction is commenced after
> August 7, 1977, may be constructed in any area to which this part applies
> unless—
>
> **(1)** a permit has been issued for such proposed facility in accordance with
> this part setting forth *emission limitations* for such facility which conform to
> the requirements of this part;
>
> . . . .
>
> **(3)** the owner or operator of such facility *demonstrates* . . . that emissions
> from construction *or operation* of such facility will not cause, or contribute
> to, air pollution [in excess of PSD increment, NAAQS, or other applicable
> emission standards or standards of performance]
>
> **(4)** the proposed facility is *subject to the best available control technology*
> [BACT] for each pollutant subject to regulation under this chapter emitted
> from, or which results from, such facility;
>
> . . . .

---

[4] Some courts have styled violations of the PSD program as "continuing violations" under the continuing violations doctrine.  *E.g.*, *Duke Energy Corp.*, 278 F. Supp. 2d at 651; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (U.S. 1982) (warning against "wooden application" of statute of limitations where it ignores the continuing nature of the violations and "the broad remedial intent of Congress" embodied in the statute).  Some courts have styled PSD violations as "a series of discrete violations [for every day a PSD permit is not obtained or BACT limits not observed] rather than a single violation that may or may not be 'continuing' in nature."  *Nat'l Parks-6th Cir.*, 480 F.3d at 417.  Plaintiff believes the Sixth Circuit's characterization is more accurate.

> **(6)** there has been an analysis of any air quality impacts projected for the area as a result of growth associated with such facility;
>
>  **(7)** the person who owns or operates, or proposes to own or operate, a major emitting facility for which a permit is required under this part agrees to conduct such monitoring as may be necessary to determine the effect which emissions from any such facility may have, *or is having*, on air quality in any area which may be affected by emissions from such source. . .

42 U.S.C § 7475(a) (emphasis added).  The emission limits in subsections (1) and (4) clearly impose ongoing obligations after construction while the plant is operation.  42 U.S.C. § 7475(a); *Portland Gen.*, 2009 U.S.Dist. LEXIS 91623 at *23 ("It makes little sense for a PSD permit to set emissions limitations and require pollution control technology, but not require a facility to operate pursuant to those restrictions."); *Duke Energy*, 278 F. Supp. 2d at 650-51 (holding that the provision for BACT limits under sub (4) "is just as integral to achieving the objectives of PSD as the preconstruction analysis and review" and "is a condition of operation").

The statute's other post-construction obligations likewise confirm that PSD is a program focused on emissions after construction or modification, not merely the act of constructing or modifying.  These include demonstrating that emissions from "the operation" of the facility are not causing excessive air pollution, sub (3), and monitoring the impact emissions from the facility "is having" on air quality, sub (7).  42 U.S.C. § 7475(a); *Portland Gen.*, 2009 U.S.Dist. LEXIS 91623 at *23 (determining activities are operating restrictions); *Ohio Edison*, 2003 U.S.Dist. LEXIS 2357 at *19 (identifying monitoring as an operating restriction).  The implementing federal regulations confirm that PSD is focused on post-modification emissions. For example:

> (2)  Post-construction monitoring.  The owner or operator of a major stationary source shall, **after construction of the stationary source or modification**, conduct such ambient air monitoring as the Administrator determines is necessary to determine the effect emissions from the stationary source or modification may have, or are having, on air quality in any area.

52 C.F.R. § 52.21(m)(2) (emphasis added); 45 Fed. Reg. 52676, 52740 (Aug. 7, 1980).

Some courts have found that 42 U.S.C. § 7475's "may be constructed" language, and certain

requirements such as the air impact analysis in sub (6), mean the statute *only* imposes pre-

construction requirements. *E.g.*, *Nat'l Parks-11th Cir.*, 502 F.3d at 1322[5]; *SIGECO*, 2002

U.S.Dist. LEXIS 14039 at *14-15.  These cases mistakenly interpret PSD as only a pre-

construction program by "focus[ing] on [the preconstruction] aspects of the PSD permit process

to the exclusion of the language in the statute stating that the PSD permit shall set forth

emissions limitations for that source following the construction activity" and the other

operational requirements noted above.  *Duke Energy*, 278 F. Supp. 2d at 650.  These cases also

summarily state, without explaining why, that the provisions of 42 U.S.C. § 7475(a) impose only

pre-construction requirements and not operating requirements.  (Duke Br. at 16.)  For example,

no case adopting Defendants' interpretation has explained how monitoring the impact a facility

"is having" on local air quality is a pre-construction requirement, much less *only* a pre-

construction requirement.  *See* 42 U.S.C. § 7475(a)(7); 42 C.F.R. § 52.21(m)(2).[6]

Additionally, the *Otter Tail* case, which Defendants particularly embrace, is on appeal to

the Eighth Circuit Court of Appeals.  *See Sierra Club v. Otter Tail Corp.*, Appeal No. 09-2862

(8th Cir.).  The United States has filed an amicus brief in that case, supporting reversal, which

---

[5] Notably, civil penalties were not actually at issue in *Nat'l Parks-11th Cir.*, since the court had previously dismissed penalties against the Tennessee Valley Authority on sovereign immunity grounds.  502 F.3d at 1321-22.

[6] Defendants claim that many of the cases finding the five-year statute of limitations does not bar civil penalties for PSD violations lack analysis.  (Duke Br. at 15, citing *Nat'l Parks-11th Cir.*, 502 F.3d at 1323.)  However, the same can be said of the cases Duke cites, which often daisy-chain; one case repeating the holding of the last case to decide the issue without providing analysis.  *E.g.*, *New York v. Am. Elec. Power Serv. Corp.*, Case No. 2:04-cv-1098, 2006 U.S.Dist. LEXIS 32829, *24-25 (S.D.Ohio Mar. 21, 2006); *U.S. v. Brotech Corp.*, Case No. 00-2428, 2000 U.S.Dist. LEXIS 13859, *11-12 (E.D.Pa. Sept. 19, 2000).  One court opined that three of the "majority" cases (*Westvaco*, *Murphy Oil*, and *Coastal Lumber*) "are premised on an oversimplified reading of the CAA provisions."  *Ohio Edison*, 2003 U.S.Dist. LEXIS 2347 at *20.

concludes that the requirements for emission limits, a compliance demonstration, and post-construction monitoring, among other things, show that "[t]he PSD provisions of the CAA require a PSD permit as a condition of ongoing operations."  Br. of the United States as Amicus Curiae, *Sierra Club v. Otter Tail Corp*, p. 7, 11/24/09 (App. A).

Some cases also claim operating requirements are contained solely in operating permits, typically issued under the CAA's Title V permitting program.  *E.g.*, *SIGECO*, 2002 U.S.Dist. LEXIS 14040, *11-14; *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 662 (W.D.N.Y. 2003).  This analysis confuses the names of the permit categories with the actual function and effect of each type of permit.  The Fifth Circuit has attributed this confusion to unfortunate nomenclature: "The CAA statutory scheme contemplates at least two different types of air permits unhappily named 'preconstruction permits' and 'operating permits,' with confusion easily resulting from the fact that preconstruction permits often include limits upon a source's operations."  *United States v. Marine Shale Processors*, 81 F.3d 1329, 1355-56 (5th Cir. 1996).  In reality, the existence of the operating permit program is inapposite.  As one court aptly put it: "[b]ecause one program contains operational requirements does not mean that the other program must lack similar requirements."  *Portland Gen.*, 2009 U.S.Dist. LEXIS 91623 at *25.

In fact, prior to 1990, PSD permits may have contained the *only* operating requirements for many sources because "[b]efore 1990, no federal law required states to maintain operating permit programs," while the PSD program was created in 1977.  *Marine Shale Processors*, 81 F.3d at 1356.  Moreover, because the CAA only requires operating permits several months *after* construction or modification, 40 C.F.R. § 70.5(a)(1)(ii), major polluters would be operating unregulated if PSD permits did not also regulate operations following construction and modification.  In other situations, the PSD and Title V programs "work in concert," with Title V

permits "consolidat[ing] pre-existing requirements (such as those from the PSD program), into a single document." *Portland Gen.*, 2009 U.S.Dist. LEXIS 91623, *24-25.

Finally, the enforcement provisions of the CAA support Plaintiff's position. As one court has noted, a source that has failed to install technology to comply with BACT emissions limits can be immediately enjoined from *operating*. *Duke Energy*, 278 F. Supp. 2d at 651. Additionally, 52 C.F.R. § 52.21(r)(1) provides "[a]ny owner or operator who constructs *or operates a source or modification* not in accordance with the application submitted pursuant to this section *or with the terms of any approval to construct* . . . shall be subject to appropriate enforcement action" (emphasis added). This provision clearly recognizes that a source must *operate* pursuant to the terms of its PSD permit, and that failure to do so is actionable. *Duke Energy*, 278 F. Supp. 2d at 651 ("each day that Duke Energy operates an allegedly modified plant . . . it may be in violation of the requirement to comply with the operation conditions, i.e., the emissions limitations, that would have been contained within a PSD permit had Duke Energy submitted to the permitting process"); *East Ky. Power Coop.*, 498 F. Supp. 2d at 975 n.7 (noting similar enforcement language in state SIP supported continuing violation theory). Courts routinely evaluate whether and to what extent a plant has violated the PSD limits that would have been in place if the source had properly obtained those limits through permitting. *E.g.*, *United States v. Cinergy*, 618 F. Supp. 2d 942, 962-969 (S.D.Ind. 2009) (determining what BACT was at the time of the illegal modifications of Wabash River units and the amount of excess pollutants emitted because it was not installed). Simply put: "Failure to obtain a [PSD] permit in the first instance does not relieve an operator of the Act's ongoing operational requirements." *Portland Gen.*, 2009 U.S.Dist. LEXIS 91623 at *24. Consequently, Defendants have not been relieved of their ongoing obligations that were triggered when Defendants modified the

Edwardsport plant and Plaintiff's request for civil penalties for Defendants' violations of those obligations is not time-barred.[7]

> **b.** **Indiana's Historic Construction and Operating Program is Not Relevant, but Even if it Were, the Actual Language of the Program Supports Plaintiff.**

Defendants argue that Indiana's prior SIP supports their Motion because, they contend, it separated construction and operating permits and, thus, a construction permit requirement cannot contain ongoing operating restrictions. Defendants' argument is misplaced for a variety of reasons.

Some courts have found a state's construction and operating permit program dispositive to a federal PSD statute of limitations case. If the relevant state's SIP treats construction and operating permits separately, "the statutory provisions governing preconstruction cannot reasonably be construed to mean that building or altering a machine without a permit is a violation that continues as long as the machine exists or is operated," since such operational requirements are contained in a separate operating permit. *Nat'l Parks-11th Cir.*, 502 F.3d at 1323 (internal quotation marks and citation omitted). Other courts have found a state's construction and operating permit program are integrated and that a preconstruction permit violation carries over through operation. *E.g.*, *Nat'l Parks-6th Cir.*, 480 F.3d at 419 ("[the Tennessee SIP] establishes that the duty to obtain a construction permit containing the proper

---

[7] Plaintiff agrees that under 28 U.S.C. § 2462, it may only seek penalties for the five years of violations preceding suit. *E.g.*, *Portland Gen.*, 2009 U.S.Dist. LEXIS 91623 at *25. Plaintiff disagrees that the relevant complaint for determining the limitations period is the First Amended Complaint filed on July 14, 2009. (Duke Br. at 16 n.10.) Contrary to Defendants' suggestion, Plaintiff was not required to file pre-suit notice of the PSD permit violations, *see* 42 U.S.C. § 7604(a)(3), (b). And, while Defendants claim Plaintiff's original complaint "contain[ed] no allegations about any specific projects," the complaint was sufficient to provide Defendants notice of Plaintiff's allegations, as evidenced by the fact that they did not file a motion to dismiss under Fed. R. Civ. P. 12(b)(6). Plaintiff's First Amended Complaint simply provided additional detail about the conduct and occurrences that gave rise to the original complaint and, therefore, relates back to the original complaint. *Compare* Complaint, 4.30.08, ¶¶ 2, 42 (stating Defendants had made modifications at various time), *with* First Amend. Compl. ¶¶ 70-198 (identifying certain projects in detail). Fed. R. Civ. P. 15(c); *Bularz v. Prudential Ins. Co. of Am.*, 93 F.3d 372, 379 (7th Cir. 1996).

emissions limits is ongoing, even *post*-construction").  A third camp rightly expresses skepticism that state construction and operating programs are even "relevant" to PSD statute of limitation cases.  *Duke Energy*, 278 F. Supp. 2d at 652; *see also* U.S. Amicus Brief, *Sierra Club v. Ottertail*, at 14-15 (App. A) (explaining it is "simply wrong" that "it makes a difference if the permitting authority issues an integrated PSD construction and operating permit").

In each of these cases, the PSD permits were governed by a particular state construction permit program. *See Nat'l Parks-6th Cir.*, 480 F.3d at 413-14 (discussing PSD permitting requirements of Tennessee SIP); *Nat'l Parks-11th Cir.*, 502 F.3d at 1325-26 & n.2 (discussing PSD permitting requirements of Alabama SIP).  That is not the case here.  The PSD claims in this case are based on the federal PSD rules.  (Order Denying Defs.' Mot. to Dismiss, 2/11/09, at 9-10, Dkt. 35.)  While Indiana did have an EPA-approved construction and operating permit program as of 1982, Plaintiff's claims in this case relate to PSD and not Indiana construction permit requirements.  As Defendants admit, the "*Indiana requirements for obtaining a construction permit were  . . . different from the PSD regulations,*" and there was no federal counterpart to the state operating permit program at that time.  (Duke Br. at 17 & n.11 (emphasis added).)  Since the state construction permit program was distinct from the federal PSD requirements at issue in this case, it has no bearing on the disputed modifications that occurred between approximately1991 and 2003.

Two cases cited by Defendants bear additional note.  Defendants cite *Otter Tail*, 608 F. Supp. 2d at 1123, as a case where the state was governed by federal PSD requirements and still concluded the statute of limitations applied since the state had a separate construction and operating permit process.  (Duke Br. at 18.)  The court's analysis appears to simply apply the holding in *Nat'l Parks-11th Circuit* without determining whether it was applicable in a state

16

governed by federal PSD regulations wholesale.  *Otter Tail*, 608 F. Supp. 2d at 1127 (applying South Dakota SIP).  In this (and other) situations, "[i]t is not helpful to ask, as the district court did, whether South Dakota has an 'integrated construction and operating permit.'"  United States Amicus Br., *Sierra Club v. Ottertail*, at 14 (App. A).

Defendants also cite *SIGECO*, a statute of limitations case that mentioned Indiana's construction and operating permit provisions.  (Duke Br. at 17-18.)  However, it is not clear that the court found the state's purportedly separate construction and operating permit program dispositive on the federal PSD claims, or on violations of the state's SIP the plaintiff also alleged in that case.  *SIGECO*, 2002 U.S.Dist. LEXIS 14040 at *13, *17.  If it is the latter, the case is of limited value since Plaintiff here does not allege Defendants violated state construction permit requirements in the Indiana SIP.[8]

Even if *SIGECO*'s holding on the federal statute of limitations issue did depend on the state construction and operating permit program, the opinion cites only the first sentence of the construction and operating permit provisions, and the fact that they are in separate sections, to conclude that the programs are separate.  *SIGECO*, 2002 U.S.Dist. LEXIS 14040 at *13 (citing APC 19 §§ 4, 5).[9]  But other sections of the SIP show the programs were actually integrated.  For example:

---

[8] Defendants claim Plaintiff alleges violations of the Indiana SIP's preconstruction requirements in Paragraph 204 of the First Amended Complaint.  (Duke Br. at 18.)  Yet Paragraph 204 does not allege Defendants violated the preconstruction PSD requirements in the state SIP (since no federally-approved requirements existed at the time), but merely refers to the fact that EPA incorporated the federal PSD regulations by reference into the Indiana SIP as it did with other non-approved states.  (First. Amend. Compl. ¶ 204, Dkt. 55.)

[9] *SIGECO*, and the Defendants in this case, refer to the old Indiana SIP as "APC 19," or Air Pollution Control Regulation 19.  *SIGECO*, 2002 U.S.Dist. LEXIS 14040 at *3; Duke Br. at 17-18.  APC 19 is simply Title 326 of the Indiana Administrative Code (or, in the 1988 edition, Title 325.1).  *See United States v. AM Gen. Corp.*, 808 F. Supp. 1353 (N.D.Ind. 1992) ("Indiana's SIP—APC 19, codified at 326 Indiana Administrative Code 2-1-1 *et seq.* . .").

- "The construction permit issued under section 3 of this rule may be used as the initial operating permit for a new source or facility." 326 IAC § 2-1-4(b) (1992); *see also* 326 IAC § 2-1-4(b) (1995 Supp.); 326 IAC § 2-1-4(b) (1996).

- During the construction permitting process, the applicant was required to agree that "the source, facility, or emission control equipment will be constructed *and will operate* in compliance with all applicable Indiana air pollution control rules." 326 IAC § 2-1-3(f) (1995 Supp.) (emphasis added); *see also* 325.1 IAC § 2-1-3(e) (1988); 326 IAC § 2-1-3(e) (1991 Supp); 326 IAC § 2-1-3(e) (1992); 326 IAC § 2-1-3(f) (1996).

- The state could impose operating conditions, like emissions limits and monitoring, in construction permits. 325.1 IAC §§ 2-1-3(h), 2-1-5(a) (1988); 326 IAC §§ 2-1-3(h), 2-1-5(a) (1991 Supp.); 326 IAC §§ 2-1-3(h); 2-1-5(a) (1992); 326 IAC § 2-1-3(i)(8), 2-1-3(j) (1995 Supp.) ("The commissioner may require, as a condition of the permit, that the owner or operator of a source or facility provide for the monitoring of emissions when necessary to demonstrate compliance with any applicable air pollution control rule."); 326 IAC §§ 2-1-3(j), 2-1-5(a) (1996).

- Emissions limitations established in construction permits could be carried over to operating permits. 325.1 IAC §§ 2-1-4(g), 2-1-5(a)(4) (1988); 326 IAC §§ 2-1-4(b), 2-1-5(a)(4) (1991 Supp.); 326 IAC §§ 2-1-4(g), 2-1-5(a)(4) (1992); 326 IAC § 2-1-4(h) (1995); 326 IAC § 2-1-4(h) (1996).[10]

In fact, a newer rule promulgated on November 25, 1998, repealed the construction and operating permit provision Judge McKinney relied on in *SIGECO* and more formally consolidated these permitting programs. *See* 326 IAC § 2-1-1 through 2-1-13 (2000 Supp.) (indicating repeal). The new rule provides "[n]o person shall *construct, operate, or modify* a source or emissions unit required to obtain a registration, permit, modification approval, or operating permit revision prior to issuance of a registration, permit, modification approval, or operating permit revision, except as provided in this article." *Id*. § 2-1.1-2 (emphasis added). The *SIGECO* court would have had no cause to address this integrated permitting provision since it post-dated the 1991 and 1992 modifications at issue in that case. *Id*. at *1.

---

[10] The court in *Nat'l Parks-6th Cir.* found a similar requirement in the Tennessee SIP indicative of an integrated permitting program. 480 F.3d at 413.

In short, even assuming *arguendo* that the format of the Indiana construction and operating permit program is relevant to the limitations issue Defendants raise, a broader analysis of the Indiana SIP indicates the permit programs were integrated.  *Nat'l Parks-6ᵗʰ Cir.*, 480 F.3d at 413-14, 418-19 (analyzing multiple sections of subject SIP); *Portland Gen.*, 2009 U.S.Dist. LEXIS 91623, *20-22 (same).  Yet the Court need not engage in this analysis at all, since the only applicable law in this case is the federal PSD program, not a state construction program, and federal law mandates denial of Defendants' motion as explained above.

        *2)  Plaintiff's Allegation that Duke Violated BACT Emission Limits is Timely.*

Plaintiff's second cause of action alleges Defendants are violating BACT emission limits imposed by 40 C.F.R. § 52.21(j), and now required by the Indiana SIP, because the modified coal-fired units at issue here are not complying with, and have never complied with, those limits.  Because the BACT emission limit violations are on-going, Plaintiff's claims for such violations are not barred by the five-year statute of limitations.

Compliance with BACT is required by the Clean Air Act itself, 42 U.S.C. § 7475(a)(4), and by enforceable Clean Air Act regulations, 40 C.F.R. § 52.21(j).  Specifically, any major modification—including the projects in this case—"shall apply best available control technology for each regulated NSR pollutant for which it would result in a significant net emissions increase at the source."  42 C.F.R. § 52.21(j)(3).  The current Indiana SIP similarly requires that any modified source apply BACT.  326 IAC 2-2-3(3).  These regulations require compliance with BACT whether or not a permit was obtained.  *Id.*

BACT is explicitly an emission limit that must be met at all times of operation under the federal regulations applicable here.  42 U.S.C. § 7479(3) (defining BACT as an emission limit); 40 C.F.R. § 52.21(b)(12) (same).  The Sixth Circuit concluded that  language nearly identical to

the federal regulations in the Tennessee SIP "by its own terms[] creates an ongoing obligation to apply BACT, regardless of what terms a preconstruction permit may or may not contain." *Nat'l Parks-6ᵗʰ Cir.*, 480 F.3d at 418.  Because of this requirement, a defendant "may not rely on any preconstruction approval to justify its post-construction failure to comply with this provision." *Id*.  Even a court finding that the obligation to *get a PSD permit* was a one-time requirement held that separate claims based on violations of BACT limits were continuing, and that 28 U.S.C. § 2462 did not bar claims occurring within the limitations period.  *New York v. Niagara Mohawk Power Corp*., 263 F. Supp. 2d 650, 663-65 (W.D.N.Y. 2003) (holding 42 U.S.C. § 7475(a)(4) creates a requirement to apply BACT emission limits separately from the requirement to obtain a permit under (a)(1)).  Indeed, the court found a contrary interpretation would frustrate the CAA's remedial goals and even reward non-compliance.  *Id*.  Consequently, "this cause of action manifests itself anew each day a plant operates without BACT limits on emissions." *Nat'l Parks-6ᵗʰ Cir.*, 480 F.3d at 419; *accord Portland Gen*., 2009 U.S.Dist. LEXIS 91623 at *21 ("the obligation to utilize BACT is ongoing . . . [and] goes beyond merely installing the technology, but also applies to operation of the facility"); *East Ky. Power Coop.*, 498 F. Supp. 2d at 974.

Duke relies on two cases to mount its defense.  (Duke Br. at 19-20.)  The first—*Nat'l Parks-11ᵗʰ Cir.*—dismissed civil penalties on BACT emission limits claims, but it did so based on the unique language of the Alabama SIP in that case.  502 F.3d at 1324 ("the obligation to apply [BACT] ... was solely a prerequisite for approval of the modification, not a condition of Unit 5's lawful operation, *under the relevant Alabama [SIP]*") (emphasis added).  Additionally, the claims in the *Nat'l Parks-11ᵗʰ Cir.* case were brought pursuant to 42 U.S.C. § 7604(a)(3), which provides for suit against any person who proposes to construct or constructs without a permit.  502 F.3d at 1323.  In contrast, suits for violations of 40 C.F.R. § 52.21(j)(3) are based on

20

42 U.S.C. § 7604(a)(1), which provides for suits for current or past violations of any "emission standard or limitation under" the Clean Air Act.  Therefore, Plaintiff's claims for violating BACT are not based on construction permitting requirements, like the claims in *Nat'l Parks-11th Cir.* were.

The second case Defendants cite—*SIGECO*—stated generally that "the relevant" federal regulations made only commencing construction a violation, but did not analyze the language of 52 C.F.R. § 52.21(j) specifically.  2002 U.S.Dist. LEXIS 14040 at *15-16.  Notably, the court seemed to recognize that if confronted with an emissions limitation requirement that applied to the facility as a result of the modifications, it would have been an ongoing requirement.  *Id.* at *17.  52 C.F.R. § 52.21(j) is such an emission limitation and ongoing requirement.

Finally, Defendants take issue with Plaintiff's citation to 326 IAC 2-2-3(3), the current Indiana PSD regulation, in the First Amended Complaint.  Defendant is correct that this regulation was not in effect at the time the disputed modifications occurred, and that its language "almost exactly track[s]" the federal rule.  (Duke Br. at 20.)  Defendants are wrong, however, that 326 IAC 2-2-3(3) does not now apply to the modified Edwardsport plant.  By its terms, the regulation is not limited to modifications that occurred on or after the effective date; rather, the regulation is phrased in the present tense, suggesting that modifications made before the regulation's promulgation still need to apply BACT emission limits.  As the Sixth Circuit pointed out, such language imposes an on-going, continuing requirement to apply BACT independently of the requirement to obtain a PSD permit.  *Nat'l Parks-6th Cir.*, 480 F.3d at 418.  Moreover, while 326 IAC 2-2-3(3) is cross-referenced in the Indiana preconstruction permit requirements, this is inapposite to the BACT claim in this case because the regulation also imposes a free-standing requirement that modified pollution source meet BACT emission limits.

For these reasons, Defendants' failure to apply BACT is an ongoing violation that continues past the date of construction of the disputed modifications to the present day.

> 3) *Plaintiff has Timely Pled Duke's Failure to Demonstrate Compliance with the Ambient Air Quality Standards.*

Like the requirement to install BACT in 40 C.F.R. § 52.21(j), subsection (k) of the same regulation requires owners or operators of a proposed modification to demonstrate compliance with NAAQS and PSD increment.  40 C.F.R. § 52.21(k); *see also* 42 U.S.C. § 7479(a)(3).  Defendants point to the conditional language of the regulation to argue that it creates only a preconstruction requirement.  (Duke Br. at 21.)  Plaintiff agrees that initially, such demonstration should occur prior to construction.  However, 40 C.F.R. § 52.21(k) does not state that the demonstration must occur *only* prior to construction of the modification; rather, it continues after the modification has been installed if the demonstration did not occur pre-construction.  *See Portland Gen.*, 2009 U.S.Dist. LEXIS 91623 at *23 (finding analogous demonstration requirement in 42 U.S.C. § 7475(a)(3) continues after construction); *Niagara Mohawk*, 263 F. Supp. 2d at 664-65 (finding that "the seven additional requirements in 42 U.S.C. § 7475(a) are not subsumed by the initial requirement to obtain a preconstruction permit").

Similarly, 326 IAC 2-2-5(a) requires a demonstration that a major modification "will not cause or contribute to air pollution in violation of any" NAAQS or PSD increment.  Consistent with the federal regulation, it is a requirement independent of any preconstruction permit review process that continues after construction if the required demonstration has not yet occurred. There is no contention that Defendants have made this demonstration for the existing Edwardsport units.  Thus, Plaintiff's third cause of action is timely since Defendants have not and cannot show they demonstrated the disputed modifications will not violate NAAQS and PSD increment as required by 40 C.F.R. § 52.21(k) and 326 IAC 2-2-5(a).

4) *Plaintiff's Allegation that Defendants Have Violated the Title V Operating Permit Program is Neither Time-Barred nor a Collateral Attack on Duke's Title V Permit.*

Plaintiff's fourth cause of action alleges that Defendants have violated CAA Title V requirements, including permit conditions in Duke Title V permit.  Defendants' arguments that this cause of action is time-barred and a collateral attack on the 2004 permit should be rejected based on the claims that Plaintiff are pursuing in this case.[11]

### a.  Plaintiff's Allegation that Defendants have Violated the Title V Program is Timely.

Under the CAA, it is a statutory violation for any person to violate any requirement of a permit issued or to operate a major source of air pollution "except in compliance with a permit issued by a permitting authority under" CAA subchapter V.  42 U.S.C. § 7661a(a); *see also Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670, 672 (7th Cir. 2008) ("Title V of the CAA requires major stationary sources of air pollution to obtain operating permits incorporating the CAA's requirements.").  At issue in this case are violations of 42 U.S.C. § 7661a(a) due to Defendants' false or erroneous permit renewal application and compliance certifications, which constitute violations of 42 U.S.C. § 7661a(a), 326 IAC 2-7-4 and the Title V permits for the Edwardsport plant.

### i)  Defendants Violated 42 U.S.C. § 7661a(a), 326 IAC 2-7-4, and their Title V Permits By Submitting An Incomplete and False Application for Permit Renewal.

It is unlawful to operate in violation of a Title V permit.  42 U.S.C. § 7661a(a).  The Defendants violated 326 IAC 2-7-4 and their Title V permits, and thus § 7661a, by submitting an

---

[11] Unrelated to the basis for Defendants' present motion, as set forth above, Plaintiff has agreed to pursue claims related to modifications occurring prior to March, 2003 in this case.  Therefore, Plaintiff is accordingly limiting its claims related to Title V to failure to apply for and obtain a permit that included a PSD as an applicable requirement, a compliance plan to come into compliance with PSD, and failure to correctly certify compliance.

application for permit renewal that did not identify the CAA's PSD program as an applicable

requirement and propose a compliance schedule to bring the plant into compliance.

The permit issued for the Edwardsport plant on August 10, 2004, and the revised permit

issued on March 11, 2008, provide in relevant part:

> (a) The application for renewal shall be submitted using the application form or forms prescribed by IDEM, OAQ, and **shall include the information specified in 326 IAC 2-7-4**. Such information shall be included in the application for each emission unit at this source, except those emission units included on the trivial or insignificant activities list contained in 326 IAC 2-7-1(21) and 326 IAC 2-7-1(40). The renewal application does require the certification by the "responsible official" as defined by 326 IAC 2-7-1(34)…

(Pls. Material Facts ("PMF") ¶¶ 10, 18) (emphasis added).  This requires submission of an

application that complies with 326 IAC 2-7-4, which in turn provides that each application for

permit renewal must meet the following requirements:

- Identify all applicable requirements that pertain to the facility, including the requirements of the PSD program promulgated in 40 C.F.R. part 52.  326 IAC 2-7-4(c)(4)(A); *see also* 40 C.F.R. § 70.5(c)(4)(i) and 326 IAC 2-7-1(6); 40 C.F.R. § 70.2 (defining "applicable requirements"); and

- Contain a "compliance plan" identifying the plant's compliance status for each applicable Clean Air Act requirement and, for those obligations that the plant is not complying with, "a narrative description of how the source will achieve compliance with such requirements" and a "schedule of remedial measures, including an enforceable sequence of actions with milestones, leading to compliance with any applicable requirements…"  326 IAC 2-7-4(c)(10)(A), (A)(iii), (B)(iii); 40 C.F.R. § 70.5(c)(8)(i), (ii)(C), (iii)(C); and

- Contain a certification by "a responsible official of [the] truth, accuracy, and completeness" of the application, including a "certification of compliance with all applicable requirements"—including the PSD program.  326 IAC 2-7-4(a)(2)(B), (f); 40 C.F.R. §§ 70.5(c)(9)(i), (d).

Moreover, the applicable requirements state that the Defendants have an ongoing requirement to

correct any erroneous statements in a pending application.  326 IAC 2-7-4(b); 40 C.F.R. §

70.5(b).

Defendants filed an application for a permit renewal on November 13, 2008.  (PMF ¶ 19.) That application failed to identify the PSD program requirements as applicable to the existing coal boilers at the plant and failed to propose a compliance schedule bringing the boilers into compliance with the PSD program.  (*Id*. ¶ 20.)  Nor is there any evidence that the Defendants have corrected these deficiencies.  (*Id*.).  For purposes of this motion, the Court must assume that boilers 7-1, 7-2 and 8-1 have been modified and are subject to PSD requirements in 42 U.S.C. §§ 7470-7492 and 40 C.F.R. § 52.21, including best available control technology limits, as applicable requirements for boilers 7-1, 7-2 or 8-1.  By failing to disclose those applicable requirements in the renewal permit, failing to propose a compliance schedule, and failing to supplement or correct these application deficiencies, Defendants have violated 326 IAC 2-7-4(c)(10)(A), (A)(iii), (B)(iii), 2-7-4(c)(4)(A), and 326 IAC 2-7-4(a)(2)(B), (f), which constitutes a violation of section B.16 of the 2004 permit and B.17 of the 2008 revision, and therefore also a violation of 42 U.S.C. § 7661a(a).  These violations began when the application to renew the permit occurred in November, 2008, and therefore are all within a five year statute of limitations.

Likewise, Defendants committed the almost the exact same violations described above when they submitted their 2006 application.  The 2006 application did not identify PSD as an applicable requirement nor contain a compliance schedule for PSD, thus making the certification on the application incorrect.  (*See* PMF ¶ 14.)  Defendants have violated 326 IAC 2-7-4(c)(10)(A), (A)(iii), (B)(iii), 2-7-4(c)(4)(A), and 326 IAC 2-7-4(a)(2)(B), (f), which constitutes a violation of section B.16 of the 2004 permit but obviously not a violation of B.17 of the 2008 revision which did not exist at the time of the 2006 application submittal.  Defendants submitted the 2006 application in 2006 which is within the five year statute of limitation.

ii)     **Defendants Violated 42 U.S.C. § 7661a(a), 326 IAC 2-7-4 and their Title V Permits By Submitting False Compliance Certifications.**

Section B.9 of the Title V permits issued for the Edwardsport plant requires the permittee to "annually submit a compliance certification report which addresses the status of the source's compliance with the terms and conditions contained in [the] permit."  (PMF ¶¶ 7, 16.)  Those conditions include B.16 of the 2004 permit and B.17 of the 2008 revised permit, which, as explained above, require applications to comply with 326 IAC 2-7-4.  By certifying compliance with the Title V permits, without disclosing that the November, 2008 application violated 326 IAC 2-7-4 by failing to identify PSD as an applicable requirement, failing to propose a compliance schedule, and failing to supplement or correct these application deficiencies, Defendants violated permit section B.9, which in turn is a violation of 42 U.S.C. § 7661a(a); *see also CARE*, 535 F.3d at 670 n.8 ("[c]ertificates of compliance are not taken lightly" and "[f]iling a false compliance certification exposes the responsible corporate official and/or the source to potential criminal sanctions, among other things").  Since they are based on compliance certifications occurring since the November, 2008 application to renew, these violations occurred within the five-year statute of limitations period.[12]

b.   **Plaintiff's Allegations that Defendants Violated the Title V Program Are Not an Impermissible Collateral Attack on Duke's Title V Permit.**

---

[12] As noted above, Plaintiff's Title V claims accrued within the five-year statute of limitations period.  But even if they had not, cases Defendants cite would still support Plaintiff's claims since violations of Title V operating permits are indisputably continuing or on-going violations of the Act.  Judge McKinney's decision in *SIGECO* states that "[i]t is generally recognized that failure to obtain an operations permit is a continuing violation for each day of operation without the permit," and further, "*[o]perating* a facility after it was modified without first obtaining the necessary construction permit may constitute a continuing violation of the relevant *operating permit*."  *SIGECO*, 2002 U.S.Dist. LEXIS 14040, *11, *14 (original emphasis); *see also Cinergy*, 397 F. Supp. 2d at 1030; *Niagara Mohawk*, 263 F. Supp. 2d at 662; *United States v. Ill. Power Co.*, 245 F. Supp. 2d 951, 959 (S.D.Ill. 2003).

Defendants next claim Plaintiff's Title V allegations are an impermissible collateral attack on Duke's 2004 Title V permit.  Plaintiff's claims are not "collateral," but are permissibly based on Defendants' violations of their Title V permits.

Congress enumerated the one, and only, way that an issued Title V permit can prevent a later suit.  Under the terms of the CAA, Title V permits are not a bar to enforcement unless a formal "permit shield" exists.  A "permit shield" can only do one of two things.  First, it can provide that compliance with a Title V permit is compliance with 42 U.S.C. § 7661a.  42 U.S.C. § 7661c(f).  Second, it can provide that compliance with a permit constitutes compliance with any other requirement of the CAA if:

1)  The permit includes the applicable requirements of such provisions, or

2)  The permitting authority in acting on the permit application makes a determination relating to the permittee that such other provisions (which shall be referred to in such determination) are not applicable and the permit includes the determination or a concise summary thereof.

*Id.*; *see also* 40 C.F.R. § 70.6(f); 326 IAC 2-7-5.  Section B.12 of Title V permits issued for the Edwardsport plant has the same limitation on a "permit shield."  (PMF ¶¶ 7, 17.)

Since there is no "permit shield" purporting to shield Defendants from complying with the PSD requirements at issue in this case, there can be no "collateral attack."  *CARE*, 535 F.3d at 678 ("Title V itself reserves the EPA's ability to bring an enforcement action unless an express 'shield' on the face of the permit bars that action"); *Communities for a Better Env't v. Cenco Refining Co.*, 180 F. Supp. 2d 1062, 1082 n.6 (C.D.Cal. 2001).  As the Seventh Circuit explained,

[The permit shield] provision would hardly be necessary if the EPA was supposed to resolve all alleged violations of the CAA in the permitting process… In addition, unlike the permitting process, the enforcement process allows for discovery, hearings, cross-examination of witnesses, and expert testimony—mechanisms designed to resolve disputed claims. It is reasonable to interpret Title V to complement, not to limit, the EPA's enforcement authority.

*CARE,* 535 F.3d at 678-79 (internal citations omitted).  In fact, the Edwardsport plant's permit shield sections specifically state that they *does not* shield the plant, or its owners and operators, from liability for violations that occurred "prior to or at the time of this permit's issuance." (PMF ¶¶ 9, 17.)

The cases Defendants cite are incorrectly decided or simply not applicable to the fact here.  (Duke Br. at 26-28.)  The district court's decision in *Otter Tail* finding a "collateral attack" despite the lack of a permit shield is unsupported by any law or, respectfully, steady analysis. 608 F. Supp. 2d at 1130-31.  *Nat'l Parks-11ᵗʰ Cir.* also did not address whether a permit shield existed in that case, relied on a 1985 state permitting program, and only discussed the collateral attack issue in one passing sentence.  502 F.3d at 1326.  Furthermore, unlike this case, where Plaintiff alleges a violation of the Title V permits issued to the Edwardsport plant, in *Nat'l Parks-11ᵗʰ Cir.*, there was no allegation of violations of the permit—only an allegation that the plant obtained the wrong permit.  *Id.*  *BP Amoco* was not even a CAA case, but a private contract and fraud case between two parties who, evidently, made a bad deal.  *BP Amoco Chem. Co. v. Flint Hills Res., LLC*, 615 F. Supp. 2d 765 (N.D.Ill. 2009).  *Solar Turbines*, 732 F. Supp. 535, 539 (M.D.Pa. 1989) and *AM General*, 34 F.3d 472 (7th Cir. 1994), to the extent they are still good law,[13] are simply irrelevant.  In addition to being based on specific statutory provisions not at issue in this case, they involved an enforcement action that directly contradicted an explicit and contrary determination made during a permit proceeding.  *Solar Turbines*, 732 F. Supp. at 538 (concerning EPA's contention that the BACT permit limit or NOx contained in the defendant's permit was wrong and invalid); Duke Br. at 28 (admitting *AM General* dealt with a

---

[13] The holdings in *AM General* and *Solar Turbines*—that EPA could not bring an enforcement action against a source that had been issued a permit by the state where EPA disagreed with the state on the adequacy of the permit—were rejected by the Supreme Court in *Alaska Department of Environmental Conservation v. EPA*, which held that EPA does have that power.  540 U.S. 461 (2004).

different provision of the CAA).  *AM General*'s dicta on collateral attacks is also dubious in light of the Seventh Circuit's more recent and direct discussion of the permit shield issue in *CARE*.

Notably, while Defendants argue in this case that Defendants' liability for undertaking major modification without complying with the CAA should be resolved in permitting, *e.g.*, Def. Br. at 26-29 and Order at 8, Dkt. 35, the Defendants argued in the permitting process that *"[t]he enforcement process,* rather than the permit review process, is the suitable venue for evaluating [prior PSD] allegations."  (Westerberg Dec., Ex. 6 at 12, 13, n.15 (emphasis added).)  Suffice it to say, Defendants' arguments are opportunistic, depending on the forum, in hopes of escaping review of their illegal modifications in *any* venue.

Like Plaintiff's claims for civil penalties on causes of action 1-3, Plaintiff's fourth cause of action is timely, and further, is not barred as a collateral attack on Duke's 2004 Title V permit.

**B.  The Concurrent Remedy Doctrine Does Not Apply to Plaintiff's Claim for Injunctive Relief.**

Plaintiff's complaint requests a variety of injunctive relief in addition to civil penalties, as allowed by the CAA.  42 U.S.C. §§ 7604(a) and (g).  Yet, Defendants contend that since Plaintiff's request for civil penalties is time-barred under 28 U.S.C. § 2462, so is its request for injunctive relief under the concurrent remedy doctrine.  Because Defendants are incorrect that civil penalties are time-barred, this argument is faulty and need not be addressed by the Court. *Nat'l Parks-6[th] Cir.*, 480 F.3d at 419-20 (concluding that since civil penalties were not subject to statute of limitations, the court "need not address" the concurrent remedy rule).  Assuming, *arguendo*, that Plaintiff cannot obtain any civil penalties on any claims, the so-called concurrent remedy rule still does not bar Plaintiff's request for injunctive relief as a majority of the courts to consider the issue have held.  *Cinergy*, 397 F.Supp.2d at 1030-32.

The Supreme Court has held that "[u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Porter v. Warner Holding Co*., 328 U.S. 395, 398 (1946).  Consistent with this principle, the *Duke Energy* court held that, "[b]y its plain terms, the general federal statute of limitations has no application to injunctive relief," but "pertains only to actions for 'any civil fine, penalty, or forfeiture, pecuniary or otherwise'."  278 F. Supp. 2d at 653 (quoting 28 U.S.C. § 2462).  More specifically, a number of courts have held that "Section 2462 does not bar injunctive relief as a matter of law" under the CAA and other acts.  *Duke Energy*, 278 F. Supp. 2d at 653 (citing *U.S. v. Telluride Co.*, 146 F.3d 1241, 1245 (10th Cir. 1998); *United States v. Banks*, 115 F.3d 916, 919 (11th Cir. 1997); *Westvaco*, 144 F. Supp. 2d at 443 n.2; *Murphy Oil*, 143 F. Supp. 2d at 1087); *see also Am. Elec. Power Serv. Corp.*, 137 F. Supp. 2d at 1067-68 ("statutes of limitation historically do not control measures of equitable relief") (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 396, 90 L. Ed. 743, 66 S. Ct. 582 (1946)).

Despite the clear language of the statutes at issue in this case, Defendants nonetheless contend the "concurrent remedy" doctrine bars Plaintiff's request for injunctive relief.  (Duke Br. at 22-25.)  Defendants further argue that courts rejecting the concurrent remedy doctrine have done so because the plaintiff was the government, to whom the doctrine normally does not apply.[14]  That distinction does not hold.  First, many of the "governments" in those cases were state attorneys general bringing claims pursuant to the same citizen suit provision as the Sierra Club's claims in this case.  *E.g*., *Cinergy*, 397 F. Supp. 2d at 1032 (refusing to apply concurrent remedy doctrine to state plaintiffs acting pursuant to the citizen suit provision); *see also*

---

[14] According to one case, statutes of limitation are enforced against the U.S. government "only when the government is acting to vindicate private interests, not a sovereign or public interest," and that "the concurrent remedy rule cannot properly be invoked against the government when it seeks equitable relief in its official capacity."  *Banks*, 115 F.3d at 919 (quoted in *United States v. Murphy Oil*, 143 F. Supp. 2d 1054, 1087 (W.D.Wis. 2001)).

*Pennsylvania v. Allegheny Energy, Inc.*, Case No. 05-885, 2006 U.S.Dist. LEXIS 38377, *17 n.3

(W.D.Pa. Apr. 19, 2006) (declining to apply concurrent remedy doctrine); *New York v. Am. Elec.*

*Power Serv. Corp.*, Case No. 2:04-cv-1098, 2006 U.S.Dist. LEXIS 32829, *28 (S.D.Ohio Mar.

21, 2006) (same).

Second, Defendants' argument ignores the many cases where courts have correctly

refused to apply the concurrent remedy doctrine to citizen suit plaintiffs.  In *Cinergy*, two citizen

groups were co-plaintiffs with the United States and several states.  397 F. Supp. 2d at 1027

(listing Hoosier Environmental Council and Ohio Environmental Council as the citizen

plaintiffs).  As to those citizen groups, the Court said:

> regardless of a government exception to the concurrent remedy doctrine, the civil fines
> and the equitable remedies the Plaintiffs seek are not concurrent, because they have
> different goals and effects.  For example, the citizen suit provisions of the Act create an
> equitable remedy to stop threats to the environment.  Civil fines collected through a
> citizen suit must be paid to the United States, not to the citizens; thus, "the primary
> purpose of civil penalties is deterrence, not reward to the Plaintiffs."  *AEP II*, 137
> F.Supp.2d at 1068 (citing 42 U.S.C. § 7604(g)).  As a result of this distinction, the
> concurrent remedy doctrine does not operate to bar the Citizens' suit for injunctive relief.

*Id.* at 1032[15]; *accord Allegheny Energy*, 2006 U.S.Dist. LEXIS 38377 at *17 n.3; *Am. Elec.*

*Power Serv. Corp.*, 137 F. Supp. 2d at 1068; *Sierra Club v. Dayton Power & Light, Inc.,* Case

No. 2:04-CV-905, 2005 U.S.Dist. LEXIS 42473, *11 (S.D.Ohio Aug. 12, 2005) (same holding in

case where Duke Energy Ohio was a co-defendant).  These decisions correctly recognize that

remedies are not "concurrent" when civil penalties under the Clean Air Act are not damages or

rewards paid to a plaintiff, but fines to be deposited in the Treasury of the United States, in

contrast to injunctive relief intended "to stop threats to the environment."  *Cinergy*, 397 F. Supp.

---

[15] Defendants seek to minimize *Cinergy* by claiming its holding was merely an "alternative" to its holding
that the doctrine did not apply to the government.  (Duke Br. at 24, n.14.)  This is not true: since there were citizen
plaintiffs in *Cinergy*, the court independently assessed whether the doctrine applied to citizens in addition to
considering whether it applied to the government.  *Cinergy*, 397 F. Supp. 2d at 1032.

2d at 1032.  Moreover, allowing citizens' claims for equitable relief is "to ensure that the public interest does not suffer from the lack of diligence of public officers."  *Id.*

Two cases cited by Defendants take the opposite view: *Nat'l Parks-11*[th] *Cir.*, and *Otter Tail*, which Defendants concede simply adopts the Eleventh Circuit's reasoning.  (Duke Br. at 22-23.)  The Eleventh Circuit's decision was based on its isolation of the phrase "on [their] own behalf" in 42 U.S.C. § 7604(a) to suggest citizen suit plaintiffs "do not represent the public at large in the same way the government does when it brings suit to enforce the statute."  *Nat'l Parks-11*[th] *Cir.*, 502 F.3d at 1327.  This view is contrary to Congressional intent behind the CAA's citizen suit provision, which is "'to afford citizens very broad opportunities to participate in the effort to prevent and abate air pollution.'"  *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 560 (1986) (quoting 1 Leg. Hist., p. 138 (Senate Consideration of the Report of the Conference Committee, Dec. 18, 1970)) (internal punctuation marks omitted).  "Congress found that that 'Government initiative in seeking enforcement under the [CAA] has been restrained,' and urged the courts to 'recognize that in bringing legitimate actions under this section citizens would be performing a service . . .'."  *Id.* (quoting S. Rep. No. 91-1196, at 36, 38).  In other words, the citizen suit provision exists precisely to give citizens the power to represent the public interest in the same way that government enforcement would.

The Eleventh Circuit also erroneously criticized Judge McKinney's decision in *Cinergy* because it found "no authority for [the] novel distinction" between the different purposes of legal and equitable relief under the CAA, and concluded that "the civil penalties and equitable relief sought in this case are concurrent."  *Nat'l Parks-11*[th] *Cir.*, 502 F.3d at 1327.  In fact, the concurrent remedy doctrine only applies where the legal and equitable relief are substantially the same.  "The very definition of . . . [concurrent equitable] jurisdiction assumes that the remedies

administered under a given state of circumstances, by equity and by the law, are *substantially the same*, – recoveries of money, or of specific tracts of land, or of specific chattels." 1 Pomeroy's Equity Jurisprudence (5th ed.) § 173 (Addendum at 100-02) (A99) (emphasis added); *see also Tull v. United States*, 481 U.S. 412, 425 (1987) (noting plaintiff under the Clean Water Act "was free to seek an equitable remedy in addition to, or independent of, legal relief"). As found by Judge McKinney and other district courts, civil penalties and injunctive relief under the CAA do not meet this test.

Defendants also cite a number of non-environmental cases to support their claims, including *Nemkov v. O'Hare Chicago Corp.*, 592 F.2d 351 (7th Cir. 1979). (Duke Br. at 23-24.) However, one environmental case has distinguished these as "equity suits arising from legal obligations and about plaintiffs who tried to evade legal statutes of limitations by unsuccessfully portraying their cases as equitable, not legal, in nature." *A-C Reorganization Trust v. E.I. Dupont De Nemours & Co.*, 968 F. Supp. 423, 429 (E.D.Wis. 1997) (declining to apply concurrent remedy doctrine in Resource Conservation and Recovery Act citizen suit). Applying that rule to a citizen suit would "put law's cart before equity's horse," since the primary relief available to environmental plaintiffs is equitable and not monetary compensation. *Id.* In fact, in Clean Air Act citizen suits there is *no* monetary compensation because penalties are paid to the United States Treasury, and not to the plaintiffs.

For all of these reasons, Defendants' attempt to extinguish Plaintiff's claims to injunctive relief with the concurrent remedy doctrine is unavailing.

C.    *Plaintiff's Claim for Declaratory Judgment is Proper.*

Defendants moved to dismiss Plaintiff's fifth cause of action, which asks for a declaration under 28 U.S.C. §§ 2201 and 2202 that Defendants have made illegal modifications without a

PSD permit, that the Edwardsport is a modified source for purposes of the CAA PSD program, that Edwardsport is subject to BACT limits, and such further necessary or proper relief as the Court may grant.  (Am. Compl. ¶ 217, Dkt. 55.)  Defendants seek to dismiss this claim because, they say, all the other claims fail.  Since the above has shown that Plaintiff's first through fourth causes of action are proper, Defendants' motion must be denied.  Moreover, Defendants offer no reason why, even if Defendants were correct regarding the statute of limitations for civil penalties, the Declaratory Judgment Act should also be precluded.

V.      CONCLUSION

For the foregoing reasons, Sierra Club's request for civil penalties is not time barred based on Defendants' PSD and Title V violations.  Additionally, Plaintiffs' request for injunctive and declaratory relief is proper.  Sierra Club thus asks the Court to deny Defendants' motion for summary judgment except as to the Unit 6 coal re-conversion project.

Dated: December 3, 2009.

MCGILLIVRAY WESTERBERG & BENDER LLC

  /s/ _Christa O. Westerberg_____

| | |
|---|---|
| David C. Bender | Robert Ukeiley |
| Christa O. Westerberg | Law Office of Robert Ukeiley |
| 305 S. Paterson Street | 435R Chestnut Street, Ste. 1 |
| Madison, WI 53703 | Berea, KY 40403 |
| Tel. 608.310.3560 | Tel: 859.986.5402 |
| Fax 608.310.3561 | Fax: 866.618.1017 |
| Email: bender@mwbattorneys.com | Email: rukeiley@igc.org |
|       westerberg@mwbattorneys.com | |

**Certificate of Service**

I hereby certify that on December 3, 2009, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Robert R. Clark rclark@taftlaw.com, docket@taftlaw.com, malexander@taftlaw.com

Julie L. Ezell julie.ezell@duke-energy.com

Scott R. Alexander salexander@taftlaw.com, docket@taftlaw.com

Jayna Morse Cacioppo jcacioppo@taftlaw.com, amichalic@taftlaw.com, docket@taftlaw.com


/s/ Christa O. Westerberg