## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

SIERRA CLUB,                                )
85 Second Street, 2nd Floor                 )
San Francisco, CA 94105,                    )
                                            )
      Plaintiff,                       )
   v.                                      )
                                            )
DUKE ENERGY INDIANA, INC.                   )
1000 E. Main Street                         )
Plainfield, IN 46168                        )
                                            )    Case No. 1:08-cv-00437-SEB-TAB
CINERGY CORP.,                              )
139 East Fourth Street                      )    Cause: 893 (Environmental)
Cincinnati, OH 45202                        )
                                            )
CINERGY PSI, INC.                           )
1000 E. Main Street                         )
Plainfield, IN 46168                        )
                                            )
PSI ENERGY, INC.,                           )
1000 E. Main Street                         )
Plainfield, IN 46168                        )
                                            )
CINERGY POWER GENERATION                    )
SERVICES, LLC                               )
139 East Fourth Street                      )
Cincinnati, OH 45202                        )
                                            )
                                            )
      Defendants.                     )

## SECOND AMENDED COMPLAINT

Plaintiff, Sierra Club, through the undersigned attorneys, alleges as follows:

### NATURE OF THE ACTION

1.     This is a civil action brought against Duke Energy Indiana, Inc. ("Duke"),

Cinergy Corp. ("Cinergy"), Cinergy PSI, Inc. ("CPSI"), PSI Energy, Inc. ("PSI") and Cinergy

Power Generation Services, LLC ("CPGS") (collectively, the "Defendants") pursuant to Section 304 of the Clean Air Act ("the Act"), 42 U.S.C. § 7604, and pursuant to 42 U.S.C. §§ 2201 and 2202, for declaratory and injunctive relief and the assessment of civil penalties for violations of the Prevention of Significant Deterioration ("PSD") provisions of the Act, 42 U.S.C. §§ 7470-92, the Indiana State Implementation Plan (SIP), and the operating permit provisions of the Act, 42 U.S.C. §§ 7661, *et seq.*

2.      On numerous occasions, Defendants modified and thereafter operated their coal-fired electric generating units at the Edwardsport Generating Station ("EGS") in Knox County, Indiana, without first obtaining appropriate permits authorizing this construction, without meeting emission limits that are "best available control technology," without demonstrating that emissions from the EGS would not cause air pollution, without applying for or obtaining the appropriate operating permits, and without installing appropriate technology to control emissions, as required by the Act and implementing regulations, and in violation of operating permits issued for the facility.

3.      As a result of the Defendants' operation of the EGS following each unpermitted, unlawful modification, and in the absence of appropriate controls, unlawful amounts of various pollutants have been, and continue to be, released into the atmosphere, aggravating air pollution locally and far downwind from these plants.

4.      An order from this Court directing Defendants to obtain the necessary permits and permit revisions, comply with best available control technology limits, install modern pollution controls, and demonstrate that emissions from the facility will not result in unlawful amounts of air pollution, will improve air quality for millions of Americans, including Sierra Club's members. It will reduce illness and death, increase agricultural yields, decrease damage to

historic structures, and protect lakes and streams from further degradation due to the fallout from acid rain and mercury deposition.

5.     Sulfur dioxide, nitrogen oxides, particulate matter, mercury, sulfuric acid mist, carbon dioxide, and other pollutants, when emitted into the air, have substantial adverse environmental and health impacts.

6.     Sulfur dioxide ("$SO_2$") interacts in the atmosphere to form sulfate aerosols, which can be inhaled and cause sickness and mortality from lung and heart disorders, including asthma, bronchitis, and heart attacks.

7.     Nitrogen oxides ("NOx") have adverse effects on human health, human welfare, and the environment. NOx forms ground level ozone, commonly referred to as smog, which is harmful to human health and the environment. Ozone can cause temporary and permanent damage to human lungs, decreased lung capacity, and increased hospital visits.  These effects impact children and the elderly most significantly.  Ozone also causes significant damage to vegetation including agricultural crops.

8.     $SO_2$ and NOx also form acid rain. Acid rain turns lakes and streams acidic, rendering them uninhabitable by aquatic life as well as harming plants, and causes decay of buildings and monuments.

9.     Particulate matter ("PM") is the term for solid or liquid particles in the air. Smaller particulate matter of a diameter of 10 micrometers or less is referred to as $PM_{10}$. Power plants, including the EGS, are major sources of PM and $PM_{10}$.  PM and $PM_{10}$ cause premature death, damage to lungs, cancer, and respiratory disease, especially among the elderly, children, and people with chronic lung disease or asthma.

- 3 -

10.     Particulate matter of a diameter of 2.5 microns or less is referred to as $PM_{2.5}$. $PM_{2.5}$ is known to be harmful to human health and cause premature death, damage to lungs, cancer, and respiratory disease and to cross from the lungs into the circulatory system and to cause or aggravate heart conditions, heart attacks, and strokes.  There is no known safe level of $PM_{2.5}$ in the air.

11.     If Defendants comply with the Clean Air Act, including the Prevention of Significant Deterioration program, 42 U.S.C. §§ 7470-7479, the Edwardsport Generating Station will decrease its air pollution emissions, including $SO_2$, NOx, PM, $PM_{10}$ and $PM_{2.5,}$ by thousands of tons.

## PARTIES

12.     Plaintiff Sierra Club is an incorporated, not-for-profit organization that has its headquarters at 85 Second Street, 2nd Floor, San Francisco, California.  Sierra Club has over 1.3 million members and supporters, including members who live, work, and recreate in the area that will be immediately impacted by pollution emissions from the Edwardsport Generating Station. Sierra Club's purpose includes practicing and promoting the responsible use of earth's ecosystems and resources, and protecting and restoring the quality of the natural and human environment.  Its mission includes reducing and eliminating pollution from the mining, combustion, and waste disposal of coal, which negatively affects Sierra Club's members as well as other members of the public.  Sierra Club's Indiana Chapter (Hoosier Chapter) has approximately 7,000 members, and its mailing address is 1915 W. 8th Street, Suite D, Indianapolis, Indiana 46202. The health and welfare of Sierra Club's members, as well as their enjoyment of outdoor activities, has been harmed by unlawful air pollution from the Edwardsport

Generating Station as described below and in Plaintiff's Claims for Relief 1-5, *infra*, and will continue to be harmed unless the relief requested in this case is granted.

13.     Sierra Club is a "person" within the meaning of section 304(a) of the Act, 42 U.S.C. § 7604(a).

14.     At all relevant times hereto, Defendant PSI was an Indiana corporation that owned or operated the Edwardsport Generating Station.  On October 1, 2006, PSI Energy changed its name to Duke Energy, Indiana.  Defendant PSI was known, at relevant times hereto, as Public Service Indiana and as Public Service Company of Indiana.  Defendant PSI was, at one time, a subsidiary of Defendant Cinergy.

15.     Defendant Duke Energy Indiana is an Indiana corporation that owns or operates, or at relevant times hereto owned or operated, the Edwardsport Generating Station.

16.     Defendant Cinergy was created in 1994 and acquired Defendant PSI, and another company, Cincinnati Gas & Electric Company.  At relevant times hereto, Defendant Cinergy owned and/or operated the Edwardsport Generating Station, including participating in planning and implementation of projects at the Edwardsport Generating Station.  Cinergy is a Delaware corporation with its principal place of business in Cincinnati, Ohio.

17.     Defendant Cinergy Power Generation Services, LLC, at relevant times hereto, was an unregulated subsidiary of Defendant Cinergy.  Defendant Cinergy Power Generating Services, LLC, provided electric production-related construction, operation, and maintenance services regarding the Edwardsport Generating Station.

18.     Each of the Defendants is a "person" within the meaning of Sections 302(e) and 304(a)(3) of the Act, 42 U.S.C. §§ 7602(e), 7604(a)(3).

**JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction over the claims set forth in this complaint pursuant to 42 U.S.C. § 7604(a), 28 U.S.C. § 1331, 1355, 2201 and 2202.  The relief requested by the Plaintiff is authorized by statute in 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 7413, 7604.

20.     All or a substantial part of the alleged events or omissions giving rise to the claims herein occurred in the Southern District of Indiana.  Thus venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).  In addition, the alleged violations which are the subject of this case are alleged to have occurred at the Edwardsport Generating Station, which is located within the Southern District of Indiana.  Thus venue is also proper in this Court pursuant to 42 U.S.C. § 7604(c)(1).

**NOTICE**

21.     No prior notice is required for the claims set forth below arising pursuant to 42 U.S.C. § 7604(a)(3).

22.     On May 1, 2008, Sierra Club provided Defendants  a notice of intent to sue for violations of the Clean Air Act and Indiana State Implementation Plan for the claims set forth below pursuant to 42 U.S.C. § 7604(a)(1).  A true and accurate copy of that notice is attached hereto as Exhibit 1.

23.     On March 13, 2009, Sierra Club provided an amended notice of intent to sue for violations by Defendants of other provisions of the Clean Air Act and Indiana State Implementation Plan for the claims set forth below pursuant to 42 U.S.C. § 7604(a)(1).  A true and accurate copy of that amended notice is attached hereto as Exhibit 2.

24.     On January 28, 2010, Sierra Club provided an additional amended notice of intent to sue for violations by Defendants of provisions of the Clean Air Act and Indiana's State Implementation Plan for the claims set forth below pursuant to 42 U.S.C. § 7604(a)(1).  A true and accurate copy of that amended notice is attached hereto as Exhibit 3.

25.     More than 60 days have passed since Sierra Club sent each of the notices of intent to sue referred to in paragraphs 22-24, above.

## BACKGROUND ON THE CLEAN AIR ACT

26.     The Clean Air Act is designed to protect and enhance the quality of the Nation's air so as to promote the public health and welfare and the productive capacity of its population. 42 U.S.C. § 7401(b)(1).

27.     Section 108(a) of the Act, 42 U.S.C. § 7408(a), requires the Environmental Protection Agency ("EPA") to identify and prepare air quality criteria for each air pollutant which may endanger public health and welfare when emitted, and which results from numerous or diverse mobile or stationary sources. Section 109 of the Act, 42 U.S.C. § 7409, requires the Administrator to promulgate National Ambient Air Quality Standards ("NAAQS"), which are upper limits on air pollution, to protect public health and welfare.

28.     Under Section 107(d) of the Act, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality meets or exceeds the NAAQS for each pollutant. An area that meets the NAAQS for a particular pollutant is termed an "attainment" area, whereas an area that does not meet the NAAQS is a "nonattainment" area. Areas for which there is insufficient information to determine compliance with NAAQS are "unclassifiable" and are treated the same as attainment areas.

- 7 -

### The Prevention of Significant Deterioration (PSD) Program

29.      Congress enacted a Prevention of Significant Deterioration program in Part C of Title I of the Act, 42 U.S.C. §§ 7470-7492, which applies in areas designated as attainment or unclassifiable.  The PSD program intends to assure that new sources of pollution, or increases in pollution from existing sources, will be added to an area only in a manner that is consistent with the preservation of existing clean air resources, to limit the degree to which pollution can cause air quality deterioration in areas attaining NAAQS, and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process.

30.      The PSD program prohibits the construction and subsequent operation of a major emitting facility in an area designated as attainment unless a PSD permit has been issued.  42 U.S.C. § 7475(a); 40 C.F.R. §§ 52.21(i) and (r).  "Construction" means any physical change or change in the method of operation (including fabrication, erection, installation, demolition, or modification of an emissions unit) that would result in a change in emissions, 40 C.F.R. § 52.21(b)(8); *see also* 42 U.S.C. § 7479(2)(B).

31.      Under the PSD program, a "major stationary source" is defined to include fossil fuel-fired steam electric plants of more than 250 million British thermal units (Btu) per hour heat input, which emit or have the potential to emit one hundred (100) tons per year or more of any regulated air pollutant. 42 U.S.C. § 7479(1); 40 C.F.R. § 52.21(b)(1)(i)(a).

32.      The Edwardsport Generating Station is, and at all relevant times was, a fossil fuel fired steam electric plant of more than 250 million Btus per hour heat input and, therefore, a "major stationary source" for purposes of the Clean Air Act's Prevention of Significant Deterioration program.

33.     A "significant" net emissions increase means an increase in the rate of emissions that would equal or exceed any of the following rates for the following pollutants: 40 tons per year of NOx; 40 tons per year of $SO_2$; 7 tons per year of sulfuric acid mist, and 25 tons per year of PM. 40 C.F.R. § 52.21(b)(23)(i).  For pollutants subject to regulation under the Act that are not set forth in 40 C.F.R. § 52.21(b)(23)(i), any increase is significant.

34.     A major stationary source of air pollution which makes a major modification in an attainment area shall meet an emission rate based on the  best available control technology ("BACT") for each pollutant subject to regulation under the Act that it would have the potential to emit in significant quantities.  40 C.F.R. § 52.21(j).  The PSD program also requires modified sources to demonstrate that emissions from the facility will not cause or contribute to air pollution in violation of any ambient air quality standard or any specified incremental amount. 40 C.F.R. § 52.21(k).

35.     The CAA requires states to adopt a SIP that contains emission limitations and such other measures as may be necessary to prevent significant deterioration of air quality in areas designated as attainment or unclassifiable, CAA Sections 110(a)(2)(C) and 161, 42 U.S.C. §§ 7410(a)(2)(C) and 7471.  A state may comply with Sections 110(a) and 161 by having its own PSD regulations approved as part of its SIP by EPA, which must be at least as stringent as those set forth at 40 C.F.R. § 51.166.  If a state does not have a PSD program that has been approved by EPA and incorporated into the SIP, the federal PSD regulations set forth at 40 C.F.R. § 52.21 are applicable.  40 C.F.R. § 52.21(a).

36.     On August 7, 1980, EPA disapproved Indiana's proposed PSD program, 40 C.F.R. § 52.793, 45 Fed. Reg. 52676, 52741 (August 7, 1980), and then incorporated by reference the federal PSD regulations set forth in 40 C.F.R. § 52.21(b) through (w) into the

Indiana SIP.  46 Fed. Reg. 9580, 9583 (January 19, 1981).  The federal PSD program at 40 C.F.R. § 52.21 applied in Indiana at the time that each of the projects at issue in this case was undertaken.

37.     On March 3, 2003, EPA conditionally approved a revision to the Indiana SIP to incorporate the PSD program contained in the Indiana regulations.  68 Fed. Reg. 9892.  That approval was effective April 2, 2003.  *Id*.  EPA later granted full approval on May 20, 2004, which became effective on July 19, 2004.  69 Fed. Reg. 29,071.  On June 18, 2007, EPA approved a revision to the Indiana State Implementation Plan to incorporate changes to the PSD program contained in the Indiana regulations.  72 Fed. Reg. 33,395 (June 18, 2007).  These approvals were all prospective, and apply only to changes to the Edwardsport plant after the relevant effective date.

## The Title V (Five) Operating Permit Program

38.     The Clean Air Act's Title V operating permit program requires major sources to apply for, obtain, and then comply with operating permits.  Pursuant to the Title V program, all "applicable requirements" for compliance with the Clean Air Act, including PSD requirements, are collected in one place in the Title V permit.  42 U.S.C. §§ 7661-7661f.

39.     EPA promulgated regulations establishing minimum elements of a Title V permit program to be administered by an air pollution control agency.  57 Fed. Reg. 32,250 (July 21, 1992).  Those regulations are codified at 40 C.F.R. part 70.

40.     Section 502(a) of the Act, 42 U.S.C. § 7661a(a), prohibits violations of any requirement of a permit issued under Title V, or operating a source subject to Title V, "except in compliance with a permit issued by a permitting authority under" Title V.

41.     Section 502(d)(1) of the Act, 42 U.S.C. § 7661a(d)(1), requires that each State develop and submit for EPA's approval an operating permit program.

42.     Indiana's major source operating permit program, known as Indiana's "Part 70" or "Title V" program, was granted interim approval by the EPA on November 14, 1995 and final approval on December 4, 2001.  60 Fed. Reg. 57,188 (Nov. 14, 1995); 66 Fed. Reg. 62,969 (Dec. 4, 2001).

43.     Section 504(a) of the Act, 42 U.S.C. § 7661c(a), requires each Title V permit to contain all applicable emission limitations and standards under the Act that apply to each major source.  It is the obligation of the permittee to ensure that it has the appropriate permit, with the required permit terms.

44.     40 C.F.R. § 70.5(a) [1] requires the owner and operator of each major source to submit a timely a complete permit application.  A "complete application" must include all information that is "sufficient to evaluate the subject source and its application and to determine all applicable requirements."  40 C.F.R. § 70.5(a)(2).  An application cannot omit any information needed to determine the applicability of, or to impose, any applicable requirement.

45.     Indiana issued a Title V operating permit for the Edwardsport plant on August 10, 2004.  It subsequently issued a revised permit for the plant on March 11, 2008.

46.     The permit issued for the Edwardsport plant on August 10, 2004, and the revised permit issued on March 11, 2008, provide in relevant part:

(a) The application for renewal shall be submitted using the application form or forms prescribed by IDEM, OAQ, and shall include the information specified in 326 IAC 2-7-4. Such information shall be included in the application for each emission unit at this source, except those emission units included on the trivial or insignificant activities list contained in 326 IAC 2-7-1(21) and 326 IAC 2-7-1(40). The renewal

---

[1] 40 C.F.R. § 70.3 provides that the requirements of 40 C.F.R. Part 70 apply to each major source located in a state that has received whole or partial approval of the Title V program.

application does require the certification by the "responsible official" as defined by 326 IAC 2-7-1(34)…

47.     326 IAC 2-7-4 provides, in part, that each application for permit renewal must meet the following requirements:

a)  Identify all applicable requirements that pertain to the facility, including the requirements of the PSD program promulgated in 40 C.F.R. part 52.  326 IAC 2-7-4(c)(4)(A); *see also* 40 C.F.R. § 70.5(c)(4)(i) and 326 IAC 2-7-1(6); 40 C.F.R. § 70.2 (defining "applicable requirements");

b)  Contain a "compliance plan" identifying the plant's compliance status for each applicable Clean Air Act requirement and, for those obligations that the plant is not complying with, "a narrative description of how the source will achieve compliance with such requirements" and a "schedule of remedial measures, including an enforceable sequence of actions with milestones, leading to compliance with any applicable requirements…"  326 IAC 2-7-4(c)(10)(A), (A)(iii), (B)(iii); 40 C.F.R. § 70.5(c)(8)(i), (ii)(C), (iii)(C); and

c)  Contain a certification by "a responsible official of [the] truth, accuracy, and completeness" of the application, including a "certification of compliance with all applicable requirements"—including the PSD program.  326 IAC 2-7-4(a)(2)(B), (f); 40 C.F.R. §§ 70.5(c)(9)(i), (d).

It is therefore a violation of the Title V permit issued for the Edwardsport plant to submit an application for renewal that fails to comply with 326 IAC 2-7-4, which in turn requires permits for renewal to identify all applicable Clean Air Act requirements, disclose violations under oath, and describe the remedial measures, actions, and milestones that will put the source into compliance with the applicable Clean Air Act requirements.  These obligations include an ongoing requirement to correct any erroneous statements in a pending application.  326 IAC 2-7-4(b); 40 C.F.R. § 70.5(b).

48.     The Act makes it unlawful for any person to violate any requirement of a permit issued under Title V or to operate a major source except in compliance with a permit issued by a permitting authority under Title V.  42 U.S.C. § 7661a and 40 C.F.R. § 70.7(b). Indiana's program similarly prohibits operation of an air pollution source unless it has either submitted all

required, and complete, applications or in compliance with a Title V operating permit.  326 IAC 2-7-3.

49.     The regulations in 40 C.F.R. part 70 contain similar requirements.  It is a violation of 40 C.F.R. § 70.5(c)(4)(i) for an applicant to fail to identify an applicable requirement in its permit application, a violation of 40 C.F.R. § 70.5(c)(8)(i) to fail to identify a source as not complying with an applicable air pollution requirement, a violation of 40 C.F.R. § 70.5(c)(8)(ii)(C) and (iii)(C) to fail to provide a schedule of compliance to bring a noncompliant source into compliance, and a violation of 40 C.F.R. § 70.5(b) to fail to supplement or correct information submitted with a Title V operating permit application that was incorrect.

50.     It also a violation of 42 U.S.C. §§ 7661b(b)(2), 7661c(a) and (c) and 40 C.F.R. § 70.5(9) and the Title V permits issued for the Edwardsport Generating Station to submit a false certification of compliance.

## GENERAL ALLEGATIONS

### The Edwardsport Generating Station

51.     Defendants are entities who own, operate, and/or were at relevant times responsible for implementing projects conducted at the Edwardsport Generating Station.

52.     The Edwardsport Generating Station includes four fossil fueled boilers connected to three turbine generators.

53.     The boilers at the EGS are known as 6 (or 6-1), 7-1, 7-2, and 8 (or 8-1).  These four boilers, and their associated turbine generators, have the capability of generating a total of 160 megawatts ("MW") of electricity for sale to the outside grid.  The combined hourly heat input capacity of these four boilers is more than 250 million Btus per hour.  Individually, each boiler's hourly heat input capacity is more than 250 million Btus per hour.

54.     Boiler 6-1 is a Babcock & Wilcox boiler that was installed in 1943.  The boiler was originally designed in the 1940s to burn pulverized coal, but was modified to burn No. 2 fuel oil in the 1970s.

55.     Boilers 7-1, 7-2 and 8-1 are Riley Stoker boilers designed to burn pulverized coal. Boilers 7-1 and 7-2 were installed in 1948.  Boiler 8-1 was installed in 1950.

56.     Each of the boilers at the Edwardsport Generating Station is capable of generating steam to produce electricity.  Each boiler is capable of supplying at least one third (1/3) of its potential electric output capacity and at least twenty-five megawatts (25 MW) of electric output capacity to a power distribution system for sale.

57.     Each of the boilers at the Edwardsport Generating Station is an Electric Utility Steam Generating Unit as that term is used in 40 C.F.R. § 52.21(b)(31).

58.     The Edwardsport Generating Station has the potential to emit in excess of 100 tons per year of the following pollutants: carbon dioxide, nitrogen oxides, sulfur dioxide, carbon monoxide, and particulate matter.

59.     The Edwardsport Generating Station is a "major emitting facility" as that term is used in 42 U.S.C. § 7475(a), a "major stationary source" as that term is used in 40 C.F.R. § 52.21(a)(2), (b)(1), and a "major source" as that term is defined in 42 U.S.C. § 7661(2).

60.     The Edwardsport Generating Station received its first Title V Operating Permit from the Indiana Department of Environmental Management in August, 2004.  That permit was modified in March, 2008.

61.     At all times relevant to this Complaint, the Edwardsport Generating Station was located in Knox County, Indiana, which was classified as either attainment or unclassifiable for all pollutants.

- 14 -

**Public Service Company of Indiana Identified Lost Operation, Time Due To Boiler Tube Leaks at Edwardsport Plant, As A Problem**

62.     In February, 1986, D.E. Vondielingen of Public Service Company of Indiana

(also known as Public Service Indiana) wrote a memo to P.J. Isenogle titled "location:

Edwardsport Station; subject: Potential Generation Capability Reduction."

63.     The February, 1986, Vondielingen memo states:

> Due to the past operating performance and problems with boiler tube leaks, it will now be necessary to plan for a 40 MW, coal fired capability cut due to boiler tube leaks.  Such capability reduction should be used for planning and scheduling purposes and results in a station, coal fired, capability of 80/80 megawatts, effective March 1, 1986.  As you can see from the attachment, Edwardsport's Equivalent Availability has decreased from the 1982 figure, due in part to the boiler tube failure rates we are presently experiencing.  We will continue to report the current capability for Edwardsport but the above figure should be used for planning and scheduling purposes until boiler tube replacement has been accomplished.  If you have any questions or require any further information, please advise.

64.     The February, 1986 Vondielingen memo then provides the following chart,

showing the equivalent availability of the Edwardsport station as the line labeled "PSI":

- 15 -



65.     Defendant PSI regularly evaluated retubing the boilers at the Edwardsport

Generating Station based on costs and benefits of such projects.  In these analyses, benefits

included increased operation, generation, and power sales.

### The Sargent & Lundy Life Extension Plan

66.     Sargent & Lundy is an outside engineering and consulting firm hired by Public

Service Indiana to do analysis and engineering related to the Edwardsport Generating Station.

67.     On August 23, 1988, J.U. Bott, the Manager of Betterment Programs for Public

Service Indiana, wrote to Mr. A.W. Wendoff, of Sargent and Lundy Engineers, and stated in his

letter:

> This is to confirm our discussion of August 22, 1988 in your
> offices concerning the life extension effort for Edwardsport and
> Nobelsville Stations.  I would like for you to develop a list of
> probable projects, based on S & L's experience and PSI's input,
> needed to extend the lives of both stations.  We will also want a
> conceptual level of cost associated with the projects.

- 16 -

68.     On September 23, 1988, Sargeny & Lundy provided Public Service Indiana with a document titled "Scope of Work for Engineering Services; Public Service Indiana; Plant Investigations; Nobelsville and Edwardsport Generating Stations."  (Hereinafter "1988 Scope of Work").

69.     The Introduction to the 1988 Scope of Work provides:

> Public Service Indiana (PSI) requested Sargent & Lundy (S&L) prepare a scope of work for plant investigations at the Nobelsville and Edwardsport Generating Stations to determine the required plant modifications and system improvements to extend the operating life of the stations to year 2005.  Meetings were held with the station personnel at Nobelsville on September 14, 1988, and with the station personnel at Edwardsport on September 15, 1988.  These discussions formulated the basis of this proposal and are documented in meeting notices of the respective meetings.

70.     The 1988 Scope of Work also states that Sargent & Lundy will perform a number of investigations at the Edwardsport plant "to determine if replacement, modification, or additions are required to extend the life of the equipment and systems to the year 2005."

71.     Additionally, the 1988 Scope of Work provides that Sargent & Lundy will prepare a "capital cost estimate" for each project that it investigates, will prioritize projects "to determine the most cost effective distribution of funds for the plant betterment projects," and publish a report of its findings.

72.     On April 25, 1989, Sargent & Lundy provided a report titled "Report SL-4502, Engineering Condition Assessment Plant, Edwardsport Generating Station, Dated April 1989." (hereinafter "April 1989 Report").

73.     The April 1989 Report contained an Executive Summary, which provided, in part:

> With their letter of August 23, 1988, Public Service Indiana (PSI) requested an engineering investigation to develop an engineering condition assessment plan for the Edwardsport Generating Station.

This plan would include the development of a list of potential projects based on Sargent & Lundy's (S&L) experience and PSI's knowledge of the station.  This plan would also include the preparation of conceptual cost estimates associated with the projects.

On September 15, 1988, a meeting was held at the Edwardsport Generating Station with the station personnel to review the status of the existing equipment and systems.  Using this information, an outline for further engineering investigations was prepared by S&L.  Notes of this meeting provided the basis for the engineering investigations performed by S&L and the basis of this report.  The scope of the work was outlined in S&L's letter dated September 23, 1988.  Upon acceptance of this scope of work, S&L performed field investigations to confirm, investigate, and observe various conditions throughout the plant.  This field investigation was performed between October 4 and October 7, 1988.

The field investigations revealed numerous equipment and systems that should be upgraded, modified, and/or repaired to continue operations.  Discussions were held on several occasions with the station personnel in joint meetings with Edwardsport and Nobelsville personnel to discuss the findings, the relative merits of the system improvements and modifications, and the categorization and prioritization of the items developed for this report.

This report is a summation of the work efforts of PSI and S&L to develop a feasible plan for the continued reliable service of the Edwardsport Generating Station.

…

Station interviews and the field examinations resulted in the recommendation of 35 major areas to be modified, upgraded, or replaced.  In the 35 major areas, a total of 90 potential work packages were developed.

The 90 work packages were categorized into two major expenditures: capital and maintenance.  This separation was based on well-established definitions of capital and maintenance expenditures used by PSI.  Further analysis of the individual work packages resulted in the ranking of the items.  For this report, the ranking was limited to a high or low priority.  This subjective determination of relative priority was identified during discussions at the project review meetings.  The high ranking was given to the work packages S&L believes are necessary for continued reliable

> service of the system equipment in the station.  The low ranking
> was assigned to work packages that would improve system or
> equipment operations but are not necessary for continued
> operation.

74.    The April 1989 Report identified, among others, the following projects to be undertaken at the Edwardsport Generating Station:

- "Replace 20% of Boiler Tubes"

- "Replace ID Fan Casing"

- "Repair Bent Shafts"

75.    Following the April 25, 1989 Report by Sargent & Lundy, a number of projects identified in the Report were undertaken at the Edwardsport Generating Station.  Some of these projects, and some developed later, form the basis for claims set forth below.

### Project 1: Replacing More Than 20% of Boiler Tubes on Boiler 7-1[2]

76.    In 1993, Defendants replaced more than 20% of the boiler tubes on Boiler 7-1, including the downcomers, risers and low-temperature superheater tubes.  This project was done pursuant to Work Order "Construction 39328."

77.    Work Order Construction 39328 states that the "necessity" for the project to replace tubes on unit 7-1 was that the "[d]own-comer tubes, low temperature superheater tubes and risers need to be replaced to reduce boiler downtime because of boiler tube failures."

78.    The project to replace those tubes on Boiler 7-1 was estimated to cost more than eight hundred thousand dollars ($800,000).

---

[2] Sierra Club groups these projects for ease of reference.  The groupings are subject to change as discovery progresses.  The groupings do not constitute "facts" pled in this Amended Complaint and Sierra Club will not amend the pleadings to account for regrouping one or more of the elements of the various projects that have occurred at the Edwardsport Generating Station.

79.     Construction work on the project to replace the tubes on Boiler 7-1 started on or about March 20, 1993 and was completed on or about May 28, 1993.  According to the Work Order Completion Notice by the Public Service Company of Indiana for work order Construction 39328, the project to replace boiler tubes on Unit 7-1 was completed and in service on June 2, 1993.

80.     Regarding replacement of 20% of the boiler tubes at the Edwardsport Generating Station, the April 1989 Report provided:

> Although our random sampling indicated reasonable tube thickness, the plant personnel noted on several occasions that tube leaks occur frequently on startup of the boilers.  With the expected use of these units, an allotment of replacement tubes must be considered.  Due to the unknown quantity of tube replacements required, S&L recommends replacement of approximately 20% of the tubes in each boiler's convection pass.
> …
> The estimated cost to replace 20% of the boiler tubes is $1,210,000…   The estimated duration for this work from authorization to completion is one year per boiler.

81.     The April 1989 Report identifies replacement of boiler tubes as a capital expenditure.

82.     The work to replace of the tubes in boiler 7-1 was treated as a capital expenditure for budget and accounting purposes.  The labor was supplied by Sterling, an outside contractor company.

83.     The project that included replacing the tubes in boiler 7-1 required materials to be ordered and brought to the plant because onsite inventory of spare parts did not include all of the materials required to complete the retubing work.  Specifically, the downcomer tubes, riser tubes, low-temperature superheater tubes, baffles, shields and attachments were ordered from a manufacturing company.

**Project 2: Replacing Lower Arch Tubes on Boiler 7-1**

84.    In 1999, Defendants replaced portions of the water wall tubing on Boiler 7-1, including the lower arch tubes, due to tube leaks in the existing tubing.

85.    The furnace portion of Boiler 7-1 is an empty space with four walls oriented at right angles to each other.  Tubes are located on the outside of the furnace, lining the walls and running vertically.  The front and rear walls of the furnace area slope in, forming a "hopper" area that is sometimes referred to as the "lower slope" or "lower arch."

86.    The lower arch tube replacement on boiler 7-1 was done pursuant to Cinergy's Work Order Authorization designated as "Construction 37174," which was prepared and approved in or about August, 1999, which was after the project had been completed.

87.    This project involved replacing portions of each of 233 waterwall tubes.

88.    The project was justified in Defendants' records as follows:

> The Boiler Water Wall tubing at the bot[t]om ring wall header is deteri[o]rated from combined internal and external corrosion resulting in frequent tube leaks and loss of availability.

89.     According to Work Order 37174, the work was economically justified "based on maintaining unit availability," because Unit 7-1 was "experiencing frequent tube leaks in this area."  The Work Order further stated:

> Predicting 1 tube leak every 3 weeks resulting in loss of this boiler for 2 days to repair (40 MW derate for 16hr per day) gives an EFA change of 1.55% and additional O&M cost of $3,500 per repair. Predicting a 10 year life the Economic Indicators are: PET Capital Cost: $342,290 NPV-$282,111 IRR-22% B.C.-1.8.

90.    Work Order 37174 estimated the cost to replace tube stubs on Unit 7-1 to be $217,202 in construction costs and $110,790 as the cost of retiring the replaced parts, for a total net cost of $327,992.

91.     Work Order 37174 was approved by at least one company executive.

92.     The work to replace the lower arch tube stubs on Unit 7-1 began on approximately February 8, 1999, and was completed on approximately March 14, 1999, at which time the unit was returned to service.  The outage to make these repairs took almost five weeks.

93.     Defendants expected that replacing the lower arch tube stubs on Unit 7-1 to result in increased operation from the unit.  Defendants predicted an increased Equivalent Availability Factor of at least 1.55% as a result of the project.

94.     The existing tubing that was replaced as part of this project was made of ASME SA-192 material, which was no longer in common use for boilers and was not readily available. The new tubing that was installed in the boiler during this project was made of ASME SA-210-A1 material, which has more than 20% higher allowable tensile strength and is more resistant to corrosion and tube failure than the previous material.

95.     Defendants hired an outside contractor to design and fabricate the boiler tubes for this project and hired another outside contractor to provide the labor to to replace the tubes.

96.     The tube replacements on Boiler 7-1 were originally done as maintenance and the costs were treated as expenses.  However, after the work was done, Defendants decided to capitalize the costs.  The justification for capitalizing stated that if the work had not been done, the boiler would have experienced one two-day outage every three weeks.

**Project 3: Replacing Lower Arch Tubes on Boiler 7-2**

97.     Defendants replaced a portions of the lower slope tubes on Boiler 7-2 in a project similar to (in fact combined with) Project 2, above.  The same outside contractors performed the tube fabrication and tube installation on Boilers 7-1 and 7-2.

98.     The project on Boiler 7-2 was done pursuant to Work Order "Construction 37175" and involved a shutdown of the boiler from March 8, 1999 through April 5, 1999, which is a period of four weeks.

99.     Similar to the work order to replace the lower arch tube stubs on Unit 7-1, the after-the-fact work order for Boiler 7-2 provided that the work had already been done and had been necessary because "[t]he Boiler Water Wall tubing at the bot[t]om ring wall header is deteriorated from combined internal and external corrosion resulting in frequent tube leaks and loss of availability."

100.    Work Order 37175 also predicted that without the work Unit 7-2 would experience "1 tube leak every 3 weeks resulting in loss of this boiler for 2 days to repair (40 MW derate for 16hr per day)," resulting in an equivalent availability factor change of 1.55% and additional O&M costs of $3,500 per repair.

101.    The estimated cost of the work on Boiler 7-2 was $340,096.

102.    As with the project on Boiler 7-1, the project on Boiler 7-2 was originally paid for as a maintenance expenditure, but was later capitalized for the same reasons as the project on Boiler 7-1, including increased scope, significant cost, and the use of improved materials compared to the material used to make replaced tubes.

## Project 4: Replacement of Boiler 7-1 Induced Draft Fan

103.    During the period of approximately 1992 and 1993, Defendants replaced induced draft fans in each of the coal-fired boilers at the Edwardsport Generating Station.

104.    Boiler 7-1 has one induced draft fan.  Defendants replaced the induced draft fan, including the fan wheel and shaft, fan housing, and dampers, in Boiler 7-1 in or about May through June, 1993, pursuant to Work Order 37106.

105.    The Boiler 7-1 induced draft fan was replaced during the outage from March 24, 1993 through June 4, 1993, which is the same outage during which Defendants replaced the generating tubes and low-temperature superheater tubes in that boiler.

106.    Defendants modified the scope of the fan replacement on Boiler 7-1 to increase the static pressure capability of the induced draft fan by 10 to 12% by upgrading the fan at an additional cost to Defendants.

## Project 5: Replacement of Boiler 8-1 Induced Draft Fan

107.    Boiler 8-1 has one induced draft fan.  Defendants replaced the induced draft fan, including the fan wheel and shaft, fan housing, and dampers, in Boiler 8-1 in or about September through December, 1993.  The 8-1 fan replacement was planned with the 7-1 fan replacement.

108.    Defendants modified the scope of the fan replacement on Boiler 8-1 to increase the static pressure capability of the induced draft fan by 10 to 12% by upgrading the fan at an additional cost to Defendants.

109.    The Boiler 8-1 induced draft fan was replaced during two outages in September and November through December, 1993.  The total outage time was approximately three to four weeks, with additional work done outside of the outages.

**Project 6: Replacement of South and West Furnace Walls in Boiler 8-1**

110.    Defendants replaced the tubing on two walls in the Boiler 8-1 furnace during an outage that lasted at least eleven (11) weeks during early 2000.

111.    Prior to the water wall tube replacements Boiler 8-1 experienced numerous tube leaks.

112.    The replacement tubes and the labor to install the new tubes were supplied by outside contractors.

113.    The project to replace the furnace wall tubes was estimated to cost over two million dollars ($2,000,000) and the cost was treated as a capital expense.

114.    The project to replace the two walls in Boiler 8-1 was approved in late 1999 and the project occurred during an outage lasting approximately 10 weeks during early 2000.

115.    During the waterwall replacement on 8-1 in 2000, Defendants also replaced the sootblowers on that boiler.  Sootblower replacement on Boiler 8-1 had previously been recommended by Sargent & Lundy in the 1989 life extension study for the Edwardsport plant.

**Project 7: Weld Metal Build-Up on North and East Furnace Walls of Boiler 8-1**

116.    Approximately a year after replacing the tubes on two water walls on Edwardsport Generating Station Boiler 8-1, Defendants determined that weld overlay on the other two walls (the north and east walls) should be implemented as a temporary step to allow the boiler to continue operating.  The existing tubes on those walls were thin and prone to leaks.

117.    The estimated cost for the weld overlay on Boiler 8-1 was close to one million ($1,000,000) dollars.

118.    The project to install weld overlay in Boiler 8-1 occurred in September and October, 2001, was done by outside contractors, and was treated as a capital expense.

**Project 8:  Weld Tube Overlays in Boiler 7-2**

119.     During the summer of 2001 Defendants installed weld overlays on 3,816 square feet for tubing on the four walls of boiler 7-2, comprising approximately 75% of the surface area of the furnace walls in that boiler.

120.     Boiler 7-2's walls were experiencing tube leaks and the weld overlay was intended to allow the boiler to sustain regular operation.

121.     The estimated cost for the weld overlay on Boiler 7-2 was over a million dollars ($1,000,000).

122.     The work to complete the weld metal overlay installation on Boiler 7-2 occurred in June and July, 2001, was done by outside contractors, and was treated as a capital expense.

**CITIZEN SUIT ENFORCEMENT PROVISIONS**

123.     Section 304(a)(1) of the Act, 42 U.S.C. § 7604(a)(1), provides that "any person may commence a civil action on his own behalf . . . against any person . . . who is alleged to have violated (if there is evidence the violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter . . . ."

124.     Section 304(a)(3) of the Act, 42 U.S.C. § 7604(a)(3), provides that "any person may commence a civil action on his own behalf… against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under Part C of subchapter I of this [the Clean Air Act] (relating to significant deterioration of air quality)…."

125.     Pursuant to Sections 113 and 304, 42 U.S.C. §§ 7413, 7604, the Court may award civil penalties up to $25,000 per day of violation for violations occurring before January 30, 1997, up to $27,500 per day for each such violation occurring between January 30, 1997 and March 15, 2004, and up to $32,500 for each such violation occurring after March 15, 2004,

injunctive relief, and Sierra Club's cost of bringing this action, including reasonable attorneys' fees.

## FIRST CLAIM FOR RELIEF
### (Construction of Major Modifications Without PSD Permits)

126.    Paragraphs 1 through 125 are realleged and incorporated herein by reference.

127.    At various times, Defendants constructed one or more major modifications, including the eight projects described above, affecting the boilers and associated equipment at the Edwardsport Generating Station.  Each such modification constitutes a physical change that resulted in a significant net emission increase, as defined by 40 C.F.R. §52.21(b)(3)(i), of one or more pollutants, including particulate matter (PM, PM10 and PM2.5), sulfur dioxide, nitrogen oxides, sulfuric acid mist, and carbon monoxide.

128.    Defendants continue to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a)(1), and 40 C.F.R. § 52.21(i) and (r) by their ongoing failure to obtain the required PSD permit for major modifications to the Edwardsport Generating Station.

129.    Based upon the foregoing, Defendants have committed ongoing violations of Section 165(a) of the Act, 42 U.S.C. §7475(a), and 40 C.F.R. §52.21, as incorporated into the Indiana SIP.  Unless restrained by an order of this Court, these and similar violations of the PSD provisions of the Act will recur at the Edwardsport Generating Station.

## SECOND CLAIM FOR RELIEF
### (Failure to Comply with Best Available Control Technology Limits)

130.    Paragraphs 1 through 129 are incorporated herein by reference.

131.    Each of the major modifications to each of the units at the Edwardsport Generating Station, including the eight projects described above, constitutes a major

modification, which triggered emission limits known as "best available control technology" applicable to the boilers.

132.    Best available control technology is an emission limit that applies to emission sources that have undergone  a major modification.  Such limits are unit-specific, but are at least as stringent as the limits set forth in 40 C.F.R. parts 60 and 61.

133.    Beginning with the first day that the first major modification was completed and returned to service, the Edwardsport Generating Station has emitted one or more pollutants, including particulate matter (PM, PM10 and PM2.5), nitrogen oxides, sulfur dioxide, carbon monoxide and sulfuric acid mist, at rates greater than the best available control technology limit for each such pollutant.

134.    Defendants are in continuing violation of the ongoing requirement to comply with best available control technology for each major modification, including those set forth above, as required by 42 U.S.C. § 7475(a)(4), 40 C.F.R. § 52.21(j) and 326 IAC 2-2-3.

## THIRD CLAIM FOR RELIEF
### (Failure to Make Demonstrations and Submit Information)

135.     Paragraphs 1 through 134 are incorporated here by reference.

136.    Beginning with the first day that the first major modification was completed, Defendants have failed to demonstrate that the emissions from the Edwardsport Generating Station do not cause or contribute to a violation of either national ambient air quality standards, or applicable maximum allowable increases over the baseline concentration, as required by 42 U.S.C. § 7475(a)(3), 40 C.F.R. § 52.21(k) and 326 IAC 2-2-5(a).

137.    Beginning with the first day that the first major modification was completed, Defendants have failed to submit an analysis of air quality in the area of the Edwardsport Generating Station, as required by 40 C.F.R. § 52.21(m) and 326 IAC 2-2-4 and 2-2-5.

138.    Beginning with the first day that the first major modification was completed, Defendants have failed to submit all information necessary to perform any analysis or make any determination required under 40 C.F.R. § 52.21, including the information necessary to determine air quality impacts resulting from the major modifications to the Edwardsport Generating Station and to determine best available control technology, in violation of 40 C.F.R. § 52.21(n).

## FOURTH CLAIM FOR RELIEF
(Violations of Clean Air Act Title V Program)

139.    Paragraphs 1 through 138 are incorporated herein by reference.

140.    Defendants have violated 42 U.S.C. § 7661a(a), 40 C.F.R. §§ 70.5(a) and (c), and the Title V permits issued for the Edwardsport Generating Station by failing to apply for and obtain a Title V permit that contained all of the applicable requirements for the Edwardsport Generating Station and by failing to provide other specific information that may be necessary to implement and enforce applicable requirements, including but not limted to the requirement to comply with best available control technology limits for particulate matter (PM, PM10 and PM2.5), nitrogen oxides, sulfur dioxide, carbon monoxide and sulfuric acid mist.

141.    Defendants have also violated 42 U.S.C. §§ 7661a(a), 7661b(b)(2), 7661c(a) and (c), 40 C.F.R. §§ 70.5(c)(4)(i), 70.5(c)(8)(i), 70.5(c)(8)(ii)(C) and (iii)(C), and 70.5(9), 326 IAC 2-7-4, and the Title V permit issued for the Edwardsport plant on August 10, 2004, and the revised Title V permit issued on March 11, 2008, by submitting Title V permit applications

pursuant to Clean Air Act Title V and 40 C.F.R. pt. 70, on or about November 21, 1996, and August 18, 2006, that: (i) contained a false certification of compliance with applicable air pollution requirements; (ii) failed to identify 42 U.S.C. § 7475 and 40 C.F.R. §§ 52.21(i) through (n) as applicable requirements for the existing boilers; (iii) failed to identify the Edwardsport Generating Station as not complying with 42 U.S.C. § 7475 and 40 C.F.R. §§ 52.21(i) through (n); and (iv) failed to provide a schedule of compliance to bring the Edwardsport Generating Station existing boilers into compliance with 42 U.S.C. § 7475 and 40 C.F.R. §§ 52.21(i) through (n).

142.   Defendants have further violated 40 C.F.R. § 70.5(b), by continuously failing to supplement or otherwise correct information submitted with the Title V permit application that was incorrect.

## FIFTH CLAIM FOR RELIEF

### (Declaratory Relief)

143.   Paragraphs 1 through 142 are incorporated herein by reference.

144.   Pursuant to 28 U.S.C. §§ 2201, 2202, Sierra Club is entitled to a declaration that Defendants violated the Clean Air Act by commencing one or more major modifications of the Edwardsport Generating Station without a PSD permit, that the Edwardsport Generating Station is a modified source for purposes of the Clean Air Act PSD program, that the Edwardsport Generating Station Boilers 7-1, 7-2 and 8-1 are subject to best available control technology limits, that the Edwardsport Generating Station has violated certain provisions of the Clean Air Act Title V program and its Title V permits, and such further necessary or proper relief as may be granted by the Court.

## PRAYER FOR RELIEF

WHEREFORE, based upon the foregoing, the Sierra Club requests that this Court:

1.      Permanently enjoin Defendants from operating the Edwardsport Generating Station, including the construction of future modifications, except in accordance with the Clean Air Act and any applicable regulatory requirements;

2.      Order the Defendants to apply for permits that are in conformity with the requirements of the PSD provisions of the Clean Air Act for each modification which Defendants commenced without first obtaining a PSD permit;

3.      Order the Defendants to remedy their past violations by, *inter alia,* requiring the Defendants to install, as appropriate, the necessary pollution controls to meet best available control technology emission limits;

4.      Order Defendants to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Clean Air Act alleged, above;

5.      Order Defendants to conduct audits of their operations to determine if any additional modifications have occurred which would require them to meet the requirements of PSD and to report the results of these audits to Sierra Club, the United States Environmental Protection Agency, and the Indiana Department of Environmental Management;

6.      Order Defendants to pay civil penalties of $25,000 to $37,500.00 per day for each separate violation of the Clean Air Act, 42 U.S.C. § 7604(g); 40 C.F.R. § 19.4; 74 Fed. Reg. 626 (January 7, 2009), including a beneficial mitigation project pursuant to 42 U.S.C. § 7604(g)(2);

7.      Order Defendants to pay Sierra Club's costs of this case, including reasonable attorneys fees;

- 31 -

8.      Declare that the Defendants were required to obtain a PSD permit for major modifications to the Edwardsport Generating Station;

9.      Declare that that the Edwardsport Generating Station is a modified source for purposes of the Clean Air Act PSD program;

10.     Declare that Boilers 7-1, 7-2 and 8-1 at the Edwardsport Generating Station are subject to best available control technology limits; and

11.     Any other relief that the Court finds just and equitable.

Dated: __May 20__, 2010


McGillivray Westerberg & Bender LLC

  /s/ David C. Bender

David C. Bender
Christa O. Westerberg
305 S. Paterson Street
Madison, WI 53703
Tel. 608.310.3560
Fax 608.310.3561
Email: bender@mwbattorneys.com
          westerberg@mwbattorneys.com


Robert Ukeiley
Admitted Pro Hac Vice
Law Office of Robert Ukeiley
435R Chestnut Street, Ste. 1
Berea, KY 40403
Tel: (859) 986-5402
Fax: (866) 618-1017
Email: rukeiley@igc.org

- 33 -

**Certificate of Service**

I hereby certify that on <u>May 20</u>, 2010, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Robert R. Clark (Terminated) rclark@taftlaw.com, docket@taftlaw.com, malexander@taftlaw.com

Julie L. Ezell julie.ezell@duke-energy.com

John D. Papageorge jpapageorge@taftlaw.com, docket@taftlaw.com, jsimmons@taftlaw.com

Scott R. Alexander salexander@taftlaw.com, docket@taftlaw.com

Jayna Morse Cacioppo jcacioppo@taftlaw.com, akwilosz@taftlaw.com, docket@taftlaw.com

David C. Bender bender@mwbattorneys.com

Christa Westerberg westerberg@mwbattorneys.com

Robert Ukeiley rukeiley@igc.org

/s/ David C. Bender