UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| SIERRA CLUB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:08-cv-437-SEB-TAB |
| | ) | |
| DUKE ENERGY INDIANA, INC., | ) | |
| CINERGY CORP., CINERGY PSI, INC., | ) | |
| PSI ENERGY, INC., and CINERGY | ) | |
| POWER GENERATION SERVICES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND STAYING ENTRY OF FINAL JUDGMENT PENDING THE CONCLUSION
OF AN APPEAL IN A RELATED CASE BEFORE THE SEVENTH CIRCUIT**

This cause is now before the Court on Defendants' Motion for Summary Judgment

[Docket No. 70], filed on October 20, 2009, pursuant to Federal Rule of Civil Procedure

56.  Plaintiff, Sierra Club, brought this action against Defendants, Duke Energy Indiana,

Inc. ("Duke"), Cinergy Corporation, Cinergy PSI, Inc., PSI Energy, Inc., and Cinergy

Power Generation Services, LLC (collectively, "Defendants"), pursuant to Section 304 of

the Clean Air Act ("the CAA"), 42 U.S.C. § 7604, seeking declaratory and injunctive

relief based on the Defendants' alleged violations of the Prevention of Significant

Deterioration ("PSD") provisions of the Act, 42 U.S.C. §§ 7470-92.  Defendants contend

that they are entitled to summary judgment because Plaintiff's claims for civil penalties

are barred by the applicable statute of limitations and Plaintiff's claims for equitable relief

are also barred by the concurrent remedy doctrine.  For the reasons detailed in this entry, we <u>GRANT</u> Defendants' Motion for Summary Judgment.[1]

## **Preliminary Matter**

Before addressing the merits of Defendants' summary judgment motion, the Court must first resolve a preliminary matter raised by Defendants.  The allegations contained in Sierra Club's First Amended Complaint concern nine maintenance projects that had been undertaken at Duke's Edwardsport Generating Station ("Edwardsport") located in Knox County, Indiana.  On October 20, 2009, Defendants filed the instant motion for summary judgment on all the claims contained in the First Amended Complaint.  On May 20, 2010, the Court granted Sierra Club's request for leave to file a Second Amended Complaint, wherein Sierra Club includes three additional projects not previously identified in the First Amended Complaint.  On May 31, 2010, Defendants filed a motion requesting that the Court include the three newly-identified projects within the scope of Defendants' October 20, 2009 Motion for Summary Judgment.  Sierra Club does not object to Defendants' motion.  Accordingly, we <u>GRANT</u> Defendants' Motion to Include Sierra Club's Newly-identified Projects as Being Subject to Duke's Motion for Summary Judgment.[2]

---

[1] In light of our ruling on Defendants' Motion for Summary Judgment, Plaintiff's Motion for Second Motion for Partial Summary Judgment on Emission Increase Test [Docket No. 70] and Motion for Oral Argument [Docket No. 81] are hereby <u>DENIED AS MOOT</u>.

[2] There were also projects in Plaintiff's First Amended Complaint that were not included in the Second Amended Complaint.  The parties have agreed that those projects are no longer a

(continued...)

**Factual Background**

Sierra Club brought this action against Defendants pursuant to Section 304 of the Clean Air Act ("the CAA"), 42 U.S.C. § 7604, seeking declaratory and injunctive relief for Defendants' alleged violations of the Prevention of Significant Deterioration ("PSD") provisions of the CAA, 42 U.S.C. §§ 7470-92.  Sierra Club alleges violations of the CAA in connection with a number of maintenance projects undertaken at Duke's Edwardsport Generating Station ("Edwardsport") located in Knox County, Indiana.[3]  Specifically, Sierra Club alleges that Defendants have modified Edwardsport without obtaining the necessary permits and without subsequently complying with various of the CAA's emissions standards.

### *Background on Regulatory Scheme*[4]

The CAA governs air quality and emissions standards throughout the United States.  Its purpose is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).  Under the CAA, the United States Environmental Protection Agency ("EPA") prescribes national air quality standards, which each state is required to

---

[2](...continued)
part of the instant lawsuit.  Accordingly, the Court will not address them further in this ruling.

[3] The Edwardsport plant houses three coal-fired boilers and one fuel oil-fired boiler that burn fossil fuel to create steam.  These boilers are connected to turbine generators which are powered by the steam, which in turn operates the generators, thereby generating electricity.

[4] We have discussed the regulatory scheme in a prior entry [Docket No. 35] and reiterate it here only to the extent that it applies to the issues now before the Court.

implement by adopting a state implementation plan.  42 U.S.C. § 7409(a)(1)(B).

Specifically at issue in this case is the PSD program, which each state must include in its

implementation plan, and is designed to prevent the deterioration of air quality by

requiring authorization for the construction of any new or modified source of air

pollution.  See 42 U.S.C. §§ 7470-7492; 40 C.F.R. § 51.166; 69 Fed. Reg. 29071.  Prior

to commencing any "major modification," as defined by the CAA, a company must

obtain a permit from the authorizing agency, which is tasked with ensuring that the

modification complies with "best available control technology" ("BACT") emissions

limits.[5]  40 C.F.R. §§ 52.21(i), (j)(3).

Pursuant to the CAA, Indiana was required to promulgate a state implementation

plan in conformity with the PSD program.  42 U.S.C. §§ 7410(a)(2)(C), 7471.  Because

Indiana did not fully comply with this requirement for a number of years, the EPA

imposed a federally administered PSD program for the State during that time.  See 40

C.F.R. §§ 52.793; 46 Fed. Reg. 9580, 9585 (Jan. 19, 1981).  Effective July 19, 2004,

however, the EPA approved Indiana's proposed revised PSD regulations which now

govern the PSD program in Indiana.  The Indiana Department of Environmental

Management ("IDEM") is responsible for overseeing and implementing the regulatory

scheme in Indiana.  326 Ind. Admin. Code § 2-2.  Although Indiana now has an EPA-

---

[5] "Best available control technology" is "an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation . . . emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility."  42 U.S.C. § 7479(3).

approved PSD program, the parties agree that, at all times relevant to this litigation, it did

not, and thus, the State was governed solely by the CAA and the EPA's regulations.

In 1990, Congress added Title V to the CAA, which established an operating

permit program requiring all major stationary sources of air pollution to obtain operating

permits. 42 U.S.C. §§ 7661-7661(f). On August 10, 1994, Indiana submitted its Title V

program to the EPA, and the EPA granted interim approval on November 15, 1995,

followed by a final approval of Indiana's Title V program, retroactive to November 1,

2001. Both the CAA and Indiana's Title V operating permit program require that

applications for Title V permits be complete and include, *inter alia*, citations to and

descriptions of each requirement of the CAA applicable to the source and a plan to bring

into compliance with all requirements any non-compliant source. 42 U.S.C. § 7661b(c);

40 C.F.R. §§ 70.5(a), (c); 326 Ind. Admin. Code §§ 2-7-4. It is also unlawful under the

CAA and Indiana's regulations for any person to violate any requirement of a permit

issued under Title V or to operate a major source except in compliance with a permit

issued under Title V. 42 U.S.C. § 7661a; 40 C.F.R. § 70.7(b); 326 Ind. Admin. Code § 2-

7-3.

### The Eight Projects at Issue

The eight projects undertaken at Edwardsport which form the basis of Plaintiffs'

claims in this litigation were carried out at the Station over eight-plus years, between

March 1993 and October 2001. The descriptions of each of the projects as well as the

approximate dates of their commencement and completion[6] are summarized as follows:

| Project Title | Project Description | Date of Commencement | Date of Completion |
|---|---|---|---|
| Project One | replacement of 20% of the boiler tubes on the 7-1 Boiler[7] | March 1993 | June 1993 |
| Project Two | replacement of the lower arch tubes on the 7-1 Boiler | February 1999 | March 1999 |
| Project Three | replacement of the lower arch tubes on the 7-2 Boiler | March 1999 | April 1999 |
| Project Four | replacement of the induced draft fan on the 7-1 Boiler | May 1993 | June 1993 |
| Project Five | replacement of the fan and fan components of the 8-1 Boiler | September 1993 | December 1993 |
| Project Six | replacement of the south and west furnace walls and sootblowers of the 8-1 Boiler | Late 1999 | Early 2000 |
| Project Seven | installation of weld overlays on the north and east furnace walls of the 8-1 Boiler | September 2001 | October 2001 |
| Project Eight | installation of weld overlays on the tubing in the 7-2 Boiler | June 2001 | July 2001 |

***Duke's Permit Status***

---

[6] There are small discrepancies between the parties' allegations regarding the commencement and completion dates of a few of the projects at issue.  Because these discrepancies do not affect our analysis and we view the facts in the light most favorable to the nonmovant at this stage in the litigation, we have used the dates alleged by Sierra Club.

[7] Edwardsport has three coal-fueled boilers that are referred to as the 7-1 Boiler, 7-2 Boiler, and 8-1 Boiler.  The station also has a fuel-oil boiler that is referred to as the 6-1 Boiler.  Steam from any of these units can be sent to any of Edwardsport's turbines, which are referred to as the Number 6 Turbine, Number 7 Turbine, and Number 8 Turbine.

It is undisputed that Defendants did not obtain preconstruction permits from the EPA or IDEM before undertaking work related to any of the projects at issue in this litigation.[8]  They did obtain a Title V permit for Edwardsport, however.  On November 20, 1996, Defendants submitted their first application for a Title V permit ("the 1996 application").  In that application, the PSD program requirements, including BACT limits, are not listed as applicable requirements for the 7-1, 7-2, and 8-1 Boilers nor is there disclosure of non-compliance or a proposed compliance plan for those boilers contained in the 1996 application.[9]

On August 10, 2004, IDEM issued the first Title V permit for Edwardsport, Permit No. 083-7243-0003 ("the 2004 Permit").  Section B.12 of the 2004 Permit contains a "permit shield," which provides in relevant part as follows:

> [C]ompliance with the conditions of this permit shall be deemed compliance with any applicable requirements as of the date of permit issuance, provided that either the applicable requirements are included and specifically identified in this permit or the permit contains an explicit determination or concise summary of a determination that other specifically identified requirements are not applicable.  The Indiana statutes from IC 13 and rules from 326 IAC, referenced in conditions in this permit, are those applicable at the time the permit was issued.  The issuance or possession of

---

[8] Defendants maintain that they did not need to obtain preconstruction permits because none of the projects at issue in this litigation was a major modification that would have required such a permit.  Sierra Club, on the other hand, contends that each of the projects was in fact a major modification.  We need not address this dispute further at this stage in the litigation, however, because Defendants contend that, even if the projects were major modifications, they are nonetheless entitled to summary judgment on Plaintiffs' claims for the separate reasons set forth in the instant motion.

[9] Duke Energy disputes that PSD requirements apply to boilers 7-1, 7-2, and 8-1 and thus asserts that its alleged omission of PSD requirements in its permit applications is immaterial.

> this permit shall not alone constitute a defense against an alleged violation
> of any law, regulation or standard, except for the requirement to obtain a
> Part 70 permit under 326 IAC 2-7 or for applicable requirements for which
> a permit shield has been granted.

Westerberg Decl. Exh 2, § B.12.  Section B.12 of the 2004 Permit further provides: "No

permit shield shall apply to any permit term or condition that is determined after issuance

of this permit to have been based on erroneous information supplied in the permit

application.  Erroneous information means information that the Permittee knew to be

false, or in the exercise of reasonable care should have been known to be false, at the time

the information was submitted."  Id. § B.12(c).  The 2004 Permit also states that nothing

in the permit alters or affects "[t]he liability of the Permittee for any violation of

applicable requirements prior to or at the time of this permit's issuance."  Id. § B.12(d)(2).

Section B.16 of the 2004 Permit requires that an application for renewal "be submitted

using the application form or forms prescribed by IDEM, OAQ, and shall include the

information specified in 326 IAC 2-7-4."  The permittee is also required to "annually

submit a compliance certification report which addresses the status of the source's

compliance with the terms and conditions contained in [the] permit."  Id. § B.9.

On August 18, 2006, Defendants submitted an application for a revision to the

2004 Permit ("the 2006 Application"), which stated that there were no unpermitted

emission sources at the Edwardsport plant.  Similar to the 1996 application, the 2006

application does not state that the PSD program requirements, including the BACT limits,

are applicable requirements for the 7-1, 7-2, or 8-1 Boilers, nor does it disclose

8

noncompliance or propose a compliance schedule for those requirements.  On March 11,

2008, IDEM issued Permit No. T083-23531-00003, a revision to the 2004 Permit ("2008

Permit Revision").  Sections B.9, B.12, and B.17 in the 2004 Permit and the 2008 Permit

Revision are identical.  On November 7, 2008, Defendants submitted a permit renewal

application for the 2008 Permit Revision ("November 2008 Application").

### *The Instant Litigation*

On April 3, 2003, Sierra Club filed its Complaint in this cause of action, alleging

that Defendants have violated and are continuing to violate various provisions of the

CAA.  On July 14, 2009, Plaintiff filed its First Amended Complaint.  Defendants filed

the instant Motion for Summary Judgment on October 20, 2009.  Sierra Club

subsequently requested and was granted leave to file its Second Amended Complaint on

May 20, 2010.  The motion for summary judgment, by stipulation of the parties, covers

the claims in the Second Amended Complaint.

## Legal Analysis

### I.    Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Disputes concerning material facts are genuine where the evidence is such that a

reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material

fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255.

## II.    PSD Claims

Plaintiff seeks both civil penalties as well as equitable relief for Defendant's alleged failure to comply with various of the CAA's PSD requirements before commencing construction of what Plaintiff alleges were major modifications to the Edwardsport plant.  Defendants argue that they are entitled to summary judgment in their favor on all of these counts because, to the extent Plaintiff seeks civil penalties, its claims are time barred and to the extent Plaintiff seeks equitable relief, those counts are barred by the concurrent remedy doctrine.  We address these arguments in turn.

### A.    Claims Seeking Civil Penalties

Sierra Club alleges that Defendants have violated, and continue to violate, 42 U.S.C. § 7475 and the implementing PSD regulations by having failed to obtain PSD permits (Count I), comply with BACT limits (Count II), and demonstrate that emissions comply with applicable air quality standards (Count III) prior to the construction of what Plaintiff claims were major modifications of the Edwardsport plant.[10]  Defendants argue that Plaintiff's claims for civil penalties based on Defendants' alleged failure to comply with the CAA's PSD requirements are barred by the applicable statute of limitations.

---

[10] As noted above, Defendants contend that the projects at issue in this litigation were not major modifications as defined under the CAA, and thus were not even subject to the PSD requirements.  However, for purposes of this Motion for Summary Judgment, Defendants are not contesting that issue.

10

It is well settled that the general federal five-year statute of limitations set forth in 28 U.S.C. § 2462[11] governs claims brought pursuant to the CAA.  See Nat'l Parks & Conservation Ass'n v. Tennessee Valley Authority (Nat'l Parks 11th Cir.), 502 F.3d 1316, 1322 (11th Cir. 2007), cert. denied, 128 S. Ct. 2958 (2008); United States v. So. Ind. Gas & Elec. Co. (SIGECO), 2002 WL 1760752, at *3 (S.D. Ind. July 26, 2002) (McKinney, C.J.).  Defendants argue that the requirements set forth in the CAA's PSD provisions are solely preconstruction requirements and, as such, any violation of those provisions is not a continuing violation but instead constitutes a single infraction that accrues, at the latest, on the date the construction was completed.  It is undisputed that the construction projects on which Plaintiff's claims are based were all completed more than five years before the instant lawsuit was filed.  Thus, Defendants contend that Plaintiff's claims for civil penalties based on Defendants' alleged failure to comply with the CAA's PSD requirements are barred because they fall outside the limitations period.

Sierra Club, however, argues that its claims are not time-barred because the alleged PSD violations are not one-time, discrete infractions, but rather ongoing

---

[11] The statute provides in relevant part as follows:

Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same time period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462.

violations that continue until the source is brought into compliance with PSD requirements.  Thus, Plaintiff claims that each day Defendants operate the plant at Edwardsport absent a permit and without complying with the other PSD requirements is a new and separate violation.  Because it is undisputed that each of the construction projects on which Plaintiff bases its claims was completed more than five years before Plaintiff filed this lawsuit, the outcome of this portion of Defendants' Motion for Summary Judgment turns on whether the § 7475(a) requirements apply only at the time of the construction or modification of the emitting facility or whether they constitute ongoing operational requirements as well.

The Seventh Circuit Court of Appeals has not directly addressed the issue of whether § 7475 imposes liability not just for the construction, but also for the operation, of a facility that has failed to comply with the PSD requirements.  However, in addressing a separate issue related to the PSD provisions of the CAA, the Seventh Circuit has stated that "it makes sense to conclude that the *last* possible moment at which a [PSD preconstruction] violation occurs is 'when the actual construction is commenced, and not at some later point in time.'" Sierra Club v. Franklin County Power of Ill., LLC, 546 F.3d 918, 928 (7th Cir. 2008) (quoting United States v. Ill. Power Co., 245 F. Supp. 2d 951, 957 (S.D. Ill. 2003)) (emphasis in Franklin County).[12]  Moreover, a number of district

---

[12] In Sierra Club v. Franklin County, the court addressed the issue of whether a PSD permit expired due to the permit holder's failure to commence construction within eighteen months of the permit's issuance.  546 F.3d at 922.

courts in this circuit, including this Court, have considered the identical question at issue in the case at bar and have found that PSD violations are not continuing in nature and accrue no later than the time at which construction is completed.  See, e.g., United States v. Midwest Generation, LLC, 694 F. Supp. 2d 999, 1008 (N.D. Ill. 2010) ("a violation of 42 U.S.C. § 7475 occurs at the time of construction and no later"); United States v. Cinergy Corp., 397 F. Supp. 2d 1025, 1030 (S.D. Ind. 2005) (McKinney, C.J.), appeal docketed, Nos. 09-3344, 09-3350, 09-3351 (7th Cir. Sept. 21, 2009) ("a violation of [the CAA's] preconstruction permit regulations is complete at the time the construction project is completed"); Ill. Power Co., 245 F. Supp. 2d at 957 (holding that a violation of § 7475 or the implementing regulations "occurs at the time of the construction or modification and is not continuing in nature"); SIGECO, 2002 WL 1760752, at *5 (S.D. Ind. July 26, 2002) (McKinney, C.J.) ("a violation of 42 U.S.C. § 7475 occurs when construction is commenced, but does not continue on past the date when construction is completed"); United States v. Murphy Oil USA, Inc., 143 F. Supp. 2d 1054, 1083 (W.D. Wis. 2001) ("[i]t appears that nothing in the statute creates a continuing liability for a facility's failure to obtain a pre-construction permit").

Although this is a question of first impression in our circuit, three of our sister circuits have addressed this issue, with two of the three concluding that PSD obligations are not ongoing.  Compare Sierra Club v. Otter Tail Power Co. (Otter Tail), ___ F.3d ___, 2010 WL 3168434 (8th Cir. Aug. 12, 2010) (finding no ongoing obligations in the CAA's PSD requirements), and Nat'l Parks 11th Cir., 502 F.3d at 1323-25 (finding no ongoing

obligations in Alabama SIP), with Nat'l Parks Conservation Assoc., Inc. v. Tennessee

Valley Authority (Nat'l Parks 6th Cir.), 480 F.3d 410, 416 (6th Cir. 2007) (finding that

PSD regulations in Tennessee SIP impose ongoing duties to obtain a PSD permit and

apply BACT).  Numerous district courts outside of our circuit have also rejected the

continuing violation theory, finding that the statute of limitations on PSD claims tolls no

later than five years after completion of the construction or modification at issue.  E.g.,

United States v. Westvaco Corp., 144 F. Supp. 2d 439, 443 (D. Md. 2001) (holding that

plaintiff was barred "from pursuing civil penalties for claims alleging a failure to obtain

required preconstruction permits more than five years before the lawsuit was filed");

United States v. Brotech Corp., 2000 WL 1368023, at *3 (E.D. Pa. Sept. 19, 2000)

("Violations of the various requirements to obtain construction permits or plan approvals

occur at the time of the construction, modification, or installation of the equipment or

facility.") (citations omitted).

     We agree with the analysis set forth in this line of cases and hold that violations of

the CAA's PSD requirements are discrete infractions governed by the five-year

limitations period, and are not continuing violations.  In making this determination, we

turn first to the language of the statute.  See Middleton v. City of Chicago, 578 F.3d 655,

658 (7th Cir. 2009) ("It is well established that when the statute's language is plain, the

sole function of the courts . . . is to enforce it according to its terms.") (quoting Lamie v.

U.S. Trustee, 540 U.S. 526, 534 (2004)).  Section 7475 of the CAA, which sets forth the

PSD requirements, is titled "Preconstruction Requirements" and provides in relevant part

as follows:

> No major emitting facility . . . may be constructed in any area in which this part applies unless –
>
> (1) a permit has been issued for such proposed facility in accordance with this part setting forth emission limitations for such facility which conform to the requirements of this part;
>
> . . .
>
> (3) the owner or operator of such facility demonstrates, as required pursuant to section 7410(j) of this title, that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess of any (A) maximum allowable increase or maximum allowable concentration for any pollutant in any area to which this part applies more than one time per year; (B) national ambient air quality standard in any air quality control region, or (C) any other applicable emission standard or standard of performance under this chapter; [and]
>
> (4) the proposed facility is subject to the best available control technology for each pollutant subject to regulation under this chapter emitted from, or which results from, such facility . . . .

42 U.S.C. § 7475(a).  The introductory language clearly states that no facility *may be constructed* unless these PSD requirements are met; it is silent as to the subsequent operation of such a facility.[13]  See Otter Tail, 2010 WL 3168434, at *5 (observing that § 7475(a) "unambiguously indicates that the PSD requirements are conditions of construction, not operation").

---

[13] We note also, as the Otter Tail Court recognized, "[t]he language of the CAA's citizen suit provision is similarly limited to construction or modification, for it authorizes suit 'against any person who *proposes to construct or constructs*' a facility without a permit."  2010 WL 3168434, at *5 (quoting 42 U.S.C. § 7604(a)(3)) (emphasis in Otter Tail); accord Nat'l Parks 11th Cir., 502 F.3d at 1323 ("'Operation of' . . . a facility [without a permit] is not articulated as a basis for a violation . . . under either 42 U.S.C. § 7475(a) or § 7604(a)(3).").

Not only does the introductory language of § 7475(a) plainly support the conclusion that the PSD requirements are solely and exclusively conditions of construction, but the fact that separate sections of the CAA clearly establish operational conditions adds additional support to this interpretation.  For example, 42 U.S.C. § 7411(e) provides that it is "unlawful . . . to operate" a facility in violation of the applicable standards of performance.  Title V prohibits "operat[ion] . . . except in compliance with a permit . . . ."  42 U.S.C. § 7661a(a).  It is an accepted principle of statutory construction that when "'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.'" Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 452 (2002) (quoting Russello v. United States, 464 U.S. 16, 23 (1983)).  In line with this principle, because Congress employed plain and specific language regarding operational requirements in other sections of the CAA, but did not include such language in § 7475(a), we conclude that Congress intended that omission and thereby created a distinction between requirements for construction and requirements for operation.  See Otter Tail, 2010 WL 3168434 at *5 ("Where Congress has intended to establish operational conditions under the Clean Air Act, it has clearly said so.  But it has not done so for the PSD program.").

Sierra Club argues that the enforcement provisions of the CAA support its position that there is an ongoing duty to abide by the PSD requirements set forth in § 7475(a), as a condition of operation.  In support of this contention, Plaintiff cites to 40 C.F.R. §

52.21(r)(1), which provides as follows:

> Any owner or operator who constructs or operates a source or modification not in accordance with the application submitted pursuant to this section or with the terms of any approval to construct, or any owner or operator of a source or modification subject to this section who commences construction . . . without applying for and receiving approval hereunder, shall be subject to appropriate enforcement action.

Sierra Club contends that this provision "clearly recognizes that a source must *operate* pursuant to the terms of its PSD permit, and that failure to do so is actionable." Pl.'s Resp. at 14. We agree that the provision requires a source *that has applied for a PSD permit* (or received an approval to construct) to operate pursuant to the terms of that permit (or approval). However, as the <u>Otter Trail</u> Court recently recognized, the first clause of § 52.21(r)(1) does not "establish a freestanding duty to obtain a permit." 2010 WL 3168434, at *6. It is only the second clause of § 52.21(r)(1) that addresses an obligation to procure a PSD permit and that provision ties the duty directly to the commencement of construction, subjecting to enforcement action "any owner or operator of a source or modification subject to this section *who commences construction . . . without applying for and receiving approval.*" § 52.21(r)(1) (emphasis added).

In other words, § 52.21(r)(1) sets forth two separate obligations. It first requires an owner or operator of a facility subject to the PSD requirements to obtain a permit *before commencement of construction*, and second, once a permit is obtained, to subsequently operate in accordance with that permit application. Thus, if Sierra Club were able to show that the modifications at the Edwardsport plant were in fact subject to the PSD

17

requirements, it could establish that Defendants violated § 52.21(r)(1) by failing to obtain

a PSD permit for those modifications at the time of construction.  However, as the plain

language of § 52.21(r)(1) indicates, any such violation necessarily had to have occurred at

the time of construction.  The regulation is silent as to the subsequent operation of a

facility without the operator having had submitted a permit application.  The only

continuing operational duty § 52.21(r)(1) references is the obligation to operate in

accordance *with the permit application submitted*.  Because Defendants in our case never

submitted a PSD permit application, they cannot be found to be operating on a continuing

basis in violation of their permit application because no such permit exists with which the

facility can comply.  See Otter Tail, 2010 WL 3168434, at *6 ("[W]hile [the defendant]

may have violated § 52.21(r)(1) by failing to apply for PSD permits in the first place, it

does not continue to do so by failing to comply with a hypothetical set of operational

parameters that would have been developed through the permitting process.").

Accordingly, a plain reading of § 52.21(r)(1) is consistent with our conclusion that the

requirements set forth in § 7475(a) are solely conditions of construction.

Sierra Club also argues that, even if we find that the obligation to obtain a PSD

permit is a one-time requirement, a facility's duties to employ BACT limits, pursuant to §

7475(a)(4), and to demonstrate that the facility's emissions will be in compliance with

applicable air pollution standards, pursuant to § 7475(a)(3), are ongoing and extend

beyond the construction stage to subsequent operation.  Thus, Plaintiff contends that,

even if we rule that Count I is untimely, Counts II and III, which allege violations of §

18

7475(a)(4) and § 7475(a)(3), respectively, are not barred by the five-year statute of limitations. For the reasons detailed below, we disagree with this alternative theory.

Initially, we note that these requirements, to wit, the requirement to obtain a PSD permit as well as the duties to include a BACT determination and a source impact analysis in the PSD permit, are all set out together in the same section of the CAA as "preconstruction requirements." As discussed above, the CAA provides only that, unless these requirements are met, "[n]o major emitting facility . . . *may be constructed*." 42 U.S.C. § 7475(a) (emphasis added). It says nothing with regard to the subsequent operation of the facility. Thus, this language supports the interpretation that the BACT limits and source impact analysis requirements are tied to the preconstruction permitting process.

The implementing federal regulations further support this interpretation.[14] For example, with regard to the BACT requirement, 40 C.F.R. § 52.21(j)(3) provides that any major modification "shall apply best available control technology for each regulated NSR pollutant for which it would result in a significant net emissions increase at the source." Plaintiff contends that this language establishes that a facility has an ongoing obligation to apply BACT limits. However, Plaintiff's argument overlooks the remainder of that subsection, which provides that the BACT requirement "applies to each *proposed*

---

[14] The Indiana SIP largely tracks the language set forth in the federal regulations, and thus, we need not engage in a detailed analysis of its provisions. However, we note the instances in which the parties have addressed relevant differences.

emissions unit" (emphasis added).  As the Eighth Circuit recognized in <u>Otter Tail</u>, when read in context, § 52.21(j)(3) "shows that the command to apply BACT is not a freestanding requirement," but rather a requirement "tied specifically to the construction process."  <u>Otter Tail</u>, 2010 WL 3168434, at *7.  Similarly, subsection (k) of the implementing regulations, which addresses the source impact analysis requirement, provides that it applies to "the *proposed* source or modification," and that the owner or operator must demonstrate that any emission increases from the proposed source or modification "*would not* cause or contribute to air pollution" in violation of any applicable limits.[15]  § 52.21(k) (emphasis added).  Moreover, the introductory language of § 52.21 provides that "paragraphs (j) through (r) of this section apply to the *construction* of any new major stationary source or the *major modification* of any existing major stationary source . . . ."  § 52.21(a)(2)(ii) (emphasis added).  Missing entirely is any reference to the subsequent operation of the facility.[16]

For the foregoing reasons, we hold that if Defendants violated any of the § 7475(a) PSD requirements by failing to obtain a PSD permit, apply BACT limits, or conduct a

---

[15] As Plaintiff highlights, the Indiana SIP provides that the owner or operator of a proposed source or major modification must demonstrate that emission increases "will not" cause or contribute to air pollution in violation of applicable standards.  326 Ind. Admin. Code § 2-2-5(a).  However, this variation in wording does not alter our analysis.

[16] It is true, as Plaintiff contends, that PSD permits establish emissions limits and thus do implicate operations.  However, the fact that the preconstruction process in some cases may set forth regulations that affect the facility's subsequent operation "does not necessarily mean that such parameters are enforceable independent of the permitting process."  <u>Otter Tail</u>, 2010 WL 3168434, at *8 (citing <u>Nat'l Parks 11th Cir.</u>, 502 F.3d at 1323).

source impact analysis, any such violation was by law a one-time infraction that accrued at the time of construction or modification of the Edwardsport plant. Accordingly, because each of the major modifications referenced in Plaintiff's Counts I, II, and III was commenced more than five years before the initiation of the instant lawsuit, Plaintiff's claims for civil remedies on Counts I, II, and III are barred by the applicable limitations period.[17]

### B.     Equitable Relief

Plaintiff also seeks equitable relief for Defendants' alleged violations of the PSD requirements of the CAA. The statute of limitations set forth in 28 U.S.C. § 2462 applies by its express terms only to claims for "any civil fine, penalty, or forfeiture," and thus, does not bar Sierra Club's claims for equitable relief. Defendants maintain, however, that Plaintiff's equitable claims are nevertheless barred by the concurrent remedy doctrine. The concurrent remedy doctrine holds that "equity will withhold its relief in such a case where the applicable statute of limitations would bar the concurrent legal remedy." Cope v. Anderson, 331 U.S. 461, 464 (1947). Under Seventh Circuit law, where "the sole remedy is not in equity and an action at law can be brought on the same facts, the remedies are concurrent for purposes of the [concurrent remedy doctrine] even though more effective relief would be available in equity." Nemkov v. O'Hare Chicago Corp.,

---

[17] Because Plaintiff's claims alleging that Defendants violated the PSD requirements set forth in the CAA fail for the reasons detailed above, Defendants are likewise entitled to summary judgment on Plaintiff's request for declaratory relief on these same claims.

592 F.2d 351, 355 (7th Cir. 1979).  In other words, "[t]he inquiry is not whether a

plaintiff could obtain the same relief at law; rather, it is whether the statute relied on

requires the plaintiff to seek relief only in equity."  Id. at 354 (citations omitted).

It is clear that the CAA does not require a plaintiff to seek relief only in equity, nor

is Plaintiff's sole remedy in equity, as evidenced by the fact that Plaintiff seeks both

equitable relief and relief at law for Defendants' alleged violations of the statute.

Moreover, Plaintiff's claims for civil penalties are based on the same set of facts as its

claims for equitable relief, to wit, Defendant's alleged violations of the CAA's PSD

requirements.  Accordingly, because Plaintiff's claims for civil penalties are barred by the

applicable statute of limitations, we hold that the concurrent remedy doctrine serves as a

bar to Plaintiff's equitable claims brought on the same facts.[18]  See Otter Tail, 2010 WL

---

[18] We recognize that in United States v. Cinergy Corp., Judge McKinney reached a different conclusion on this issue, finding that, while the plaintiff's claims based on defendant's alleged failure to comply with the PSD requirements were barred by the five-year statute of limitations, the plaintiff's equitable claims on the same facts were not similarly time barred. 397 F. Supp. 2d at 1031-32.  However, in determining that the concurrent remedy doctrine did not act to bar the equitable claims in Cinergy, Judge McKinney relied primarily on the fact that the United States was the plaintiff in that suit.  It is well-established that the concurrent remedy doctrine does not apply to suits brought by the United States in its official enforcement capacity. Id. at 1032 (citing E.I. Dupont De Nemours & Co. v. Davis, 264 U.S. 456, 462 (1924)).  While we wholly agree with Judge McKinney's analysis regarding the government exception, because the United States is not involved in the instant dispute, that exception does not apply to the case at bar.

Alternatively, Judge McKinney suggested that, even if the government exception to the concurrent remedy doctrine had not applied, the civil remedies and equitable relief at issue in that case were nonetheless not concurrent because "they have different goals and effects." Id. We respectfully disagree with this part of his analysis.  As discussed above, our understanding of the doctrine is that it is not the nature of the remedy that is determinative, but rather whether the equitable relief is available on the same set of facts as a time barred legal remedy that determines whether the concurrent remedy doctrine applies.  See Nemkov, 592 F.2d at 354-55.  Thus, we

(continued...)

3168434, at *8-9 (holding that "because [the plaintiff's] PSD civil penalty claims are barred by the statute of limitations, the equitable remedies it seeks under those causes of action are barred as well"); Nat'l Parks 11th Cir., 502 F.3d at 1327 (finding that "the civil penalties and equitable relief sought . . . are concurrent because an action at law or equity could be brought on the same facts") (internal quotation and citation omitted).

## III.   Title V Claim

In Count IV of its Second Amended Complaint, Sierra Club seeks relief for Defendants' alleged violations of the CAA's Title V program and the implementing regulations.  Specifically, Plaintiff alleges that Defendants failed "to apply for and obtain a Title V permit that contained all of the applicable requirements for the Edwardsport Generating Station and [failed] to provide other specific information that may be necessary to implement and enforce applicable requirements . . . ."  Second Am. Compl. § 140.  Sierra Club further alleges that Defendants violated the Title V permit issued for the Edwardsport plant on August 10, 2004, and the revised Title V permit issued on March 11, 2008, by submitting Title V permit applications on November 21, 1996 and August 18, 2006, which contained false certifications of compliance with applicable air pollution requirements and failed to identify applicable PSD requirements or provide a schedule of compliance to bring Edwardsport's boilers in compliance with the CAA.  Id. § 141.

---

[18](...continued)
find that the doctrine acts to bar equitable relief here because legal remedies albeit time-barred were available to vindicate the same rights for which Plaintiff was seeking relief in equity.

Finally, Sierra Club alleges that Defendants have "continuously fail[ed] to supplement or otherwise correct information submitted with the Title V permit application that was incorrect," in violation of 40 C.F.R. § 70.5(b).  Id. § 142.

Defendants maintain that Count IV constitutes an impermissible collateral attack on their Title V permits because Sierra Club is alleging that the Title V permits themselves are defective due to Defendants having submitted incomplete or inaccurate applications to secure them.  Defendants contend that, in order to obtain judicial review of this issue, such a claim must have first been raised administratively, under 42 U.S.C. § 7661d, during the period when IDEM and the EPA were reviewing Defendants' permit applications.

Title V sets forth its own provisions for challenging a Title V permit, which state as follows:  If a Title V application does not comply with a requirement of the CAA, the EPA is required to object to the issuance of the permit.  42 U.S.C. § 7661d(b)(1).  If it does not object, any person may petition the EPA to do so.  Id. § 7661d(b)(2).  If the EPA denies the petition requesting it object to the permit issuance, such denial is subject to the judicial review provisions of 42 U.S.C. § 7607, which provide in relevant part that a petition for review of the EPA's denial of a petition to object must be filed in the United States Court of Appeals for the circuit in which the action arose.  Id.  The CAA specifically provides that private parties are prohibited from seeking judicial review in a civil enforcement proceeding of an action of the EPA, if that action could have been reviewed pursuant to § 7607(b)(1).  See 42 U.S.C. § 7607(b)(2) ("Action of the

Administrator with respect to which review should have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement.").

Although Sierra Club contends that it is alleging that Defendants are operating in violation of their Title V permit, their allegations in fact focus solely on alleged omissions in Defendants' applications and defects in the permitting process.  In other words, Plaintiff is alleging no more than that the Title V permit obtained by Defendants omitted applicable requirements of the CAA.  Such a claim could have and should have been raised during the administrative review process, but Plaintiff never challenged Defendants' Title V permit applications during the permitting process.  Accordingly, Count IV does, indeed, constitute an impermissible collateral attack on Defendants' facially valid Title V permit, as Defendants contend, and we do not have jurisdiction to grant relief on this claim.  See Otter Tail, 2010 WL 3168434, at *9-13; BP Amoco Chem. Co. v. Flint Hills Resources, LLC, 615 F. Supp. 2d 765, 776 (N.D. Ill. 2009) (citing Nat'l Parks 11th Cir., 502 F.3d at 1326; United States v. AM Gen. Corp., 34 F.3d 472 (7th Cir. 1994)).

## IV.    Conclusion

For the reasons detailed in this entry, we GRANT Defendant's Motion for Summary Judgment in its entirety.  However, we hereby STAY entry of final judgment pending the ruling of the Seventh Circuit Court of Appeals in United States v. Cinergy Corporation, 397 F. Supp. 2d 1025 (S.D. Ind. 2005), appeal docketed, Nos. 09-3344, 09-

3350, 09-3351 (7th Cir. Sept. 21, 2009), as that appeal addresses the application of the

statute of limitations to the plaintiff's claims that the defendant violated the PSD

requirements of the CAA.

IT IS SO ORDERED.


Date: _____


SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Scott R. Alexander
TAFT STETTINIUS & HOLLISTER LLP
salexander@taftlaw.com

David C. Bender
MCGILLIVRAY WESTERBERG & BENDER LLC
bender@mwbattorneys.com

Jayna Morse Cacioppo
TAFT STETTINIUS & HOLLISTER LLP
jcacioppo@taftlaw.com

Robert R. Clark
TAFT STETTINIUS & HOLLISTER LLP
rclark@taftlaw.com

Julie L. Ezell
DUKE ENERGY LEGAL DEPARTMENT
julie.ezell@duke-energy.com

John D. Papageorge
TAFT STETTINIUS & HOLLISTER LLP
jpapageorge@taftlaw.com

Robert  Ukeiley
LAW OFFICE OF ROBERT UKEILEY
rukeiley@igc.org

Christa Westerberg
McGILLIVRAY WESTERBERG & BENDER LLC
westerberg@mwbattorneys.com